**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

FILED

Name  McClure, Wilbur

    (Last)        (First)       (Initial)

Prisoner Number  C-50493

Institutional Address  CTF, O.O. Box 689, Soledad, CA., 93960-0689

---

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

WILBUR MCCLURE

(Enter the full name of plaintiff in this action.)

vs.

Ben Curry,

Warden.

(Enter the full name of respondent(s) or jailor in this action.)

CV  08  3959

Case No. _____

(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

CW

(PR)

E-filing

---

**Read Comments Carefully Before Filling In**

**When and Where to File**

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

**Who to Name as Respondent**

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now __and__ the Attorney General of the state in which the judgment you seek to attack was entered.

**A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE**

1. What sentence are you challenging in this petition?

    (a)    Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

    <u>L.A.Co.Superior Court</u>         <u>Los Angeles</u>
    Court                                Location

    (b)    Case number, if known <u>A811397</u>

    (c)    Date and terms of sentence <u>7 to Life</u>

    (d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>XXX</u>    No _____

    Where?

    Name of Institution: <u>Correctional Training Facility</u>

    Address: <u>P.O. Box 689, Soledad, CA. 93960-0689</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>Kidnap Robbery, P.C.§§209(b), 667.5(b)</u>

_____

_____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

Arraignment:                     Yes __xx__     No _____

Preliminary Hearing:             Yes __xx__     No _____

Motion to Suppress:              Yes _____     No _____

4. How did you plead?

Guilty _____   Not Guilty __xx__   Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury __xx__     Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?        Yes __xx__     No _____

7. Did you have an attorney at the following proceedings:   xx

(a)   Arraignment              Yes __xx__     No _____

(b)   Preliminary hearing      Yes __xx__     No _____

(c)   Time of plea             Yes __xx__     No _____

(d)   Trial                    Yes __xx__     No _____

(e)   Sentencing               Yes __xx__     No _____

(f)   Appeal                   Yes __xx__     No _____

(g)   Other post-conviction proceeding   Yes _____   No _____

8. Did you appeal your conviction?       Yes __xx__     No _____

(a)   If you did, to what court(s) did you appeal?

Court of Appeal                Yes __xx__     No _____

Year: __?__        Result: __AFFIRMED_____

Supreme Court of California    Yes _____     No _____

Year: _____     Result: _____

Any other court                Yes _____     No _____

Year: _____     Result: _____

(b)   If you appealed, were the grounds the same as those that you are raising in this

petition?                                     Yes _____    No _XX___

(c)    Was there an opinion?                  Yes _____    No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                              Yes _____    No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?        Yes _____    No_____

     [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition. You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following

        questions for each proceeding. Attach extra paper if you need more space.

    I.    Name of Court: _____

        Type of Proceeding: _____

        Grounds raised (Be brief but specific):

        a._____

        b._____

        c._____

        d._____

        Result: _____Date of Result:_____

    II.   Name of Court: _____

        Type of Proceeding: _____

        Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____Date of Result:_____

6    III.    Name of Court: _____

7           Type of Proceeding: _____

8           Grounds raised (Be brief but specific):

9           a._____

10          b._____

11          c._____

12          d._____

13          Result: _____Date of Result:_____

14   IV.    Name of Court: _____

15          Type of Proceeding: _____

16          Grounds raised (Be brief but specific):

17          a._____

18          b._____

19          c._____

20          d._____

21          Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                           Yes _xx_    No_____

24   Name and location of court: NORTHERN DISTRICT OF CAL._____

25   B. GROUNDS FOR RELIEF

26          State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27   support each claim.  For example, what legal right or privilege were you denied?  What happened?

28   Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

6   _____

7   Supporting Facts:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

8   _____

9   _____

10  _____

11  Claim Two:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

12  _____

13  Supporting Facts:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

14  _____

15  _____

16  _____

17  Claim Three:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

18  _____

19  Supporting Facts:___SEE ATTACHED WRIT OF HABEAS CORPUS_____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    _____SEE ATTACHED MEMORANDUM OF POINTS AND_____

5    _____AUTHORITIES_____

6    _____

7    Do you have an attorney for this petition?              Yes_____    No _XX_

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on  _8 - 12 - 08_                    Wilbur Lynn McClose

14                     Date                              Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS              - 7 -

# EXHIBIT "A"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | 11-13-07 | | | |
|-------|----------|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J.DITTMER | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH 004785<br>In re,<br>WILBUR McCLORE.,<br>Petitioner,<br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAUS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on July 13, 2007, by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that the Petitioner presents an unreasonable risk of danger to society and is unsuitable for parole. Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

The Petitioner was received in the Department of Corrections on April 6, 1987, after a conviction for kidnap for robbery and assault with a deadly weapon. He was sentenced to life with the possibility of parole, plus one year. His minimum parole eligibility date was April 4, 1993.

The record reflects that on November 25, 1985, the Petitioner's accomplice, armed with a gun, approached the victim, Krispi Boucher, in a parking lot and demanded her money and her purse. When the victim told him that she did not have her purse, he hit her in the face and forced her into the passenger seat of her car. The victim then told the Petitioner's accomplice that her purse was in the trunk of the car and gave him her keys. After retrieving the victim's purse, the Petitioner's accomplice pushed her into the back seat of the car and got into the driver's seat. The Petitioner got into the passenger seat. While they were driving, the Petitioner took the victim's jewelry. Then, both men forced the victim to purchase clothing and shoes for them. Afterward, they released the victim on the side of a freeway and drove away.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on January 4, 2007. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense and his previous record of violence.

The Court finds that there is some evidence to support the Board's findings that the offense was carried out in a dispassionate and calculated manner and that the motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15,§2402, subd. (c)(1)(B) and (c)(1)(E). The Petitioner and his accomplice approached the victim with the intent of robbing her at gunpoint. Despite the victim's cooperation in giving them her purse and money and her pleas that they take the car and leave her, they forced her to drive with them, ripped her jewelry off of her, and then forced her to purchase clothing and shoes at the store. These actions were deliberate, planned, dispassionate and calculated. Also, the motive of obtaining money, jewelry and clothes was very trivial in relation to the kidnapping and robbery.

1

| Minutes Entered |
|-----------------|
| 11-13-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**DEPT 100**

| Date: | 11-13-07 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J.DITTMER | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

| | | (Parties and Counsel checked if present) | |
|---|---|---|---|
| | BH 004785 | | |
| | In re, | | Counsel for Petitioner: |
| | WILBUR McCLORE., | | |
| | Petitioner, | | Counsel for Respondent: |
| | On Habeas Corpus | | |

The Court also finds that there is some evidence to support the Board's finding that the Petitioner has a previous record of violence. Cal. Code Regs., tit. 15,§2402, subd. (c)(2). The Petitioner was previously convicted of assault with a deadly weapon for hitting another woman with a telephone.

The Board also considered the Petitioner's 115 for fighting in 1994 and the fact it considered his parole plans to be unrealistic. While these factors may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15,§2402(b).

The Board also considered the Petitioner's post-conviction gains, however, they still concluded that the Petitioner would pose and unreasonable threat to public safety. Penal Code §3041(b). The Court finds that there is some evidence to support this determination because of the nature of his commitment offense and his previous record of violence.

The Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The Board must articulate reasons that justify a postponement, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for two years, because of the nature of this commitment offense; his previous record of violence; and his need to develop more insight into his offense. These reasons were sufficient to justify a two-year denial.

The Court finds that the Petitioner's argument that he received ineffective assistance of counsel at his hearing is without merit. In order to prevail on a claim of ineffective assistance, the Petitioner must show that a reasonable probability exists that, but for the counsel's failings, the result would have been more favorable to the defendant. See In re Resendiz (2001) 25 Cal.4th 230,239. Here, it is clear that the Board would have come to the same conclusion, based on the factors discussed above, regardless of any inaction by the Petitioner's attorney.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

2

| Minutes Entered |
|---|
| 11-13-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | 11-13-07 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J.DITTMER | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004785
In re,
WILBUR McCLORE.,
            Petitioner,
    On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:


Wilbur McClore
C-50493
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice-State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

3

| Minutes Entered |
|---|
| 11-13-07 |
| County Clerk |

# EXHIBIT "B"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL  SECOND DIST.

**FILED**

MAR 20 2008

JOSEPH A. LANE                    Clerk

V. GRAY
                              Deputy Clerk

In re

WILBUR McCLORE,

on

Habeas Corpus.

B206230

(Los Angeles County
Super. Ct. No. A811397)
(Steven R. Van Sicklen, Judge)

ORDER

BY THE COURT:

The petition for writ of habeas corpus, filed March 6, 2008, has been read and considered. The request for appointment of counsel is denied. The petition is denied. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071; *In re Rosenkrantz* (2002) 29 Cal.4th 616.)

# EXHIBIT "C"

Court of Appeal, Second Appellate District, Div. 3 - No. B206230
**S162615**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re WILBUR MCCLORE on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

JUN 1 1 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**
Chief Justice

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


Wilbur McClure,

     Petitioner,

        v.                     Case No.

Ben Curry, Warden,

     Respondent.           **PROOF OF SERVICE**

_____/


     I hereby certify that on         , I served a copy of
the attached PETITION FOR WRIT OF HABEAS CORPUS, by placing a
copy in a postage paid envelope addressed to the person(s)
hereinafter listed, by depositing said envelope in the United
States Mail at Soledad, California, 93960-0689.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

450 Golden Gate Ave

Box 36060

San Francisco, CA.

94102

     I declare under penalty of perjury that the foregoing is
true and correct.


_____

Wilbur McClure, C-50493

Correctional Training Facility

P.O. Box 689 / B-Wing, 217L

Soledad, CA. 93960-0690

Petitioner in Pro Se

1

<strong>TABLE OF CONTENTS</strong>

2

<u>Topic</u>                                                                  <u>Pages</u>

3

Index .........................................i,ii

4

Points and Authorities .........................iii,iv,v,vi

5

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

6
7
8

PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY INTEREST IN THE EXPECTATION OF PAROLE UNDER PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME OF INCARCERATION.

.................................1

9

A. EXISTENCE OF A LIBERTY INTEREST

.................................1

10

B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY

.................................4

11

<u>GROUND ONE</u>:

12
13

THE BOARD'S DECISION TO DENY PAROLE IS OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY "SOME EVIDENCE" CONTAINING AN INDICIA OF RELIABILITY.

.................................5

14

<u>GROUND TWO</u>:

15
16
17
18
19

THE BOARD'S FINDING OF UNSUITABILITY AND REFUSAL OF THE GRANTING OF PAROLE VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE" IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

.................................8

20
21
22
23

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT PETITIONER POSES AN "UNREASONABLE RISK" OF THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE. THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBI- TRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL DUE PROCESS.

.................................11

24
25
26

B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT PROHIBITS STATE ACTION THAT DEPRIVES A PERSON OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW.

.................................15

<u>GROUND THREE</u>:

27
28

THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY RELYING ON THE UNCHANGING FACTS OF THE CRIME IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION,

-i-

## TABLE OF CONTENTS (continued)

Topic                                                                 Pages

(GROUND THREE cont.)
        AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
        BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
        EGREGIOUSNESS    IS    BARRED    BY    THE    INMATES
        COMPLIANCE WITH THOSE AGREED TERMS.
                ..................................16
    A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
       THE CRIME VIOLATES DUE PROCESS.
                ..................................18
    B. CONTINUED RELIANCE UPON FACTS OF THE CRIME
       VIOLATES DUE PROCESS.
                ..................................22
    C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
       UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
       AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
       OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
       WHO NO LONGER POSE A PUBLIC DANGER.
                ..................................25
    D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
       N PAROLE DECISIONS.
                ..................................27
    E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY
       HEARING.
                .................................. 28
CONCLUSION      .................................. 30
PRAYER FOR RELIEF  .................................. 31

## EXHIBITS

"A" Abstract of Judgement

"B" B.P.H. Hearing Transcripts and Decision of January 4, 2007.

"C" BPT Decision of Sept. 12, 2005, BPT Decision of Oct. 23, 2003,
    BPT Decision of July 18, 2002, BPT Decision of June 7, 2001.

"D" Psychological Evaluation Report of Oct. 7, 2003 and May 13,
    1999.

"E" Laudatory Chronos and Certificate of Achievements.

1

## POINTS AND AUTHORITIES

2

Name/Title

3

In re Bramble
(1947) 31 Cal.2d 43, 51 [6] P.2d 411

4

People v. Stuart
(1956) 47 Cal.2d 167, 175 [7] 302 P.2d 5, 55 A.L.R.2d 705

5

6

People v. Smith
(1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33

7

In re McVickers
(1946) 29 Cal.2d 264, 278, 176 P.2d 40

8

9

People v. Valentine
(1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1

10

People v. Ralph
(1944) Cal.2d 575, 581 [2] 150 P.2d 401

11

12

Biggs v. Terhune
(9th Cir. 2003) 334 F.3d 910, 914, 915,916

13

In re Ramirez
(2001) 94 Cal.App.4th 549, 564-565, 571

14

15

Edward v. Balisok
(1997) 520 U.S 541, 648

16

In re Caswell
92 Cal.App.4th 1017, 1029

17

18

People v. Dubon
90 Cal.App.4th 949, 952, (2001)

19

Charlton v. Federal Trade Comm.
543 F.2d 903-907, 908 (D.C. Cir. 1976)

20

21

McQuillion v. Duncan
306 F.3d 901-910, (9th Cir. 2002)

22

In re Smith
109 Cal.App.4th 489 (2003)

23

24

Kentucky Dept of Corrections v. Thompson
490 U.S. 454, 459-460 (1989)

25

Board of Pardons v. Allen
(1987) 482 U.S. 369, 376-78

26

27

Greenholtz v. Inmates of Neb. Penal & Corr. Complex
(1979) 442 U.S. 1, 11-12

28

-iii-

POINTS AND AUTHORITIES (continued)

Name/Title

U.S. v. Guagliardo
275 F.3d 868-872, (9th Cir. 2002)

Graynet v. City of Rockford
408 U.S. 104, 108-109 (1972)

Irons v. Warden
358 F.Supp.2d 936 (E.D. Cal. 2005)

In re Scott
34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595

Shaputis
37 Cal.Rptr.3d at 335

In re Rosenkrantz
29 Cal.4th at 654-661

In re Smith
114 Cal.App.4th 343, 370,372

Caswell v. Calderon
363 F.3d 832, 389 (9th Cir. 2004)

Scott
119 Cal.4th at 899

Scott
133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920

Superintendent v. Hill
472 U.S 445, 455-457 (1985)

In re Minnis
(1972) 7 Cal.3d 639, 643, n.2

People v. Morse
(1964) 60 Cal.2d 631, 643, n.8

Masoner
2004 WL1090177 *1-2

Bair
2005 WL2219220 *12 n.3

Williams v. State of New York
(1949) 337 U.S. 241, 247

Sass v. Calif. Board of Prison Terms
376 F.Supp.2d (E.D. Cal. 2005)

1          <u>POINTS AND AUTHORITIES</u> (continued)

2    <u>Title/Name</u>

3    In re Lee
     49 Cal.Rptr.3d 931
4
     In re Elkins
5    50 Cal.Rptr.3d 503

6    Rosenkrantz v. Marshall
     774 F.Supp.2d, 1063 (C.D. Cal. 2006)
7
     Blankenship v. Kane,
8    2006 WL5215627 *3 (N.D. Cal. 2006)

9    Murille v. Perez
     2005 L2592420 *3n.1. (C.D. Cal. 2005)
10
     Siafullah v. Carey
11   2005 WL1555389 *8 (E.D. Cal. 2005)

12   Superintendent Steve Lomas Hill
     472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985)
13
     Rojas v. Neilson
14   428 F.3d 1229, 1232, (9th Cir. 2005)

15   Sanchez v. Kane,
     444 F.Supp.2d 1049 (C.D.Cal. 2006)
16
     Delgado v. Lewis
17   233 F.3d 976, 982 (9th Cir. 2000)

18   Pham v. Terhune
     400 F.3d 740, 742 (9th Cir. 2005)
19
     Hines v. Thompson
20   336 F.3d 848, 853 (9th Cir. 2003)

21   Pirtle v. Morgan
     313 F.3d 1160 , 1167 (9th Cir. 2002)
22
     Powell v. Gomez
23   33 F.3d 39, 40

24   Earp v. Oronski
     (9th Cir. 2003) 372 U.S. 293 (1963)
25
     Keeney v. Tamaya-Reyes
26   504 U.S. 1, 5 1992

27   Taylor v. Maddox
     (9th Cir. 2004) 336 F.3d 992, 1001.
28

                              -v-

<u>POINTS AND AUTHORITIES</u> (continued)

<u>Title/Name</u>

In re Lawrence
(May 22, 2007) Cal.Rptr.3d WL1475283

In re Elkins
(2006) 144 Cal.App.4th 475, 487

In re Lee
(2006) 143 Cal.App.4th 1400, 1408

In re Barker
May 29, 2007, DJDAR 7548

Martin v. Marshall
431 F.Supp.2d at p.1047

CCR, Title 15, Division 2
    §2000(b)(49)
    §2000(b)(62)(90)
    §2402
    §2402(a)(b)

Penal Codes
    §3041
    §3041(a)
    §3041(b)

Evidence Code
    §115

California Constitution, Article V
    §8(b)

## MEMORANDUM OF POINTS AND AUTHORITIES

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY INTEREST IN THE EXPECTATION OF PAROLE UNDER PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME OF INCARCERATION.**

The due process clause of the 5th and 14th Amendment prohibits a state action that deprives a person of life, liberty or property without due process.

However, a person alleging such a violation must establish that (a), he had protection; (b) that he was deprived of such a protection; and, (c) that the procedure which led to the deprivation was constitutionally deficient. <u>Kentucky Dept. of Corrections v. Thomas</u>, 490 U.S .459-460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900 (9th Cir. 2002).

### A. EXISTENCE OF A LIBERTY INTEREST.

The Supreme Court held in 1979, and reiterated in 1987 that, "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and then, thereby, gives rise to a constitutionally protected 'Liberty Interest'". <u>McQuillion v. Duncan</u>, <u>supra</u>, 306 F.3d at 901, (citing <u>Greenholtz v. Nebraska Penal Institute</u>, 442 U.S. I, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

Recently, our Ninth Circuit has "held" that California's parole scheme created such a liberty interest because Penal Code §3041 uses mandatory language and is similar to the Nebraska and Montana statues addressed in <u>Greenholtz</u>, <u>supra</u>, and

-1-

1  Allen, supra. (See McQuillion, supra, 306 F.3d at 901-901).

2  Not only did the Ninth Circuit hold that "Section 3041 of

3  the Penal Code creates in every inmate a cognizable liberty

4  interest in parole which is protected by the procedural

5  safeguards of the due process clause," but further held that

6  "the interest arises upon the incarceration of the inmate."

7  Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

8  Two United States Supreme Court decisions, Greenholtz v.

9  Inmates of Nebraska Penal and Correctional Complex, (1979) 442

10 U.S. 1, 12, decided in 1979 and Board of Pardons v. Allen,

11 (1987) 482 U.S. 369, 381, decided in 1987, held the Federal Due

12 Process Clause creates a constitutional liberty interest for

13 convicted persons in certain jurisdictions. The existence of

14 this right depends on whether the state employs "mandatory

15 language" indicating parole will be granted if certain findings

16 are made, Board of Pardons v. Allen, supra, 482 U.S. at pages

17 377-381. In 2002 the Ninth Circuit examined the California

18 parole scheme in MQuillion v. Duncan, (9th Cir. 2002) 306 F.3d

19 895 and found it "uses mandatory language and is largely

20 parallel to the schemes found in Greenholtz and Allen,"

21 McQuillion v. Duncan, supra, 306 F.3d at page 901. Accordingly,

22 the McQullion court found a "liberty interest" was created under

23 the federal constitution for state prisoners in California,

24 McQullion v. Duncan, supra, 306 F.3d at page 901.

25 While it is true post McQuillion, the California Supreme

26 Court had occasion to visit and decide in In re Dannenberg that

27 "life" prisoners did not have a liberty interest in the

28 expectation that the Board of Parole Hearings would engage in

-2-

"uniform term" analysis under Penal Code §3041(a) <u>if</u> it demonstrated that public safety warranted denial of parole under §3041(b). That court <u>did not</u> hold, however, that there is <u>no</u> protected liberty interest in parole whatsoever. Indeed, California courts have continued to analyze such claims. See <u>In re Shaputis</u>, 135 Cal. App. 4th, 217, 224, 231-232, Cal.Rptr.3d 324 (citing <u>Dannenberg</u>); <u>In re Scott</u>, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905 (2005); <u>In re Lee</u>, 49 Cal.Rptr.3d 931; <u>In re Elkins</u>, 50 Cal.Rptr.3d 503; <u>In re Lawrence</u>, (May 22, 2007), Cal.Rptr.3d WL1475283. Post <u>Dannenberg</u>, even federal courts have uniformly, save one District court decision (Eastern District of California), which seemingly reversed itself in its very next case, [see <u>Sass v. California Board of Prison Terms</u>, 376 F.Supp.2d, 975, 982 (E.D. Cal. 2005), which was recently overrulled by the Ninth Circuit in <u>Sass v. Board of Prison Terms</u> 376 F.Supp.2d, 975, 982, (9th Cir. 2006), and is currently under appeal. (See and compare <u>Sass</u>, <u>supra</u>, to <u>Bair v. Folsom State Prison</u>, 2005 WL2219110 fn.3 (E.D. Cal. 2005), Report and Recommendations adopted by 2005 WL3081634 fn.1 (E.D. Cal. 2005).], have followed the reasoning in <u>McQuillon</u>, <u>supra</u>, establishing a liberty interest. Because the Ninth Circuit analyzed the liberty interest which arose from California's Penal Code §3041(a), <u>Dannenberg</u> does not undermine the Ninth Circuit decision in <u>McQuillon</u>. Therefore, <u>McQuillon v. Duncan</u> holds that the mandatory language of Penal Code §3041(b) creating a liberty interest in parole remains controlling precedent. [See <u>Rosenkrantz v. Marshall</u>, 774 F.Supp.2d 1063 (C.D. Cal. 2006); <u>Blankenship v. Kane</u>, 2006 WL5215627 *3 (N.D.

1 Cal. 2006); <u>Murille v. Perez</u>, 2005 W.2592420 *3 N.1 (C.D. Cal.

2 2005); <u>Saifullah v. Carey</u>, 2005 WL1555389 *8 (E.D. Cal. 2005)].

3     Thus, petitioner has clearly established not only that he

4 has a constitutionally protected liberty interest but that he

5 was denied this liberty by the denial of parole by the Board of

6 Parole Hearings on January 4 , 2007.

7     B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY.

8     It is established principles of due process that a prisoner

9 must provided <u>notice</u> of the hearings; and <u>opportunity</u> to be

10 heard; and, <u>statement of reasons</u>, for denial of parole.

11     Petitioner agrees that he was provided each of these

12 protections. However, the United States Supreme Court has

13 expanded these protections to include:

14         "In a variety of contexts, the court has
           recognized decisions resulting in a loss of an
15         important liberty interest violates due process
           if the decision is not supported by some
16         evidence." <u>Superintendent v. Hill</u>, 472 U.S. at
           455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356
17         (1985): <u>Rosenkrantz v. Marshall</u>, 444 F.Supp.2d
           1063 (C.D. Cal. 2006) fn. 13; <u>Rojas v. Neilson</u>,
18         428 F.3d 1229, 1232 (9th Cir. 2005).[Per curiam]

19 The court further held:

20         "Although '[T]he some evidence standard is
           minimally stringent', <u>Powell v. Gomez</u>, 33 F.3d
21         39, 40, the evidence underlying the
           [Governor's] decision must have some indicia of
22         reliability." <u>Hill</u>, <u>supra</u>, 472 U.S. at 455-56,
           105 S.Ct. at 2774; See also <u>Sanchez v. Kane</u>,
23         444 F.Supp.2d 1049 (C.D. Cal. 2006).

24     As an additional matter the <u>Hill</u> court concluded that the

25 decision to deny parole must not be "otherwise arbitrary." <u>Hill</u>,

26 <u>supra</u>, at 547.

27     Clearly then, the <u>Hill</u> analysis determined that due process

28 requires much more than notice, opportunity to be heard and

-4-

1 statement of reason. It also requires (A). evidence which
2 supports the conclusion; (B). the evidence to be reliably
3 related to the issue of present dangerousness (CCR Title 15,
4 §2402(a)); In re Scott, supra, 1373 Cal.App.4th 593, 34
5 Cal.Rptr.3d 905; In re Elkins, 50 Cal.Rptr.3d 503; In re Lee, 49
6 Cal.Rptr.3d 931; (C). the evidence must be truthful and (D). the
7 decision must not be arbitrary or capricious. Sanchez v. Kane,
8 444 F.Supp.2d 1049 (C.D. Cal. 2006).

9 GROUND ONE:

10          THE BOARD'S DECISION TO DENY PAROLE IS
11     OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY
       "SOME EVIDENCE" CONTAINING AN INDICIA OF
12     RELIABILITY.

13      In combining the California and federal standards of
14 review, as they have been articulated thus far by the California
15 Supreme Court and the Ninth Circuit, respectively, the
16 commitment crime can lack the power to supply "some evidence"
17 supporting a denial of parole because of the interplay between
18 two factors - the nature of that crime and the passage of time
19 since its commission. That is, the fact there is "some evidence"
20 the crime was committed and committed a certain way at a certain
21 time does not mean that crime necessarily represents "some
22 evidence", that petitioner's release on parole will pose an
23 unreasonable risk of danger to the public safety at the present
24 time. Whether it possesses the necessary predictive value
25 depends both on the nature of the crime and how long ago it
26 happened. Petitioner's commitment offense, now over 20 years in
27 the past does not provide "some evidence" his present release
28 would represent an "unreasonable risk" of danger to the

-5-

1  community.

2      It is worth noting that the issue before this court is
3  whether petitioner is suitable for parole, <u>not</u> when he should be
4  released under the California parole system. The Board's initial
5  task with respect to any inmate serving an indeterminate
6  sentence is to determine whether the prisoner is suitable for
7  parole. That is whether the prisoner "pose[s] an unreasonable
8  risk of danger to society if released from prison. CCR, Title 15
9  §2402." Only after the Board deems an inmate suitable is a
10 release date set. CCR, Title 15, §2282; See also <u>Dannenberg</u>, 34
11 Cal.4th 1061, 1071 (2005). ("[A] determination of individual
12 suitability must proceed the setting of a ... parole release
13 date.") The actual parole release date may well be (in some
14 cases) a number of years into the future, under the Board
15 regulations, the release date is established using a matrix that
16 takes into account the inmate's offense of imprisonment and the
17 circumstances in which it was committed. CCR, Title 15, §2282.

18     Supreme Court law clearly established a parole decision,
19 like a prison disciplinary decision, deprives a prisoner of due
20 process if it is not uspported by "some evidence" or is
21 "otherwise arbitrary." <u>Hill</u>, <u>supra</u>, at 457; <u>McQuillion v. Duncan</u>
22 306 F.3d 895, 904 (9th Cir. 2002).

23     However, that evidence "must have some indicia of
24 reliability," <u>Scott I</u>, <u>supra</u>, 119 Cal.App.4th at p.899) and
25 "suitability determinations must have some rational basis in
26 fact. (<u>In re Elkins</u>, 144 Cal.App.4th at p.489).

27     As our Supreme Court has summarized it, "the judicial
28 branch is authorized to review the factual basis of a decision

-6-

1  of the board denying parole in order to ensure that the decision
2  comports with the requirements of due process of law, but ... in
3  conducting such review, the court may inquire only whether "some
4  evidence" in the record before the board supports the decision
5  to deny parole, based upon factors specified by statute and
6  regulation. If the decision's consideration of the specified
7  factors is not supported by "some evidence" in the record and
8  thus is devoid of a factual basis, the court should grant the
9  prisoner's petition for writ of habeas corpus and should order
10 the board to vacate its decision denying parole and thereafter
11 to proceed in accordance with due process of law. (Rosenkrantz,
12 supra, 29 Cal.4th at p.658, underline added). Finally, as has
13 been recently stated, because the overarching consideration is
14 public safety, the test in reviewing the board's decision
15 denying parole "is not whether some evidence supports the
16 reasons [the board] cites for denying parole, but whether some
17 evidence indicates a parolee's release unreasonably endangers
18 public safety.[Citations]. Some evidence of the existence of a
19 particular factor does not necessarily equate to some evidence
20 the parolee's release unreasonably endangers public safety." (In
21 re Lee, 143 Cal.App.4th at p.1408)(In re Barker, May 29, 2007),
22 DJDAR   7548)(In  re  Lawrence, (May  22,  2007)  Cal.Rptr.3d
23 WL1475283)(In re Rosenkrantz, (2002) 29 Cal.4th 616, 665)(In re
24 Dannenberg, (2005) 34 Cal.4th 1061, 1100).

25    Merely to pick pieces from evidence to create one's version
26 sufficient  to  justify  an  action  is  not  "some  evidence"
27 reasonably related to the circumstances sufficient to deny
28 parole. Superintendent v. Hill, requires more. The Hill

-7-

1  requirement mandates that the evidence relied upon possess not
2  only an "indicia of reliability" but that is is "reasonably
3  related to the circumstances so as to constitute some evidence
4  that the crime was 'particularly egregious'". (i.e. "reasonably"
5  sufficient to support the decision made). See Hill, 472 U.S.
6  445, 455-56, (1985). Accordingly, to recite in rote,
7  circumstances of the crime sufficient under different
8  circumstances (for instance as one would apply to first degree
9  murder) and proclaim that sufficient under these circumstances,
10 does not constitute "some evidence" justifying denial of parole
11 or establish a current danger to the public. The decision of the
12 board is unreasonable in light of the volumes of evidence
13 showing suitability. Furthermore, since the evidence clearly
14 does not support the board's conclusion, the "conclusion" does
15 not possess any "indicia of reliability" and is patently
16 arbitrary and capricious, denying petitioner his liberty
17 interest in parole. It is clear that the board's finding amounts
18 to an "unreasonable" determination of the facts in light of the
19 evidence available to the board at the hearing. Only by
20 examination may the court determine whether the board's decision
21 was in fact "unreasonable" or "objectively unreasonable."
22 Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000); Pham v.
23 Terhune 400 F.3d 740, 742 (9th Cir. 2005); Hines v. Thompson,
24 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d
25 1160, 1167 (9th Cir. 2002).

26 GROUND TWO:

27
28
THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
OF THE GRANTING OF PAROLE VIOLATED THE
PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED

-8-

1    HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
2    WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
     WITHOUT    ANY    RELIABLE    EVIDENCE    OR    "SOME
3    EVIDENCE," IN VIOLATION OF THE 5TH AND 14TH
     AMENDMENT OF THE UNITED STATES CONSTITUTION.

4        Section    3041    of    the    California    Penal    Code    creates

5    substantial presumption that a parole release date shall be set

6    at the initial parole hearing, and in a manner that is uniform

7    to other similar offenses. Subdivision (a) and (b), of §3041

8    mandates that a parole release date "shall" be set "unless" the

9    board finds that the gravity of the commitment offense or

10   offenses, or the timing and gravity of past convicted offenses

11   are such that a consideration of the public safety warrant not

12   setting a release date at that hearing. "Furthermore, if there

13   be any reasonable doubt as to identity of offense we are bound

14   to resolve that doubt in favor of petitioner." (In re Bramble,

15   1947, 31 Cal.2d 43, 51, [6], 187 P.2d 411). Moreover, the rule

16   is    established    that    when    language    which    is    reasonably

17   susceptible    of    two    constructions    is    used    in    a    penal    law,

18   ordinarily that construction which is more favorable to the

19   offender will be adopted. The defendant is entitled to the

20   benefit of every reasonable doubt, whether it arises out of a

21   question of fact, or as to the true interpretation of words or

22   the construction of language used in a statute. (People v.

23   Stuart, (1956), 47 Cal.2d 167, 175, [7], 302 P.2d 5, 55 A.L.R.2d

24   705; People v. Smith, (1955) 44 Cal.2d 77, 79 [2], 279 P.2d 33;

25   In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187 P.2d

26   441; In re McVickers, (1946) 29 Cal.2d 264, 278, 176 P.2d 40;

27   People v. Valentine, (1946 28 Cal.2d 121, 143 [20], 159 P.2d 1;

28   People v. Ralph, (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401).

1    There is no other criteria in the statute for denying parole to
2    a prisoner. It appears from the language that "consideration of
3    the public safety" is nonetheless limited to the gravity of the
4    offense and/or the timing and gravity of any past "convicted"
5    offense or offenses. The statute does not encompass or authorize
6    some of the criteria set forth by the California Code of
7    Regulations, Title 15, §2402. It does appear that the statute
8    has been enlarged to include additional criteria not expressly
9    authorized by the statute.

10        Nothwithstanding, the argument set forth in the petition is
11   not merely an argument about a state law violation. The
12   presumption vested by the statue is substantial, while the
13   statutory criteria the board must meet in order to deny parole
14   is limited to criminal conduct at the time of the offense. For
15   the board to interpret the statute in such a manner as to deny
16   parole solely on the commitment offense after the board had
17   denied petitioner on the exact same point nine times, deprives
18   petitioner of a substantial liberty interest protected by
19   federal due process. (See Biggs at 334 F.3d 917). The effect of
20   such an interpretation, established by practice, is to subject
21   all prisoners to pro forma decisions, where the board goes
22   through the motion of due processs review, citing post hoc
23   rationalizations to justify the parole denial, that is now
24   always the result. This is little different that a decision to
25   deny parole made without any evidence to support it. Thus, by
26   misinterpretation, whether inadvertently or intentionally, the
27   result is not merely a violation because it is an action the
28   board is simply not authorized to take by the enabling statute

-10-

1  that  impinges  on  federally  protected  liberty  interests.
2  Petitioner relies on this claim which is now brought before the
3  state court.

4        A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
          PETITIONER  POSES  AN  "UNREASONABLE  RISK"  OF
5         THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
          THE  DECISION  WAS  WITHOUT  EVIDENCE  AND  WAS
6         ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
          DUE PROCESS.
7

8        The regulatory law requires the board to set a release date
9  unless it finds that the prisoner poses an "unreasonable risk"
10 to public safety if released at that time. (15 CCR, §2402). This
11 is consistent with the enabling state which requires the setting
12 of a release date.

13       If the preponderate record before the board demonstrates
14 that petitioner does not post the "unreasonable risk" (which the
15 record shows that he does not, from petitioner's last 9 parole
16 hearings), a release date must be set.

17       If the board denies petitioner parole without making this
18 requisite finding based on relevant and credible facts in the
19 record, then this is not merely a state law violation, but a
20 deprivation of the substantial liberty interest he has in
21 obtaining a release date. Failure of the board to act in accord
22 with the regulations, in such situations, constitutes a
23 substantive due process violation because it constitutes an
24 abuse of discretion that unfairly and inaccurately deprives the
25 prisoner of his right to that federally protected liberty
26 interest. The board needs more than "some evidence" to arrive at
27 their decision, even though once the decision is made, the
28 reviewing court needs only to find "some evidence" to support

-11-

1   the decision or findings that were made. As petitioner will

2   point out, the "some evidence" standard is not a "burden of

3   proof" - although the board and the governor seems to think it

4   is. Petitioner will demonstrate by clear and convincing facts

5   that the board's burden of proof is the "preponderance of

6   evidence" standard, but they totally ignore this in arriving at

7   their post hoc rationalization to deny parole in nearly every

8   case. There must be a weighing and balancing process according

9   to a burden of proof.

10      Thus, petitioner alleges that the board's decision in his

11  case exceeded the bounds of "review" and was made without the

12  procedural safeguards required by the Constitution, and without

13  applying the proper proof necessary to overcome the presumptive

14  right to release delineated in Penal Code §3041.

15      Statutory law in California applies the "rock bottom"

16  burden of proof in judicatory proceedings at the "preponderance

17  of evidence" level. (Evidence Code §115). The board lists under

18  "good cause," the preponderance evidence (15 CCR, Division 2,

19  §2001(b)(49), and also lists "relevant" and "material" evidence

20  as the standard for being valid "evidence." (15 CCR, Div. 2,

21  §2000(b)(62)(material evidence), and (90)(relevant evidence).

22  The "good cause" provision is a requirement for decision making

23  that applise to all substantive decisions. These regulatory and

24  statutory provisions initiate the weighing and balancing process

25  of evidence at parole hearings. A responsibility the board must

26  undertake. The board cannot apply the "some evidence" standard

27  because it is not a burden of proof. (In re Ramirez, (2001) 94

28  Cal.App.4th 549 at 564-565; Edwards v. Balisok, (1997) 520 U.S.

-12-

1  641, at 648). The "some evidence" applies only to questions of
2  evidentiary sufficiency as an "additional requirement of due
3  process, not substituted for other due process requirements."
4  (Ibid.) The "some evidence" standard is applied only by the
5  reviewing court to determine if the board's (governor's)
6  decision is supported by "some evidence," if the court finds the
7  board complied with all other requisite due process
8  requirements. If the board failed to apply a critical element in
9  the weighng and balancing of evidence, such as a burden of
10 proof, then the court cannot deny the petition because there
11 isn't "some evidence" in the record to support the decision.
12 (Scott I, supra, 119 Cal.App.4th at p.899, In re Elkins, supra,
13 144 Cal.App.4th at 489). As the Appellate Court in In re Caswell
14 92 Cal.App.4th 1017, 1029, pointed out, there is always some
15 evidence in the record of unsuitability of parole, which if
16 invoked, would subject every consideration of parole to an
17 arbitrary standard or political whim, but for a burden of proof,
18 and the burden of producing evidence, is clearly in California
19 law, e.g. People v. Dubon, 90 Cal.App.4th 949, 952, (2001), and
20 applies to all state agencies.

21      Here, where the statute presumes that a parole date "shall
22 normally" be set, the board must, in their weighing and
23 balancing of all relevant, material and reliable evidence,
24 present by a preponderance of that evidence, a "rational
25 connection" between the basic facts the board is asserting as
26 sufficient to deny parole, and the ultimate fact statutorily
27 presumed, i.e., that the prisoner is more than likely not
28 "suitable" for setting a parole release date.

1   Petitioner submits that the board and the governor have
2   broad discretion in parole matter, but the requirement of
3   procedural due process embodied in the California Constitution
4   places some limitations upon these discretionary powers.

5   As heretofore shown, the board's burden of proof is the
6   preponderance of relevant and material evidence standard. This
7   is the "rock bottom" standard allowed by California law.
8   (Evidence Code §115; see e.g. Charlton v. Federal Trade Comm.,
9   543 F.2d, 903-907, 908, (D.C. Cir. 1976)(speaking to this
10  standard as being "rock bottom" burden of proof). "Good Cause"
11  is defined in the BPT's regulations as "a finding by the board
12  based upon a preponderance of the (material and relevant)
13  evidence that there is a factual basis and good reason for the
14  decision made." (Ibid. 2000). Here, in petitioner's case, the
15  board, based on the "material and relevant" evidence found
16  petitioner unsuitable for parole on the basis of the commitment
17  offense which petitioner has been denied nine    times base
18  primarily on the same issues, i.e., unchanging factors. This is
19  a clear due process violation and especially where the relevant
20  and reliable evidence concerning public safety that was
21  presented at petitioner's subsequent parole consideration
22  hearings that show that petitioner does not pose an
23  "unreasonable risk to the public if released at this time.

24  The mandatory language in §3041 of the Penal Code
25  established a rebuttable presumption affecting the board's
26  burden of producing evidence and the burden of proof
27  implementing public policy regarding the parole of "term to
28  life" prisoners.

-14-

1        Petitioner asserts that the ultimate facts sought is a
2   determination whether the prisoner is currently in "unreasonable
3   risk" of danger to the public safety if released on parole.
4   (Subd. (b), Penal code §3041; 15 CCR. §2402(a)).

5        The presumption created by mandatory language in both
6   subdivision (a) and (b) of P.C. §3041 is that the petitioner
7   "shall normally" have a parole release date set "unless" the
8   presumption is overcome by the board which carries the burden of
9   proof as to the existence of the presumed fact. McQuillion v.
10  Duncan, 306 F.3d, 901-902, (9th Cir. 2002): Biggs v. Terhune,
11  334 F.3d 910, 916-917 (9th Cir. 2003)(regarding the presumption
12  in Penal Code §3041). If the board cannot produce the evidence
13  according to the burden of proof required, then the presumption
14  stands, and the court is obliged to uphold the presumption, and
15  under In re Smith, 109 Cal.App.4th 489 (2003), must order
16  petitioner released from custody.

17       B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
18          PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
            OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
19          PROCESS OF LAW.

20       The due process clause of the 14th Amendment prohibits
21  state action that deprives a person of life, liberty, or
22  property, without due process of law, A person alleging a due
23  process violation must first demonstrate that he or she was
24  deprived of liberty or property interest protected by the due
25  process clause, and then show that the procedures that led to
26  the deprivation were constitutionally insufficient. Kentucky
27  Dept. of Corrections v. Thompson, 490 U.S. 454, 459-460 (1989);
28  McQuillion v. Duncan, 306 F.3d, 895, 900 (9th Cir. 2002).

-15-

1       In the parole context, a prisoner alleging a due process

2  claim must demonstrate the existence of a protected liberty

3  interest in parole, and the denial of one or more of the

4  procedural protections that must be afforded when a prisoner has

5  a liberty interest in parole. The Supreme Court held in 1979,

6  and reiterated in 1987, that "a state's statutory scheme, if it

7  uses mandatory language, creates a presumption that parole

8  release will be granted when or unless certain designated

9  findings are made, and thereby gives rise to a constitutional

10 liberty interest." McQuillion, supra, 306 F.3d, 16, 901 (citing

11 Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)

12 and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987).

13      The Ninth Circuit has held that California's parole scheme

14 creates a cognizable liberty interest in release on parole

15 because Penal Code §3041 uses mandatory language and is similar

16 to the Nebraska and Montana statutes addressed in Greenholtz and

17 Allen, respectively. McQuillion, 306 F.3d 15, 901-902. As the

18 Ninth Circuit has explained, "§3041 of the California Penal Code

19 creates in every inmate a cognizable interest in parole which is

20 protected by the procedural safeguards of the due process

21 clause," and that interest arises "upon the incarceration of the

22 inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir.

23 2003).

24 GROUND THREE:

25          THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
           RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
26         THE FACE OF CLEAR EVIDENCE OF REHABILITATION
           AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
27         BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
           EGREGIOUSNESS IS BARRED BY THE INMATE'S
28         COMPLIANCE WITH THOSE AGREED TERMS.

1    When the board repeatedly relies on the unchanging facts of
2   the crime to deny parole, in the face of clear evidence that the
3   inmate has been rehabilitated, due process is violated. Biggs v.
4   Terhune, supra, at 915-916, Ramirez, supra, at 571). However,
5   here, the board goes a step further. At the conclusion of each
6   hearing attended by petitioner, the board gave him a series of
7   what to do to be found suitable for parole. If the crime was
8   going to continue to be an impediment to parole, then what
9   difference would it make whether petitioner followed those
10  recommendations, since parole would be denied in any event as
11  the crime will never change? How could the board make those
12  recommendations in good faith if the crime was such that parole
13  was not going to occur no matter how well petitioner programs?
14  Even worse, if he complies with those recommendations and the
15  board gives him a parole date, if the governor is permitted to
16  effectively negate this whole process unilaterally taking that
17  parole date away, then the recommendations and compliances are
18  rendered useless acts.

19    The board has a duty to make all recommendations
20  "sufficiently clear" to inform petitioner what conduct will
21  result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d
22  868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408
23  U.S. 104, 108-109, (1972)). "A prisoner's due process rights are
24  violated if parole conditions are not made 'sufficiently clear'
25  so as to inform him of what conduct will result in his being
26  returned to prison. Likewise, the Board of Prison Terms has a
27  duty to make recommendations for parole eligibility
28  'sufficiently clear' so as to inform the inmate of conduct that

-17-

1  will warrant a finding of suitability." <u>U.S. V. Guagliardo</u>,
2  <u>supra</u>, 278 F.3d 868. Thus, the onus is on the board to clearly
3  and specifically stated what conduct will warrant a finding of
4  suitability. Therefore it follows that there is only one way to
5  interpret the recommendatins given to petitioner at the
6  Documentation hearing and at each of the Subsequent parole
7  hearings. They constitute the board's "sufficiently clear"
8  instructions as to what petitioner must do to be found suitable.
9  As stated, it is indisputable but that petitioner has complied
10 with every single one of the board's directives to him, and
11 thus, the board must finally find petitioner suitable for
12 release. If the board's directions to the inmate are not
13 acknowledged as sincere offers providing legitimate goals for
14 achieving a status of parole suitability, then they are mere
15 "hoops" designated to support elaborate ruse and a further
16 affront to the due process rights of all prisoners who rely upon
17 them.

18     As noted, petitioner sincerely relied upon the
19 recommendations of the prior board panels, and he partook to
20 fulfill each one. Petitioner's fulfillment may be recognized
21 through his educational and vocational accomplishments and
22 gains, his ongoing self-help work and his crime free behavior
23 throughout his nearly 20 years of incarceration. Petitioner has
24 complied with those directives following each and every hearing,
25 and the board should finally recognize his compliance by
26 granting parole.

27     A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
       CRIME VIOLATES DUE PROCESS.
28

1    In Biggs v. Terhune, the 9th Circuit held that even if the
2  commitment offense(s) are sufficient to support a denial of
3  parole based upon considerations of due process. Biggs v.
4  Terhune, supra, 334 F.3d at 916. The Ramirez court also
5  acknowledged that there will always be "some evidence" to
6  support a finding that a prisoner committed the underlying
7  offense. Those facts alone, however, do not justify the denial
8  of parole. Thus, while concluding that there was factual support
9  for the findings as to the crime and priors, the Ramirez, court
10 still found the board's decision arbitrary since there had been
11 7 hearings at that point, 9 years had passed beyond the minimum
12 term and it was 17 years after entering prison, and all evidence
13 showed rehabilitation.(Id. at 571). Likewise, as the Biggs court
14 more recently said, despite the fact that there may remain
15 evidence to support a finding of egregiousness of the crime:

16        "A continued reliance in the future on an
17     unchanging factor, the circumstances of the
       offense and conduct prior to imprisonment,
       runs contrary to the rehabilitative goals
18     espoused by the prison system and could result
       in a due process violation." (Biggs, supra, at
19     916-917).

20    In the published case of Irons v. Warden, 358 F.Supp.2d 936
21 (E.D. Cal. 2005), the federal court found that the board
22 violated the prisoner's due process by continuing to rely on the
23 immutable factors. (e.g. the commitment offense and history
24 prior to incarceration) to support the denial of parole. In
25 doing so, the federal judge there ruled that continuing to rely
26 on those factors that can never change, such as the commitment
27 offense, or history prior to imprisonment, where there is no
28 proof of continuing bad conduct to support a finding of current

1  threat to the public, offends due process.

2      In interpreting the rule set forth in Biggs, and the plain

3  language of Penal Code §3041, it is clear that even if the crime

4  may be considered egregious, under federal due process

5  priciples, the denial of parole based on the immutable facts of

6  the crime is only authorized at the first parole consideration

7  hearing. The provisions of Penal Code §3041 only talk of the use

8  of the crime to defer setting of a date at the initial hearing.

9  (Penal Code §3041(a)). After that, to give the statute a

10 constitutional interpretation that is not unreasonably vague,

11 further denials would have to be based on some facts arising

12 subsequent to the crime that show a continued propensity for

13 violence, making the inmate a danger to the public. (Biggs v.

14 Terhune, supra, 334 F.3d at 914-915). To rule otherwise would

15 put petitioner in an impossible situation, where no matter what

16 he shows in terms of positive behavior, reformation,, self-help,

17 work skills, parole plans, or just rehabilitation in general, he

18 would never be able to overcome the unchanging facts of the

19 crime. The only logical application of Constitutionaly Due

20 Process dictates what the court in Irons held, i.e., that any

21 subsequent denial requires the presence of some in-prison

22 behavior showing that the inmate currently presents an

23 unreasonable risk of danger if paroled.

24     Here, the facts of the crime have been used as the real

25 reason for denying parole on 9 separate occasions, yet, those

26 facts have never been tied to current behaviors showing

27 petitioner still presents an unreasonable risk of danger to the

28 public at this time. A rule requiring the presence of in-prison,

-20-

1   adverse behavior to justify further denial based on the crime,
2   simply recognizes what the 9th Circuit in Biggs alluded to when
3   it talked of the rehabilitative goals of the system, and, the
4   need to take into consideration that a person can change. At
5   this point, petitioner has been incarcerated for twenty years,
6   eligible for parole for more than 14  of those years. His
7   programming clearly shows his full rehabilitation. In drawing
8   the line as to when further denials become arbitrary, it is
9   obvious that the line has clearly been crossed in this case, and
10  in fact, was crossed as soon as the crime was used in the second
11  parole hearing without the presence of facts showing a continued
12  risk of danger based on how petitioner was programming in
13  prison. To the contrary, the in-prison facts are exclusively
14  positive.

15      As the Ramirez court noted, the paroling authority must do
16  more than merely commend petitioner for the hard work done to
17  rehabilitate himself while in prison. They must actually
18  consider these factors "as...circumstance[s] tending to show his
19  suitability for parole." Ramirez, supra, 94 Cal.App.4th at
20  571-572 [emphasis original]. Of course, all the board did with
21  petitioner's extensive accomplishments was to brush them aside
22  with several terse lines, and issue superficial compliments. The
23  Biggs rule is clear that if an inmate continue[s] to demonstrate
24  exemplary behavior and evidence of rehabilitation, denying him a
25  parole date simply because of the nature of his  offense and
26  prior conduct would raise serious questions involving his
27  liberty interest in parole. Biggs v. Terhune, supra, 334 F.3d at
28  916. Here, the evidence of rehabilitation is beyond dispute.

-21-

1    In comparing the present case with _Biggs_, it is undeniably
2   clear that the board lacks any justification whatsoever to
3   continue to deny petitioner a parole date. In _Biggs_, the inmate
4   was convicted of the premeditated and deliberate First Degree
5   Murder of a witness in a major theft case against the
6   defendants, and yet, the court was quick to caution the board
7   that it could not continue to solely rely on the commitment
8   offense to deny the inmate parole, even though it was only his
9   initial hearing at that point. Yet, petitioner has been denied
10  parole on 9 separate occasions, each time effectively relying
11  virtually exclusively upon the unchanging facts of his
12  commitment offense. The continued reliance upon the commitment
13  offense is simply arbitrary, particularly in the fact of the
14  board's acknowledgements of petitioner's model behavior in
15  prison and extensive accomplishments, all of which are conceded
16  by the statement of decision. Therefore, as the court states in
17  _Biggs_, denying him a parole date simply because of the nature of
18  the offense, not only raises serious questions involving his
19  liberty interest in parole, but blatantly violates due process.
20  (See _Biggs v. Terhune_, _supra_, 334 F.3d at 915-916; _Irons_,
21  _supra_).

22      B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
         DUE PROCESS.
23      First, continued reliance upon these unchanging factors
24  makes a sham of California's parole system and amounts to an
25  arbitrary denial of petitioner's "liberty interest in release on
26  parole," and his "presumption that a parole release date will be
27  granted." (See _McQuillion v. Duncan_, 306 F.3d 895, 902 (9th Cir.
28  2002), _Biggs_, 334 F.3d at 9144-915, _Rosenkrantz_, 29 Cal.4th at

- −22−

1   654, 661). Petitioner has been denied parole on nine different
2   occasions. continued reliance upon these unchanging factors
3   amounts to converting petitioner's offense to a term of life
4   without the possibility of parole. (See Irons, 358 F.Supp.2d at
5   947 ["continuous reliance on the unchanging circumstances
6   transforms an offense into a de facto life imprisonment without
7   the possibility of parole"]; Scott, 34 Cal.Rptr.3d at 919-920,
8   133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335).
9   Second, the circumstances of the crime and petitioner's conduct
10  prior to imprisonment do not amount to some evidence supporting
11  the conclusion that petitioner "currently" (underline added)
12  poses an unreasonable risk of danger if released at this time."]
13  In re Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the
14  parole context, the requirments of due process can only be met
15  if "some evidence" supports the decision and the evidence
16  underlying the decision is supported by "some indicia of
17  reliability." Biggs, 334 F.3d at 914; Caswell v. Calderon, 353
18  F.3d 832, 839 (9th Cir. 2004); Scott, 119 Cal.4th at 899;
19  Superintendent v. Hill, 472 U.S. 445, 455-457 (1985);
20  McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002).

21      Petitioner presents a stronger case than Biggs for several
22  reasons. First petitioner's commitment offense was less serious
23  than the petitioner in Biggs. The Biggs petitioner was involved
24  in a violent, manipulative and premeditated murder, the
25  petitioner here has a much lesser serious offense than
26  petitioner Biggs. Second, the Biggs petitioner had not yet
27  served the full terms of his sentence, while petitioner here has
28  exceeded his sentence by approximately twenty years. Finally,

-23-

1  petitioner here has demonstrated exemplary behavior and evidence
2  of rehabilitation; as required by Biggs court, for a significant
3  period of time. Therefore, the sole reliance on petitioner's
4  commitment offense in denying him parole impinges on
5  petitioner's constitutional liberty interest in parole. (Martin
6  v. Marshall, supra, 431 F.Supp.2d at p.1047). (In re Lawrence,
7  (May 22, 2007), Cal.Rptr.3d WL1475283 (Cal.App.2d Dist.).

8      While it may have been reasonable to rely on petitioner's
9  offense and conduct prior to imprisonment as an indicator of
10  dangerousness for some period of time, continued reliance on
11  such unchanging circumstances after 20 years of incarceration
12  and nine parole suitability hearings, violates due process
13  because these factors now lack predictive value with regards to
14  petitioner's present and future dangerousness. After 20 years
15  of rehabilitation in which petitioner's eligible parole date for
16  release was passed on April 4, 1993 , (Exhibit "B" , Initial
17  M.E.P.D.), the ability to predict petitioner's future
18  dangerousness based simply on the circumstances of the crime is
19  nil. (See Irons, 358 F.Supp.2d at 947 n.2 ["four prior times in
20  finding [Irons] unsuitable for parole" and "after 15 years" of
21  imprisonment, ability to assess dangerousness "is near zero."];
22  Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920 ["the
23  predictive value of the commitment offense may be very
24  questionable after a long period of time."].

25      Petitioner's record is replete with evidence of
26  petitioner's rehabilitation, which was expressed by the board,
27  including Psychological Reports, Correctional Counselor's
28  Reports, extensive self-improvement through vocational,

-24-

1 educational, self-help therapy and disciplinary free

2 incarceration for the past 11 years. (See Exhibit "B").

3     While the board may initially have been entitled to rely

4 upon the commitment offense and petitioner's conduct prior to

5 imprisonment to find petitioner unsuitable for parole, under

6 these circumstances, petitioner submits that the continued

7 reliance and sole reliance of the convicted offense do not now

8 constitute "some evidence" with "some indicia of reliability" of

9 petitioner's current dangerousness. (See Hill, 472 U.S. at 445;

10 Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner,

11 2004 WL1090188 *1-2; Bair, 2005 WL2219220, *12 n.3; Scott, 133

12 Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920; Rosenkrantz,

13 2002 29 Cal.4th 616, 665; Dannenberg, (2005) 34 Cal.4th 1061,

14 1100; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re

15 Lawrence, (2007) Cal.Rptr.3d WL1475283; In re Barker, (2007)

16 DJDAR 7548).

17        C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE

         UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM

18          AND THE LIBERTY INTERESTS OF INMATES. THE

         ESSENCE OF THE PAROLE SYSTEM IS THE RE-ENTRY OF

19          PRISONERS WHO NO LONGER POSE A PUBLIC THREAT.

20     Parole, the release of the imprisoned before they have

21 served the maximum time set by their sentence, has long been

22 part of the California penal system. The Indeterminate

23 Sentencing Law, requiring the trial judge to set a minimum but

24 not a maximum sentence was enacted in 1971. In re Minnis, (1972)

25 7 Cal.3d 639, 643, n.2 ("the court in imposing the sentence

26 shall not fix the term or duration of the period of

27 imprisonment")(citation and internal quotations omitteds). The

28 goal of indeterminate sentences and the California parole system

1  is not only to punish but also to provide for reformation and
2  rehabilitation:

3      "The belief no longer prevails that every
4      offense in a like legal category calls for an
       identical punishment without regard to the
5      past life and habits of a particular offender
       ... retribution is no longer the dominant
6      objective of the criminal law. Reformation and
       rehabilitation of offenders have become
7      important goals of criminal jurisprudence."

   People v. Morse, (1964) 60 Cal.2d 631, 643, n.8 (quoting
8  Williams v. State of New York, (1949) 337 U.S. 241, 247). In a
9  lengthy discussion of this topic, the California Supreme Court
10 states as follows:

11     [T]he purpose of the indeterminate sentence
12     law, like other modern laws in relation to the
       administration of the criminal law, is to
13     mitigate the punishment which would otherwise
       be imposed upon the offender. These laws place
14     emphasis upon the reformation of the offender.
       They seek to make the punishment fit the
15     criminal rather than the the crime. The
       endeavor to put before the prisoner great
16     incentive to well-doing, in order that his
       will to do well would be strengthened and
17     confirmed by the habit of well-doing.

18     [...]

19     [T]he interests of society require that under
       prison discipline every effort should be made
20     to produce a reformation of the prisoner ...
       The Legislative policy [was to provide a
21     system whereby] a hope was to be held out to
       prisoners that through good conduct in prison
22     and a disposition shown toward reformation,
       they might be permitted a conditional liberty
23     upon restraint under which they might be
       restored again to society...

24     [...]

25     Although good conduct while incarcerated and
26     potential for reform are not the only relevant
       factors, the court has acknowledged their
       significance. Furthermore, authority has
27     declared that these factors are among those of
       "paramount importance."

28 In re Minnis, Cal.3d at 644-645. The Rosenkrantz court, citing

-26-

1   Minnis, reaffirmed the principles. "[E]ven before factors
2   relevant to parole decisions had been set forth expressly by
3   state statute and by regulations, we concluded that [a]ny
4   official or board with discretion, is under obligation to
5   consider all relevant factors [citations], and the [official or
6   board] cannot, consistently with its obligation, ignore post
7   conviction factors unless directed to do so by Legislature." In
8   re Rosenkrantz, (2002) 29 Cal.4th 515, 656 (quoting Minnis, 7
9   Cal.3d at 645).

10      D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
           IN PAROLE DECISIONS.
11      "[P]arole applicants in California have an expectation that
12   they will granted parole unless the board finds, in the exercise
13   of its discretion, that they are unsuitable for parole in light
14   of the circumstances specified by statute and by regulation."
15   Rosenkrantz, 29 Cal.4th at 659-61 (holding that the California
16   Constitution, Article V, §8(b) and the California Penal Code
17   §3041, "give rise to a protected liberty interest in that "a
18   prisoner granted parole by the board has an expectation that the
19   governor's decision to affirm, modify, or reverse, the board's
20   determination will be based upon the same factors the board is
21   required to consider," and that "liberty interest underlying a
22   governor's parole review decision is protected by due process of
23   law.").

24      Federal courts have also unequivically held that
25   California's parole system gives rise to a liberty interest
26   constitutionally protected by due process. (See Board of Pardons
27   v. Allen, (1987) 482 U.S. 369, 376-78; Greenholtz v. Inmates of
28   Neb. Penal & Correctional Complex, (1979) 442 U.S. 1, 11-12,

1    (holding a state's statutory parole scheme that uses mandatory
2    language may create a presumption that parole release will be
3    granted upon certain circumstances or findings, thus giving rise
4    to a constitutionally protected liberty interest); McQuillion v.
5    Duncan, (9th Cir. 2002) 306 F.3d 896, 902-903, n.1, 903 (holding
6    that because California's parole scheme uses mandatory language
7    and is largely parallel to the schemes found in Allen and
8    Greenholtz, that give rise to a protected liberty interest in
9    release on parole, "California's parole scheme gives rise to a
10   cognizable liberty interest in release on parole"). Biggs v.
11   Terhune, (9th Cir. 2003) 334 F.3d 910, 915-916.

12       E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY HEARING.

13       On  habeas  corpus,  a  petitioner  is  entitled  to  an
14   evidentiary hearing where the petitioner has established a
15   "colorable" claim for relief and where the petitioner has never
16   been accorded a state or federal hearing on his claim. Earp v.
17   Oronski, (9th Cir. 2003) 372 U.S 293 (1963) and Keeney v.
18   Tamaya-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable"
19   claim, a petitioner is merely required to allege specific facts
20   which, if true, would entitle him to relief. (Ibid.). Granted,
21   under AEDPA, a federal court is not required to order a hearing
22   where petitioner failed to develope the facts in state court. In
23   such  cases,  the  federal  court  accords  a  presumption  of
24   correctness to the facts found by the state court and need not
25   hold a evidentiary hearing, unless those facts are rebutted by
26   clear and convincing evidence. On the other hand, no deference
27   is due where state had made an unreasonable determination of the
28   facts and where a state court makes evidentiary finding without

-28-

1  holding a hearing and giving petitioner an opportunity to
2  present evidence. Such findings clearly result in an
3  "unreasonable determination" of the facts. Taylor v. Maddox,
4  (9th Cir. 2004) 336 F.3d 992, 1001.

5       In summation, an evidentiary hearing is required under the
6  AEDPA and the Appellate court will remand for a hearing if the
7  District Court rules without granting one, "where petitioner
8  establishes a colorable claim for relief and has never been
9  accorded a state or federal hearing on his claim." Earp, supra,
10 at 1167.

11      Here, petitioner requests an evidentiary hearing at every
12 level of the state's habeas proceedings and each of the court's
13 to which he appealed who rule without granting him an evidentiary
14 hearing. As a result, (1) petitioner is entitled to an
15 evidentiary hearing in this court before the court can make any
16 credibility determination of the facts alleged in the petition
17 and supporting exhibits; (2) any contrived facts found by the
18 state court while denying a request for an evidentiary hearing
19 necessarily resulting from an "unreasonable determination" of
20 the facts and hence are not entitled to any presumption of
21 correctness. (Earp, supra, at 1167; Taylor, supra, at
22 1101)["when state court's legal error infects the fact finding
23 process, thus resulting in factual determinations will be
24 unreasonable and no presumption of correctness can attach to
25 it"].

26
27
28

-29-

1

## CONCLUSION

2      All criminal convictions represent the basest form of human
3  behavior. Our laws however, provide mechanisms by which even
4  some murderers are entitled to be paroled. The judiciary has an
5  obligation to faithfully execute those laws. The record
6  establishes that petitioner does not pose an unreasonable risk
7  to public safety. Any contrary conclusion lacks any evidentiary
8  support. As the record is void of any evidence to substantiate a
9  claim of "present danger" and allows only for a contrary
10  conclusion, it (justice) can only be served by an order from
11  this court directing an evidentiary hearing; and because there
12  is nothing which, either singly or in conjunction with other
13  evidence that could support any decision other than parole
14  suitable, the board's decision should be vacated; the petition
15  issued; the petitioner remanded back to the board with
16  directions to find petitioner suitable; set a parole release
17  date within 30 days; and/or petitioner ordered released. Only in
18  this way can the liberty interest petitioner continues to be
19  denied be restored.

20  ///
21  ///

22

23

24

25

26

27

28

1

## PRAYER FOR RELIEF

2    Petitioner is without remedy save for Habeas Corpus.

3 Accordingly, petitioner requests that the court:

4          1. Issue a Writ of Habeas Corpus granting petitioner's

5             Due Process violation claims;

6          2. Issue an Order to Show Cause;

7          3. Declare the rights of petitioner;

8          4. Appoint counsel to represent petitioner;

9          5. Issue an Order directing an Evidentiary Hearing;

10         6. Issue an Order releasing petitioner based on

11            supporting evidence;

12         7. Grant any and all relief found necessary or

13            appropriate.

14

15 Dated this 12 day of August, 2008.

16                          Respectfully submitted,

17

18                          Wilbur Lynn McClure

19                          Wilbur McClure

20                          Petitioner in Pro Per

21 ///

22 ///

23

24

25

26

27

28

-31-

# EXHIBIT "A"

**DEPT.** NW S

70

### SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| Date: | MARCH 31, 1987 | | |
| HONORABLE: | DARLENE SCHEMPP | JUDGE | G COVEY , Deputy Clerk |
| | G FENNER | Deputy Sheriff | G GORKOS , Reporter |
| | | | (Parties and counsel checked if present) |

| | | | |
|---|---|---|---|
| A 811397 | | Counsel for Plaintiff | IRA REINER , DISTRICT ATTY. BY |
| **PEOPLE OF THE STATE OF CALIFORNIA** | | | M ROSENBLATT DEPUTY |
| **VS** | | | |
| 02) MC CLURE, WILBER LYNN | | Counsel for Defendant | M ADELSON 987.2 ~~PUBLIC DEFENDER XXXXXX~~ |
| X 016527 | | by | J ESTEIN XXXXXX |

**NATURE OF PROCEEDINGS PROBATION AND SENTENCE**     (Boxes checked if order applicable)

PROBATION DENIED, SENTENCE AS INDICATED BELOW.

Whereas the said defendant having ....been............duly....Found.................................................
guilty in this court of the crime of  KIDNAPING FOR ROBBERY (Sec. 209(b) PC) a felony,
as charged in count 14 of the Information.

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
State Prison. for LIFE.  Plus 1 year pursuant to section 667(a) to run
CONSECUTIVE TO Count 14.

     ☒ Defendant is given credit for ...728.............days in custody (includes __243__ days good time/work time).
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles and
delivered by him into the custody of the Director of Corrections at the California State Institution
     ☒ for Men at Chino, California
     ☐ for Women at Frontera, California
     ☐ .............................................

☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

**2**  76J805A (REV. 7-82) 4-85
C-109

**JUDGMENT**

**ENTERED**
04-01-87

FRANK S. ZOLIN
EXECUTIVE OFFICE
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

PINK ORIGINAL TO FILE          YELLOW COPY TO STATEWIDE DISTRIBUTION
WHITE COPY TO MICROFILM      GREEN COPY TO PROBATION EXPEDITER

Date
HONORABLE: MARCH 31 1987

DARLENE SCHEMPP                    JUDGE
H. FEELER              Deputy Sheriff        G COVEY        N&S
                                              G GORKOS       Deputy Clerk
CASE NO. 302                                                 Reporter
A611397

(Parties and counsel checked if present)

PEOPLE OF THE STATE OF CALIFORNIA
                        VS          Counsel for People:
                                    DEPUTY DISTRICT ATTY:  M. Rosenblatt

CHARGE   02 MCCLURE WILBER LYNN ✓
         209.B  01CTS    211   Counsel for Defendant: ADELSON 987.2  by J. Estein ✓
                                487.3  01CTS
(BOX CHECKED IF ORDER APPLICABLE) X

NATURE OF PROCEEDINGS

71   P&S  X016527  REH/REM OTH

72   _____ IS SWORN AS THE ENGLISH/ _____  01-23-86  INTERPRETER
□ CRIMINAL PROCEEDINGS ADJOURNED/RESUMED.  □ OATH FILED PER SECTION 68560 GOVERNMENT CODE.
73   □ DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE.

74   □ ON _____ MOTION, PROBATION AND SENTENCE HEARING/FURTHER PROCEEDINGS CONTINUED TO _____
        AT _____ A.M. IN DEPT. _____
75   □ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR SENTENCING.   □ SUPPLEMENTAL PROBATION REPORT/PROGRESS REPORT ORDERED
76   ☒ PROBATION DENIED _____ SENTENCE IMPOSED AS FOLLOWS:   □ DEFENDANT ORDERED TO RETURN.
     ☒ IMPRISONED IN STATE PRISON FOR _____  □ TERM PRESCRIBED BY LAW □ □ TOTAL OF _____ YEARS _____ MONTH
     ☒ COURT SELECTS THE _____ TERM OF _____ YEARS FOR THE BASE TERM AS TO COUNT  14
     ☒ PLUS  One  YEAR(S) PURSUANT TO PENAL CODE SECTION  667(a) term consecutive to
     ☒ PLUS _____ AS INDICATED IN BOX 87 BELOW  Count 14.
     □ COMMITTED TO CALIFORNIA YOUTH AUTHORITY, THE TERM OF IMPRISONMENT TO WHICH THE DEFENDANT WOULD
        HAVE BEEN SENTENCED PURSUANT TO SECTION 1170 PENAL CODE IS _____ YEARS
     □ IMPRISONED IN LOS ANGELES COUNTY JAIL FOR TERM OF _____ DAYS
     □ FINED IN SUM OF $ _____
        TOTAL FINE OF $ _____  PLUS ADDITIONAL FINE OF $ _____  (1137.5 HEALTH & SAFETY CODE) FOR A
        BE PAID TO COUNTY CLERK/PROBATION OFFICER IN SUCH MANNER AS HE SHALL PRESCRIBE.  PLUS $ _____  ASSESSMENT AND SURCHARGE (1464 & 1208.8 PENAL CODE) TO
     □ PAY RESTITUTION FINE IN SUM OF $ _____  PURSUANT TO SECTION 13967(a) GOVERNMENT CODE PAYABLE TO
        □ RESTITUTION FUND  □ PROBATION DEPARTMENT IN SUCH MANNER AS THEY PRESCRIBE.  □ SAID FINE TO BE STAYED
        WHILE DEFENDANT PAYS RESTITUTION AND IF RESTITUTION IS PAID IN FULL, STAY SHALL BE PERMANENT.
77   □ SENTENCE IS SUSPENDED.
78   □ PROBATION GRANTED FOR A PERIOD OF _____ YEARS  □ □ PROBATION TO BE WITHOUT FORMAL SUPERVISION.
   1   □ SPEND FIRST _____ DAYS IN COUNTY JAIL   □ ROAD CAMP OR HONOR FARM RECOMMENDED.
   2   □ WORK FURLOUGH PROGRAM RECOMMENDED.   □ NOT TO BE ELIGIBLE FOR COUNTY PAROLE
   3   □ MINIMUM PAYMENT OF FINE/RESTITUTION TO BE $ _____
   4   □ MAKE RESTITUTION OF $ _____ TO THE VICTIM/RESTITUTION FUND PURSUANT TO SECTION 1203.04
        PENAL CODE IN SUCH MANNER AS THE PROBATION OFFICER SHALL PRESCRIBE.  □ TOTAL AMOUNT OF RESTITUTION TO
        INCLUDE 2% SERVICE CHARGE AS AUTHORIZED BY SECTION 270 WELFARE & INST. CODE.
   5   □ NOT DRINK ANY ALCOHOLIC BEVERAGE AND STAY OUT OF PLACES WHERE THEY ARE THE CHIEF ITEM OF SALE.
   6   □ NOT USE OR POSSESS ANY NARCOTICS, DANGEROUS OR RESTRICTED DRUGS OR ASSOCIATED PARAPHERNALIA, EXCEPT WITH VALID
        PRESCRIPTION, AND STAY AWAY FROM PLACES WHERE USERS CONGREGATE.
   7   □ NOT ASSOCIATE WITH PERSONS KNOWN BY YOU TO BE NARCOTIC OR DRUG USERS OR SELLERS.
   8   □ SUBMIT TO PERIODIC ANTI-NARCOTIC TESTS AS DIRECTED BY THE PROBATION OFFICER. SUCH TESTING TO BE SUSPENDED WHILE
        THE DEFENDANT IS IN CUSTODY, IS HOSPITALIZED, OR IS IN A RESIDENTIAL DRUG TREATMENT PROGRAM APPROVED BY
        PROBATION OFFICER.
   9   □ HAVE NO BLANK CHECKS IN POSSESSION. NOT WRITE ANY PORTION OF ANY CHECKS. NOT HAVE BANK ACCOUNT UPON WHICH YOU
        MAY DRAW CHECKS.
   10  □ NOT GAMBLE OR ENGAGE IN BOOKMAKING ACTIVITIES OR HAVE PARAPHERNALIA THEREOF IN POSSESSION, AND NOT BE PRESENT IN
        PLACES WHERE GAMBLING OR BOOKMAKING IS CONDUCTED.
   11  □ NOT ASSOCIATE WITH _____
   12  □ COOPERATE WITH PROBATION OFFICER IN A PLAN FOR _____
   13  □ SUPPORT DEPENDENTS AS DIRECTED BY PROBATION OFFICER.
   14  □ SEEK AND MAINTAIN TRAINING, SCHOOLING OR EMPLOYMENT AS APPROVED BY PROBATION OFFICER.
   15  □ MAINTAIN RESIDENCE AS APPROVED BY PROBATION OFFICER.
   16  □ SURRENDER DRIVER'S LICENSE TO CLERK OF COURT TO BE RETURNED TO DEPARTMENT OF MOTOR VEHICLES.
   17  □ NOT DRIVE A MOTOR VEHICLE UNLESS LAWFULLY LICENSED AND INSURED.
   18  □ NOT OWN, USE OR POSSESS ANY DANGEROUS OR DEADLY WEAPONS.
   19  □ SUBMIT PERSON AND PROPERTY TO SEARCH OR SEIZURE AT ANY TIME OF THE DAY OR NIGHT BY ANY LAW ENFORCEMENT OFFICER
        WITH OR WITHOUT A WARRANT.
   20  □ OBEY ALL LAWS, ORDERS, RULES AND REGULATIONS OF THE PROBATION DEPARTMENT AND OF THE COURT.
79   ☒ DEFENDANT TO BE GIVEN CREDIT FOR  718  DAYS IN CUSTODY (INCLUDES  363  DAYS GOOD TIME/WORK TIME)
80   □ SENTENCE/COUNTS TO RUN CONSECUTIVELY TO/CONCURRENTLY WITH _____
81   □ STAY OF EXECUTION OF _____

82   □ ON MOTION OF PEOPLE, COUNTS _____ GRANTED TO _____
83   ☒ COURT ADVISES DEFENDANT OF HIS APPEAL RIGHTS.   _____ DISMISSED IN FURTHERANCE OF JUSTICE.
84   □ "NOTICE RE CERTIFICATE OF REHABILITATION AND PARDON" GIVEN TO DEFENDANT.
85   □ DEFENDANT TO PAY COSTS OF PROBATION SERVICES IN AMOUNT OF $ _____
86   □ COURT FINDS THAT DEFENDANT DOES NOT HAVE THE PRESENT ABILITY TO PAY COSTS OF INCARCERATION/LEGAL SERVICES RENDERED/
        PROBATION SERVICES RENDERED.
87   ☒ FURTHER ORDER AS FOLLOWS: _____
     Select the mid term of Three (3) years + said Sentence is stayed pursuant
     to Penal Code Section 654. As to Count 15 the Court
     Select the mid term of 2 years. Said sentence is stayed pursuant
     to Penal Code Section 654. As to Count 16 the Court selects the mid
     term of 2 years. Said sentence is stayed pursuant to Penal Code Section
     654. Both stays to become permanent upon the completion of the
     Sentence in Count 14. The Notice of Appeal is not in the file.

88   □ SHERIFF IS ORDERED TO ALLOW DEFENDANT _____ PHONE CALLS AT DEFENDANT'S OWN EXPENSE
89   □ DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.
90   □ BAIL, IF POSTED, FORFEITED/O.R. REVOKED. BENCH WARRANT ORDERED ISSUED/REISSUED/AND HELD UNTIL _____
     □ NO BAIL/BAIL FIXED AT $ _____
91   □ DEFENDANT APPEARING BENCH WARRANT ORDERED RECALLED/QUASHED  □ RECALL NO. _____ □ WRITTEN  □ ABSTRACT FILED

☒ REMANDED          □ BAIL        □ BAIL EXON.         □ BOND NO. _____
□ RELEASED          □ OR         □ O.R. DISCHARGED     □ ON PROBATION           MINUTES ENTERED
                    □ BENCH WARRANT                    ☒ IN CUSTODY OTHER MATTER  MAR 31 1987
74C776 (REV. 9-84)                                                              COUNTY CLERK   3 P&S

1          THE COURT:   Do the People wish to be heard?

2          MS. ROSENBLATT:   Thank you, Your Honor.

3               What counsel is suggesting by the early offer

4     to plead is that the People reduce the charge from a 209

5     to a 207 without legal ground, which is violative of

6     Prop 8.   And I don't think that is a consideration in this

7     case.

8               Certainly, the defendant's interest in pleading

9     guilty was so that he would have a determinant sentence and

10    that his background and future conduct would not weigh

11    against him in the state prison system where that is

12    considered on a light sentence case.

13              As far as the lack of fabrication to a jury

14    in this particular case, I would respectfully  refer the

15    court's attention to the statement of the defendant on

16    page 9 of the probation and sentence report, which if one

17    were to believe the testimony now two times of Kristi Boucher

18    in the trial of the defendant, it is totally contrary to

19    her testimony.   And suggests a totally different thing having

20    occurred.

21              Not that the defendant misunderstood a true

22    set of facts, but that Miss Boucher's version of the facts

23    wherein the defendant, for example, pulled the jewelry from

24    her neck, et cetera; wherein, his partner, Mr. Murphy,

25    threatened the life of Miss Boucher in his presence were

26    not true.

27              The lower end of the 209, I suppose every

28    crime is relative to another.   But this victim was terrorized.

1    She, again, wasn't used. And that is on the positive side

2    for the defendant. But she was taken for a distance of

3    approximately 15 miles, I believe, and she was taken from

4    place to place. And her life was threatened more than one

5    time.

6                    I suggest that the court do the following:

7                    That the court sentence the defendant to the

8    light term on 209(b) of count IV. That the count XV mid term

9    on the 211 be stayed pursuant to 654. That the mid term

10   of two years on the 487.38 stand pursuant to 654.

11                   That there was a prior conviction to which

12   the defendant plead guilty, which was a burglary, which he

13   served time in state prison, but did not -- at the time of

14   the plea the defendant would not admit the residential

15   nature of the burglary, although in the statement of the

16   plea, Penal Code section 667(a) was referred to.

17                   There wasn't a very good factual basis taken

18   for that. And I have spoken to counsel who would be willing

19   to stipulate that that prior was taken as a 667.5(b) prior.

20                   Would you so stipulate, Counsel?

21        MR. EPSTEIN:  The one-year prior?

22        MS. ROSENBLATT:  Yes.

23        MR. EPSTEIN:  So stipulated.

24        MS. ROSENBLATT:  And that is a one-year prior.

25                   I would ask that one-year prior run consecutive

26   to and to follow the -- well, however is proper. Whether

27   it is to follow or run before the life term as to count XIV.

28                   The defendant's prior record, his record for --

EXHIBIT "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number C-50493
Hearing of: )
)
WILBUR McCLORE )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 4, 2007

3:15 P.M.


PANEL PRESENT:

SANDRA BRYSON, Presiding Commissioner
JOAN THOMPSON, Deputy Commissioner

OTHERS PRESENT:

WILBUR McCLORE, Inmate
MARY ANN TARDIFF, Attorney for Inmate
JOANN GLIDDEN, Deputy District Attorney
Two Correctional Officers, Unidentified

**INMATE COPY**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No         See Review of Hearing
_____ Yes        Transcript Memorandum


Don Larson -- Vine, McKinnon & Hall

ii


INDEX


                                                                Page

Proceedings........................................ 1

Case Factors...................................... 7

Pre-Commitment Factors............................10

Post-Commitment Factors...........................41

Parole Plans......................................51

Closing Statements................................71

Recess............................................82

Decision..........................................83

Adjournment.......................................91

Transcriber Certification.........................92


--oOo--

1

**P R O C E E D I N G S**

1    **DEPUTY COMMISSIONER THOMPSON:**  You are on tape.

2    **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And this

3    is the ninth Subsequent Parole Consideration Hearing for

4

5    Wilbur McClore, CDC number C, Charles, 50493.  Today's

6    date is January 4th, 2007, and the time is 3:15.  We're

7    located at the Correctional Training Facility, Soledad.

8    This inmate was received April 6th, 1987, from

9    Los Angeles County.  The life term began April 6th,

10   1987, with a minimum eligible parole date of April 4th,

11   1993, charging in case number, A, Adam, 81397, Count 1,

12   the controlling offense, Penal Code 209(b), kidnap for

13   robbery, plus Penal Code 6675 -- .5(b), the prior felony

14   that it was a prison term, and noncontrolling offense,

15   that's Los Angeles case number A807032, charging in

16   Count 1, Penal Code 245(a), that's AWD, assault with a

17   deadly weapon, for which the inmate received a term of

18   life plus one year.  This Hearing is being recorded.

19   For the purpose of voice identification, each of us will

20   state our first and last name, spelling the last name.

21   When it is your turn, sir, after you spell your last

22   name, please state your CDC number.  I will start, and

23   then go to my left.  Sandra Bryson, B-R-Y-S-O-N, Board

24   of Parole Hearings.

25   **DEPUTY COMMISSIONER THOMPSON:**  Joan Thompson,

26   T-H-O-M-P-S-O-N, Deputy Commissioner, Board of Parole

27   Hearings.

2

1    **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  JoAnn Glidden,

2    G-L-I-D-D-E-N, Deputy District Attorney, Los Angeles

3    County.

4         **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-R-D-I,

5    double F, attorney for Mr. McClore.

6         **INMATE MCCLORE:**  Wilbur McClore, M-C-C-L-O-R-E,

7    C-50493.

8         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

9         **INMATE MCCLORE:**  You're welcome.

10        **PRESIDING COMMISSIONER BRYSON:**  And if you would

11   pull the mike closer to you, the recording equipment is

12   not all that great.  Yeah, you've room on the cord to be

13   able --

14        **INMATE MCCLORE:**  Okay.

15        **PRESIDING COMMISSIONER BRYSON:**  -- to do that.  Want

16   to make sure that everything gets --

17        **INMATE MCCLORE:**  Okay.

18        **PRESIDING COMMISSIONER BRYSON:**  -- heard.  Okay.

19   And I note for the record we have two correctional peace

20   officers in the room who are here for security purposes.

21   And, first of all, Commissioner Thompson, is there any

22   confidential material in the file, and if so, will it be

23   used today?

24        **DEPUTY COMMISSIONER THOMPSON:**  No use will be made

25   of the confidential information that is -- there is some

26   confidential information.  I don't believe it would

27   relate to anything that is pertinent to this Hearing.

3

1     It's not to be used.

2         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

3     right, I passed the hearing checklist marked Exhibit 1

4     to your attorney and also to the district attorney to

5     ensure that we're all proceeding with the same set of

6     documents.  And first, let me ask, does the District

7     Attorney have all the documents?

8         **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I think I miss --

9     I don't have the transcript of the sentencing, and I

10    also don't have the crime partner's last Hearing

11    transcript and decision face sheet.

12        **PRESIDING COMMISSIONER BRYSON:**  Ah, yes, and as we

13    found in the prior, in the prior Hearing we had, I

14    believe that if you look in the (inaudible) section

15    there is the face sheet, but you will not have the crime

16    partner's --

17        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  Transcript.

18        **PRESIDING COMMISSIONER BRYSON:**  -- information

19    because -- correct -- because that's included in the

20    confidential file, if it exists.

21        **ATTORNEY TARDIFF:**  Wasn't that requested

22    specifically by the last Panel or something?  I thought

23    in the crime partner's ... I don't --

24        **PRESIDING COMMISSIONER BRYSON:**  But that is

25    available to the Panel because we --

26        **ATTORNEY TARDIFF:**  Correct.

27        **PRESIDING COMMISSIONER BRYSON:**  -- can read it in

4

1    the C-File.

2        **ATTORNEY TARDIFF:**  If it's there.  Didn't they ask

3    for that specifically?  Maybe I'm mixing the --

4        **PRESIDING COMMISSIONER BRYSON:**  Who?  The Panel?

5    Well, what I'm saying -- what I'm saying is if the Panel

6    wants to look at it --

7        **ATTORNEY TARDIFF:**  Right.

8        **PRESIDING COMMISSIONER BRYSON:**  -- we go to the

9    C-File.

10        **ATTORNEY TARDIFF:**  Right.

11        **PRESIDING COMMISSIONER BRYSON:**  Okay.

12        **ATTORNEY TARDIFF:**  Because (inaudible), if it never

13    got there and was asked by the Panel ....

14        **PRESIDING COMMISSIONER BRYSON:**  Well, I'm not aware,

15    I didn't (inaudible).

16        **ATTORNEY TARDIFF:**  Okay.

17        **PRESIDING COMMISSIONER BRYSON:**  As to the sentencing

18    transcripts, I didn't find the sentencing transcripts in

19    my Board packet --

20        **ATTORNEY TARDIFF:**  No.

21        **PRESIDING COMMISSIONER BRYSON:**  -- either.  And I

22    suspect that also has been a mistake by records because

23    they're looking at sentencing memos, and they're wrongly

24    assuming they are the transcripts.  One moment,

25    (inaudible) so I can't verify one way or another.  But I

26    do not have a copy of that either.  I believe that is an

27    error.  Counsel, do you have a copy of the sentencing

5

1    transcript?

2        **ATTORNEY TARDIFF:**  I have part of it from, from my

3    client, but I don't have --

4        **PRESIDING COMMISSIONER BRYSON:**  Hidden there --

5        **ATTORNEY TARDIFF:**  No.

6        **PRESIDING COMMISSIONER BRYSON:**  -- in the packet?

7        **ATTORNEY TARDIFF:**  No.

8        **PRESIDING COMMISSIONER BRYSON:**  So I'm going to mark

9    that on the Exhibit 1 that neither of these are actually

10   present.  And, counsel, do you have the documents other

11   than the sentencing transcripts and the crime partner's

12   last Hearing transcript (inaudible)?

13       **ATTORNEY TARDIFF:**  Yes.

14       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Are there any

15   additional documents to be submitted?

16       **ATTORNEY TARDIFF:**  Well, I do have part of the

17   sentencing -- I don't -- I can -- I'll pass it over to

18   you (inaudible).

19       **PRESIDING COMMISSIONER BRYSON:**  (Inaudible.)

20       **ATTORNEY TARDIFF:**  I'm not sure if it's (inaudible).

21       **PRESIDING COMMISSIONER BRYSON:**  I think (inaudible)

22   right.

23       **DEPUTY COMMISSIONER THOMPSON:**  Well, one is a

24   laudatory, two are laudatory chronos, and one is, I

25   believe a work supervisor's (inaudible).

26       **PRESIDING COMMISSIONER BRYSON:**  Well, yeah, we'll do

27   (inaudible) all right.  All right, sir, today you and

6

1   your attorney signed the document marked Exhibit 2.  And

2   this is regarding ADA Accommodation Hearing Procedures

3   and Inmate's Rights.  Counsel, do you have any comments

4   or concerns regarding this inmate's ADA rights,

5   procedurally, understanding his ability to participate

6   in the Hearing?

7       **ATTORNEY TARDIFF:**  No.

8       **PRESIDING COMMISSIONER BRYSON:**  Are there any

9   preliminary objections?

10      **ATTORNEY TARDIFF:**  No.

11      **PRESIDING COMMISSIONER BRYSON:**  Will he be speaking

12   with the Panel today?

13      **ATTORNEY TARDIFF:**  Yes.

14      **PRESIDING COMMISSIONER BRYSON:**  All right, sir.  If

15   you would raise your right hand.  Do you solemnly swear

16   or affirm that the testimony you give at this Hearing

17   will be the truth, the whole truth, and nothing but the

18   truth?

19      **INMATE MCCLORE:**  Yes.

20      **PRESIDING COMMISSIONER BRYSON:**  I'm going to read

21   the crime as -- I'm going to read two sources, actually

22   (inaudible) this is important.  First the probation

23   officer's report beginning on ....

24      **ATTORNEY TARDIFF:**  It's hard to find the page on

25   that.  It's kind of in the middle of the (inaudible).

26      **PRESIDING COMMISSIONER BRYSON:**  (Inaudible.)

27      **ATTORNEY TARDIFF:**  Here, do you want me to give it

7

1    to you?  I think that's what you want.

2        **PRESIDING COMMISSIONER BRYSON:**  That's what I

3    wanted.  Elements.  Thank you.  This is page 2.

4        **ATTORNEY TARDIFF:**  But it's really not.

5        **PRESIDING COMMISSIONER BRYSON:**  It's really not.

6    Thank you.  According to the police report:

7            "On November 26th, 1985, at about 1:15 p.m.,

8            the victim started to get out of her car in

9            Wendy's parking lot when codefendant Murphy ran

10           up and pushed her back inside.  He forced her

11           over to the passenger's side, entered, and

12           grabbed her by the throat, forcing her to the

13           floorboard.  He struck her in the face and

14           demanded her money.  She said her purse was in

15           the trunk, and when he went to get it, he told

16           her not to try to get away, as, quotes, "I have

17           a gun, and I'll use it," end quote.  While the

18           codefendant was getting property out of the

19           trunk, she noticed the defendant approach the

20           driver's side and watch her.  When the

21           codefendant came back with her purse, he got

22           into the driver's seat.  The defendant then

23           went around the passenger's side, opened the

24           door, and grabbed the victim by the arm,

25           forcing her to get into the backseat.  He then

26           got into the front passenger's seat.  He turned

27           toward the victim and said, "If you make a

8

1    stupid move" -- this is a quote -- "we're going
2    to kill you.  We have a gun."  End quote.  They
3    then drove to a shopping area in San Fernando.
4    The codefendant had the victim exit the car and
5    put his arm around her neck.  He told her to
6    act as if he were her boyfriend.  The three
7    went into a sporting goods store where the
8    codefendant picked out three sweat suits and
9    had the victim pay for them.  They then drove
10   to a shoe store, where the defendant took two
11   boxes of tennis shoes from the shelf and the
12   victim paid for them.  As they were driving on
13   the Simi Freeway, they pulled off the road and
14   took jewelry from the victim.  They then forced
15   her out of the car and drove off.  The victim
16   fled down an embankment and phoned the police."
17       And now I'm going to also read the version of the
18   facts as stated in the Court of Appeals document,
19   2nd Appellate District Division III, People v. Wilbur
20   Lynn McClore.  This was filed on February 10th of 1988.
21   Beginning on page 2, second line:
22       "It was established that approximately
23       11:00 a.m. on November 25th, 1985 (verbatim),
24       as Krispi, that's K-R-I-S-P-I, Boucher or
25       Bouker, B-O-U-C-H-E-R, was about to get out of
26       her car in a parking lot in a Wendy's
27       restaurant.  A man came up to her, opened the

```
 1      car door and demanded her purse and money.
 2      When she responded she did not have her purse,
 3      the man struck her across the face and forced
 4      her by the neck into the passenger's seat.
 5      Boucher gave of the man her keys and told him
 6      her purse was in the trunk.  While the man
 7      opened trunk, Boucher saw the appellant outside
 8      the passenger door to her car.  Appellant
 9      entered the passenger's side, and the other man
10      entered the car on the driver's side, and
11      pushed Boucher into the backseat.  When Boucher
12      told the man, quotes, "Take my car, take
13      everything, just let me out," end quote, one of
14      the men responded, quotes, "Sit back, you're
15      going to go for a ride," end quote.  As they
16      drove, appellant went through Boucher's purse,
17      taking the money from her wallet.  Appellant
18      then demanded she write out a check for $200
19      and gave it to him.  Appellant ripped a
20      necklace from Boucher's neck, took the rings
21      from her fingers, and her watch.  Thereafter,
22      Boucher and her kidnappers went to two stores,
23      where the men forced her to buy shoes and
24      clothing for them.  Hours later, the men
25      released Boucher on the side of the freeway."
26          And at this time I'm also going to read into the
27   record a probation officer's list of prior, of the
```

10

1    inmate's prior criminal history.  This is source from

2    the CINI document, the CINI printout of July 11th of

3    1984, L.A.P.D.  And I'll read this and I'll refer to

4    this as well.  As to the juvenile history, that's

5    unknown.  As to the adult history, there's a

6    January 12th, 1982, L.A.P.D. arrest, which is 484 PC,

7    petty theft, and this involved credit cards; a warrant

8    was issued.  Defendant states he was a driver of the

9    vehicle, the passenger paid for his gas with a stolen

10   credit card -- he didn't know it was stolen, was

11   convicted, sentenced to five days in jail and to pay

12   restitution to the gas station.  Did you pay restitution

13   to the gas station on that?

14       **INMATE MCCLORE:**  To be honest, I really don't

15   remember.  It's been so long.

16       **PRESIDING COMMISSIONER BRYSON:**  Okay.

17       **INMATE MCCLORE:**  It's probably true.

18       **PRESIDING COMMISSIONER BRYSON:**  Okay.  March 7th, of

19   1982 -- so we're talking two months later -- then,

20   Modesto Sheriff's Office, he was arrested on 182.1,

21   that's penal code, conspiracy to commit a crime.  459

22   with penal code, PC 458, burglary, on June 13th of 1982.

23   The defendant was convicted of Penal Code 459 burglary,

24   second degree, and sentenced to state prison for a

25   period of two years.  A mental note, there is a second

26   term on you.  He was paroled on July 11th, 1982, L.A.

27   County.  His expiration date, "if," I-F, I think that

11

1    means "is," tentatively, again, this is in the probation

2    officer's report, July of 1987. The defendant

3    burglarized his girlfriend's aunt's home in Modesto,

4    California. He had prior knowledge the aunt had a

5    security system in the home and numerous valuable items.

6    A safe containing important papers, jewelry, and cash

7    was stolen. Then on April 24th of 1984, the defendant's

8    parole was revoked by the parole board; he was sentenced

9    to one year in custody, and so forth. So, sir, let's go

10   back before -- you seemed to have issues with women; you

11   burglarized your girlfriend's aunt's home. How could

12   you do that?

13       INMATE MCCLORE: Well, at that time I was just out

14   of control. I was an angry individual, and I went

15   through -- at my last Hearing, Mrs. Fisher (phonetic)

16   gave me some good advice, and I really used it. I went

17   back through my Central Files, and I couldn't understand

18   that I was the person that had so little faith in my own

19   ability to do for myself, that I started living off of

20   other people. And, when it come to other people's

21   feelings, I was an angry person, didn't really care

22   about other people's feelings. And I truly come to

23   understand now how I hurt so many people that cared and

24   trusted in me. And that's basically what happened.

25       PRESIDING COMMISSIONER BRYSON: What were you angry

26   about?

27       INMATE MCCLORE: Not -- I used to have, I used to

12

1   work, I used to have good jobs. And I lost my job, I

2   couldn't get another job, and I just got angry because,

3   got mad, you know, at everybody. Took it out on

4   everybody, just being angry. Like I lost the ability to

5   go look for a job, be independent again.

6       **DEPUTY DISTRICT ATTORNEY GLIDDEN:** (Inaudible) I

7   notice that the report from which you're reading is --

8   doesn't have his entire record. The next probation

9   report shows another entry on 3/22/84, the probation

10  reports of 3/10/87. In my file, it comes directly after

11  the one that --

12      **ATTORNEY TARDIFF:** If he -- actually, you should

13  probably just go to the first section --

14      **DEPUTY DISTRICT ATTORNEY GLIDDEN:** (Inaudible.)

15      **ATTORNEY TARDIFF:** -- (inaudible) case summary.

16  That gives you the entire rap sheet.

17      **PRESIDING COMMISSIONER BRYSON:** Except that we

18  haven't gotten to that yet. You're talking about the

19  L.A.P.D., that was a March 22nd, 1982 --

20      **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Oh, I'm sorry. I

21  thought that -- okay.

22      **PRESIDING COMMISSIONER BRYSON:** This is 1982.

23      **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Right. I just --

24  I thought you were looking at that first probation

25  report, which doesn't even include that, that entry, and

26  that's why I just wanted to --

27      **PRESIDING COMMISSIONER BRYSON:** Okay.

13

1          **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  -- to see if you
2    were aware of that.
3          **PRESIDING COMMISSIONER BRYSON:**  Thank you, I
4    appreciate that a lot.
5          **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I'm sorry to
6    interrupt.
7          **PRESIDING COMMISSIONER BRYSON:**  No problem.  I just
8    haven't the gotten there yet.  We're still on ....
9          **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  Okay.
10         **PRESIDING COMMISSIONER BRYSON:**  I'm trying to
11   understand why --
12         **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  Thank you.
13   Sorry.
14         **PRESIDING COMMISSIONER BRYSON:**  -- he, he's
15   burglarizing his girlfriend's --
16         **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  Yeah.
17         **PRESIDING COMMISSIONER BRYSON:**  -- aunt.  Okay.  So,
18   what did the girlfriend think about this?  Was your
19   girlfriend part of this?
20         **INMATE MCCLORE:**  No, she wasn't part of it.  That's
21   why I feel so bad, because I feel, I betrayed to her.
22   And I truly understand impact that I brought to her and
23   her family, I done did that.  And she was just go
24   without -- which I understand, I accept full
25   responsibilities for that, that crime, and for what I
26   later (inaudible) and the whole thing.  I don't have
27   anything to hide on that.  I just was an angry person,

14

1    and took it out on her, and I betrayed her trust.

2        **PRESIDING COMMISSIONER BRYSON:**  Well, that brings us

3    then to the, the next crime, which was actually the same

4    month -- this is March 22nd of 1984 -- I'm sorry, this

5    is two years later -- which was an L.A.P.D. arrest, for

6    Penal Code 266(h), pimping; and Penal Code 245, ADW.

7    This, what, what was this about?  You forced the victim

8    into --

9        **INMATE MCCLORE:**  (Inaudible.)  What?

10       **PRESIDING COMMISSIONER BRYSON:**  -- into

11   prostitution?

12       **INMATE MCCLORE:**  No.  When I met this lady, Violet

13   Gray (phonetic), she was already in prostitution.  And I

14   just met her, and we just became friends.  She had a

15   family that she brought with her from another state, and

16   we just friends.  But I never forced her into

17   prostitution.  And the pimping and pandering case was

18   dismissed on me.  And, so I gave her money; she gave me

19   money.  So, I really wasn't pimping.

20       **PRESIDING COMMISSIONER BRYSON:**  Ah, now what

21   about -- okay, what about your prison term?  Tell me

22   about the crime that got you into prison for life.

23       **INMATE MCCLORE:**  On this, on the kidnapping?

24       **PRESIDING COMMISSIONER BRYSON:**  You're a second,

25   your second commitment; are you not?

26       **ATTORNEY TARDIFF:**  I guess the A-, a 245, the ADW,

27   which he was convicted of --

15

1       **PRESIDING COMMISSIONER BRYSON:** Uh-huh.

2       **ATTORNEY TARDIFF:** -- on that, on that 3/22/84

3   arrest, right?

4       **PRESIDING COMMISSIONER BRYSON:** Right.

5       **ATTORNEY TARDIFF:** So the pimping and the pandering.

6   And then he's got the ADW in addition, and that's what

7   he was convicted of.

8       **DEPUTY DISTRICT ATTORNEY GLIDDEN:** But he did go to

9   prison.

10      **ATTORNEY TARDIFF:** Yeah, right.

11      **DEPUTY DISTRICT ATTORNEY GLIDDEN:** The Commissioner

12  is referring to the '82 prison commitment.

13      **ATTORNEY TARDIFF:** Right.

14      **PRESIDING COMMISSIONER BRYSON:** The prison

15  commitment.

16      **ATTORNEY TARDIFF:** Okay.

17      **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Yeah.

18      **PRESIDING COMMISSIONER BRYSON:** So, what I want to

19  know is ... because, okay, this was, this was burglary

20  second, correct?

21      **INMATE MCCLORE:** That's on the girlfriend.

22      **PRESIDING COMMISSIONER BRYSON:** Right.

23      **INMATE MCCLORE:** The burglary, right.

24      **PRESIDING COMMISSIONER BRYSON:** Okay.

25      **INMATE MCCLORE:** Okay.

26      **PRESIDING COMMISSIONER BRYSON:** So, well, I'm just

27  asking what, how did you come to do this crime? And you

16

1    said you were angry --

2        INMATE MCCLORE:  Right.

3        PRESIDING COMMISSIONER BRYSON:  -- but that doesn't

4    explain the crime.  What, why were you in (inaudible) I

5    want you to describe what happened.

6        INMATE MCCLORE:  What happened, I just, she went, I

7    needed some money, and I decided go ahead and do, do the

8    burglary because I needed the money.  And I was angry at

9    the time, you know, like I said, I lost my job.

10       PRESIDING COMMISSIONER BRYSON:  So how did you know

11   there was money?  There was a safe involved here, right?

12       INMATE MCCLORE:  Right.

13       PRESIDING COMMISSIONER BRYSON:  What was that about?

14   And how did you know that, why did you target her?  Why

15   didn't you -- why didn't you go to work?

16       INMATE MCCLORE:  Exactly.  That's what I'm saying, I

17   wish I would have went to work at that time, but --

18       PRESIDING COMMISSIONER BRYSON:  Okay.

19       INMATE MCCLORE:  -- I didn't have no money at the

20   time, and I lost my -- I had so little faith in my own

21   ability because I lost my job and I wasn't (inaudible).

22       PRESIDING COMMISSIONER BRYSON:  How did you loose

23   your job?  Why did you loose your job?

24       INMATE MCCLORE:  Just not showing up, not being

25   responsible.  I don't know how to keep the job.

26       PRESIDING COMMISSIONER BRYSON:  What was the job

27   that you had?

17

1    **INMATE MCCLORE:**  Well, I had one job working at

2    Kertech in San Fernando Valley on De Soto Street in

3    shipping and receiving, and I had another job working

4    at --

5    **PRESIDING COMMISSIONER BRYSON:**  Which job did you

6    have at the time that you, just prior to being, to you

7    pulling this burglary.  What was the last job you had?

8    **INMATE MCCLORE:**  Kertech, working shipping and

9    receiving out in San Fernando Valley.

10    **PRESIDING COMMISSIONER BRYSON:**  And what did you do

11    that they caused you to get fired there?

12    **INMATE MCCLORE:**  I really don't -- I really didn't

13    get fired, I just got lazy.  I got lazy, got tired of

14    working.  I didn't get fired.

15    **PRESIDING COMMISSIONER BRYSON:**  So you quit?

16    **INMATE MCCLORE:**  Absolutely.

17    **PRESIDING COMMISSIONER BRYSON:**  So, why were you

18    angry?

19    **INMATE MCCLORE:**  Because like (inaudible), I should

20    have kept my job and stayed more responsible to my

21    family.

22    **PRESIDING COMMISSIONER BRYSON:**  We know that now,

23    sir.

24    **INMATE MCCLORE:**  Yeah.

25    **PRESIDING COMMISSIONER BRYSON:**  We're trying to

26    understand if -- trying to understand where the true

27    source of your -- you said you were an angry young man,

18

1    why were you so angry?

2         **INMATE MCCLORE:**  Well, basically because I didn't

3    know how to survive for myself, for keeping a job.  I

4    didn't understand being independent, I strongly wanted

5    to be independent, to being a responsible person.

6         **PRESIDING COMMISSIONER BRYSON:**  Okay.  What I'm

7    building to, sir, is that this crime occurred when you

8    were 29-and-a-half basically, you were almost 30 years

9    old.

10        **INMATE MCCLORE:**  Exactly.

11        **PRESIDING COMMISSIONER BRYSON:**  That's not,

12   (inaudible) out of control, doesn't know what he's

13   doing.  This is -- we're talking now of an adult who's

14   supposed to be mature.

15        **INMATE MCCLORE:**  Absolutely.  And I wasn't.  I just

16   wasn't.

17        **PRESIDING COMMISSIONER BRYSON:**  All right.  Let's

18   talk about your personal history, okay?  Oh, first, I'd

19   like to ask you a couple of questions about the crime

20   itself.  According to the transcripts, the victim

21   reported that you told her, quotes, "We weren't going to

22   hurt you," and in your prisoner's version for the

23   October, 2004, report, you stated that you didn't

24   immediately know what the problem was in the offense,

25   and that in fact you wanted the Board to note that,

26   while you participated in crime, you showed compassion

27   toward the victim.  You feel that way today?

19

1      **INMATE MCCLORE:**  Yes.

2      **ATTORNEY TARDIFF:**  May I interject for a --

3      **PRESIDING COMMISSIONER BRYSON:**  Yes.

4      **ATTORNEY TARDIFF:**  -- moment.  There's a transcript

5      from the Initial Hearing.  I have it here, and I can....

6      And this issue came up, and they asked that he put it on

7      record, this, the behavior he had towards the victim.

8      And why don't you tell them (inaudible).  So, basically,

9      it starts at line 13, and it's from the, the Superior

10     Court transcript when they questioned the victim

11     regarding what Mr. McClore said to her.  And this is her

12     testimony, and it starts on line 13.

13     **PRESIDING COMMISSIONER BRYSON:**  Okay.  This is the

14     attorney, McPherson (phonetic).

15     **ATTORNEY TARDIFF:**  Right.

16     **PRESIDING COMMISSIONER BRYSON:**  Presume (inaudible).

17     I presume the way this is -- I presume the way this is

18     the victim question that the victim -- what was the

19     first thing you remember him saying to you whether, it

20     was the first thing whether, it was the first thing or

21     not, the first thing you remember him saying to you.

22     The only thing I remember the passenger actually saying

23     to me was, he turned around and looked at me and he

24     says, quote, "Why are you crying?  Why" -- dash, dash --

25     "we're not going to hurt you," end quotes.  So that's

26     the first thing you remember him saying.  Okay.  And the

27     point of this is do you --

20

1       **ATTORNEY TARDIFF:**   That's her testimony about what
2    he said to her.

3       **PRESIDING COMMISSIONER BRYSON:**   Okay.   And in fact
4    that's what's reflected here in the Board reports.

5       **ATTORNEY TARDIFF:**   And as opposed to this statement
6    that he's supposedly said we're going to shoot you.

7       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   But I also have
8    another transcript which does reflect that she, he
9    threatened to --

10       **ATTORNEY TARDIFF:**   Her statement?

11       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   Yes.   Her
12    testimony.

13       **ATTORNEY TARDIFF:**   Okay.   What's that about?

14       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   You know, it,
15    it's not the entire transcript, because I'm not sure if
16    it's the trial or the preliminary hearing.

17       **ATTORNEY TARDIFF:**   Um-um.

18       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   But, I, I do have
19    it, and I have some things I plan to quote, and it talks
20    about --

21       **ATTORNEY TARDIFF:**   So that's from the trial that
22    that transcript that was read into the record, the
23    first, at the Initial Hearing.   And the victim states
24    that he never said anything about going to kill you.
25    And now you're saying you have other transcripts where
26    she does say ....

27       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   I have the

21

1    transcript of the victim's testimony where she says --

2        **ATTORNEY TARDIFF:** Do we have that? We have that in

3    our packets, I think, right? Is that this -- right

4    after the Appellate Court decision?

5        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Yes. Correct.

6        **ATTORNEY TARDIFF:** Do you have a page number on

7    that? Right after the Appellate --

8        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Well, I have, I

9    have quotations from various locations in that

10    transcript, where he says -- but it goes, it's very

11    long, it's about a hundred, well --

12        **ATTORNEY TARDIFF:** Here's this --

13        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** It starts here on

14    page 159.

15        **ATTORNEY TARDIFF:** Right.

16        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Right.

17        **ATTORNEY TARDIFF:** And where's the lines, though,

18    where she says that he says these things?

19        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Ah ... okay.

20    Well, she goes, she describes -- let's see. Let's see.

21    Okay. Well, on ....

22        **PRESIDING COMMISSIONER BRYSON:** Well, on page 164,

23    "They told me to do exactly what they said, and if I

24    showed any fear and so forth, they would take my life,

25    so I did exactly what they asked."

26        **DEPUTY DISTRICT ATTORNEY GLIDDEN:** Right. Here's

27    another one, "When I got into the car he told me, he, he

22

1    told me not to try to get away because, quote, 'I have a

2    gun, and I'll use it.'"  Inmate was also identified as

3    the person who ripped the jewelry from her neck.

4        **ATTORNEY TARDIFF:**  Where are you reading that from?

5        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  Well --

6        **ATTORNEY TARDIFF:**  What page?

7        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  -- I didn't note

8    the page.  These are notes that I took from the

9    transcript that I have in here.

10       **ATTORNEY TARDIFF:**  Okay.  It's on page one -- okay,

11   they told me, the detective said ... well, they -- we

12   don't know if it's --

13       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  But then later in

14   the transcript she identifies, later on -- for some

15   reason they went through the whole thing and then they,

16   at the end, had her identify who does these things.

17   And, I, since -- I, several hours today, I went through

18   the transcript, and at the end it does talk about who

19   does it.

20       **PRESIDING COMMISSIONER BRYSON:**  Well, if we may,

21   let's look at it this way:  She was a woman --

22       **INMATE MCCLORE:**  Exactly.

23       **PRESIDING COMMISSIONER BRYSON:**  You were two strong,

24   young men --

25       **INMATE MCCLORE:**  Absolutely.

26       **PRESIDING COMMISSIONER BRYSON:**  You forced her into

27   the car, smashed her head down, you're grabbing stuff

23

1    off her, some kinds of threats were evidently made.

2    What woman would not be in fear for her life at that

3    time? So, it's, it's, I would submit to this Panel it's

4    moot as to whether, what exactly, who said exactly what

5    at what time. What is really offensive in this

6    proceeding is the concept of perhaps your, your role in

7    this was somewhat mitigated in that you showed

8    compassion. Frankly this Panel has difficulty seeing

9    compassion in your role in this at all. I mean,

10    regardless of what you told her -- because the typical

11    response for a victim undergoing that kind of force

12    would be, not to believe -- whatever came out of an

13    individual's, an aggressor's mouth at that point would

14    be countermanded by what's going on, physically, at that

15    point. And so, I'm --

16    **INMATE MCCLORE:** (Inaudible.)

17    **PRESIDING COMMISSIONER BRYSON:** -- no, I'm talking

18    to you for a moment. Okay, so, regardless of what you

19    had said, the idea that you're trying to comfort her, if

20    you really wanted to give her comfort, you would not

21    have engaged in this in the first place, number one, but

22    number two, you would have immediately assisted her to

23    get free, which you did not. You were a full partner,

24    obviously, and it's clear to this Panel, in this entire

25    event. Now, go ahead.

26    **INMATE MCCLORE:** I'm not here to change any facts --

27    **PRESIDING COMMISSIONER BRYSON:** Right.

24

1    **INMATE MCCLORE:** -- which you have on paperwork.

2    **PRESIDING COMMISSIONER BRYSON:** Okay.

3    **INMATE MCCLORE:** I accept full responsibility for

4    that crime, any other crime that I committed. I'm not

5    debating who said what or whatever.

6    **PRESIDING COMMISSIONER BRYSON:** Um-um.

7    **INMATE MCCLORE:** Again, I'm not here to change any

8    facts. I accept full responsibility for that crime, for

9    any crime that I've done, and I have -- my remorse is

10   very sincere for what I done.

11   **ATTORNEY TARDIFF:** But I think her question is this:

12   That if you're claiming that you showed compassion, she,

13   the Commissioner, is wondering how you showed compassion

14   by even participating at all in the crime. Right?

15   **PRESIDING COMMISSIONER BRYSON:** And that brings into

16   question if you understand the nature and magnitude of

17   the commitment offense. That's the issue here.

18   **INMATE MCCLORE:** Right. And I understand that.

19   **ATTORNEY TARDIFF:** So can you answer the question,

20   then, I guess, you know, he's still -- in terms of the

21   compassion -- I don't know, I mean I can't drag it out

22   of you, but compassion is not shown by doing this crime.

23   **INMATE MCCLORE:** Absolutely. And I do, and --

24   **ATTORNEY TARDIFF:** So when you're saying,

25   compassion, what do you mean?

26   **INMATE MCCLORE:** I was having empathy for what, for

27   the victim what she was going through. It's just that I

25

1    still went through it and I didn't really want go

2    through it, and I did it, and I'm sorry for it.  But I,

3    I understand that doing the crime and what she went

4    through, it was traumatized to her mentally.

5        **ATTORNEY TARDIFF:**  So you mean you have compassion

6    now or at the time of the commitment offense you felt --

7        **INMATE MCCLORE:**  At the time now.  Right now.

8        **ATTORNEY TARDIFF:**  Okay.  So then ... may I?  Just,

9    if --

10       **PRESIDING COMMISSIONER BRYSON:**  Go ahead, although

11   your --

12       **ATTORNEY TARDIFF:**  I'm (inaudible) --

13       **PRESIDING COMMISSIONER BRYSON:**  -- you actually

14   (inaudible) mouth --

15       **ATTORNEY TARDIFF:**  -- I'm trying not to.

16       **INMATE MCCLORE:**  Yeah, but see, (inaudible) --

17   like --

18       **ATTORNEY TARDIFF:**  I won't ask --

19       **INMATE MCCLORE:**  -- like when you read the case

20   off --

21       **PRESIDING COMMISSIONER BRYSON:**  Yeah.

22       **INMATE MCCLORE:**  -- the facts is the facts, and I'm

23   here to agree to it.  Whether it's right, what they,

24   what she testified in the transcript or what the

25   probation said or whatever was said, at that time I was

26   out of control, I didn't have compassion because I went

27   along with the crime with the -- with the other

26

1   individual.  Today I have much compassion, empathy,

2   remorse, everything that I can think of to what I done

3   to this victim at that particular time.

4       **ATTORNEY TARDIFF:**  But that's not she -- this is

5   what she wants to know:  He stated that he would like

6   the Board to note that while he participated in the

7   crime, he showed compassion towards the victim.  That's

8   what you're specifically asked to address.  Do you

9   understand that?

10      **INMATE MCCLORE:**  Right.  And the compassion -- the

11  only thing I feel when I just turned around, told her

12  not to be crying, because we're not going to hurt you.

13  And I insured that she didn't get hurt.  That's the

14  compassion that I had, that I felt at that time.  She

15  wasn't going to be hurt, and she never got hurt.  And

16  that's what I told her, and I meant it, and she never

17  got hurt.  That's my compassion to her.  And I made sure

18  that she wasn't going to be hurt by me or my crime

19  partner.

20      **PRESIDING COMMISSIONER BRYSON:**  What do you mean by

21  hurt?

22      **INMATE MCCLORE:**  Hurt in any kind of ways, you know,

23  far as -- whatever I, whatever he, my (inaudible) what

24  he like to do, or, or anything, in my control, that I

25  made sure that he didn't go no further than what we did

26  in the crime.  As far as not being raped or being hit or

27  beat up, that was never going to happen, and I assured

27

1    that to her, to stop crying, that she wasn't going to be

2    hurt.    That's my compassion to her.    And I made sure of

3    that.    And that's why we let her go.    It wasn't that she

4    had escaped, she had to jump out the car, or nothing

5    like that.    That's my compassion to her what I told her,

6    and I meant that.

7        PRESIDING COMMISSIONER BRYSON:    See, that, that

8    still brings me questions, sir, if you really

9    understand, because this is -- let me go to the other

10   crime, the noncontrolling case, the ADW case, where the

11   victim was a Bonnie Bray (phonetic).    About how old was

12   she?    Do you remember?    Approximately.

13       INMATE MCCLORE:    She was about mid-30s.

14       PRESIDING COMMISSIONER BRYSON:    Okay.    And, do you,

15   I don't understand, really, your involvement in this

16   crime if you are claiming that in fact you weren't

17   forcing her into prostitution, and I have no idea what

18   assaulting her with a telephone meant.    So maybe you

19   could elaborate a little bit on what happened there.

20       INMATE MCCLORE:    Okay.    When it come to telephone, I

21   admit that I hit her with the telephone.    I was on the

22   telephone talking some business or something.    She was

23   sitting next to me.

24       PRESIDING COMMISSIONER BRYSON:    You were talking

25   some business --

26       INMATE MCCLORE:    To a friend of mine on the

27   telephone.    And she was trying to get my attention, she

28

1    kept trying to get my attention.  And I turned around

2    and I told her, (inaudible) at the time, stop.  So I

3    just spontaneously turned around, and tapped her on the

4    leg and told her to stop.  And that's what it was.

5        PRESIDING COMMISSIONER BRYSON:  Tapped on what, I'm

6    sorry.

7        INMATE MCCLORE:  I tapped on her leg with the

8    telephone.

9        PRESIDING COMMISSIONER BRYSON:  On the leg, on her

10   leg, you tapped her?

11       INMATE MCCLORE:  Right.  I hit the telephone on the

12   leg, but it wasn't no, like she had to go the doctor,

13   there wasn't no swelling, there wasn't no injury of

14   anything.  Just tapped her on the leg with the

15   telephone.  Then she stopped.

16       PRESIDING COMMISSIONER BRYSON:  How did that turn

17   into ADW?

18       INMATE MCCLORE:  That's all it is.  That's what I

19   did, that convicted me of.  They said it was assault

20   with a great bodily -- I don't understand it neither.

21   There's not a doctor's report.  That's all I did, bam.

22       PRESIDING COMMISSIONER BRYSON:  What did she do?

23       INMATE MCCLORE:  She stopped after that.

24       PRESIDING COMMISSIONER BRYSON:  How did this turn

25   into a crime?

26       INMATE MCCLORE:  She went and turned me in for the

27   pimping and pandering case.  And they found me guilty of

29

1    that; they dropped the pimping and pandering and found

2    me guilty of assault.  And they said it was great bodily

3    injury.

4        PRESIDING COMMISSIONER BRYSON:  For the

5    transcriptionist, do you mean pimping and pandering?

6        INMATE MCCLORE:  Right.

7        PRESIDING COMMISSIONER BRYSON:  This being

8    P-A-N-D-E-R-I-N-G.  Then you said, "There's no way in

9    the world I would deal with this woman; she weighed 300

10   pounds, and was taller than me."  What, what was the

11   circumstance ....

12       INMATE MCCLORE:  Huh?

13       PRESIDING COMMISSIONER BRYSON:  This is not funny,

14   but it's just amazing to me that you are dealing with

15   this this way.  What were the circumstances after -- you

16   smacked her on the thigh with the telephone --

17       INMATE MCCLORE:  Right.

18       PRESIDING COMMISSIONER BRYSON:  -- now, did she call

19   the police?  What happened after that?

20       INMATE MCCLORE:  After that --

21       PRESIDING COMMISSIONER BRYSON:  Well --

22       INMATE MCCLORE:  -- didn't, didn't anything happen.

23   What happened was she came with the pimping and

24   pandering case and charged me for pimping and pandering.

25       PRESIDING COMMISSIONER BRYSON:  Wait a minute.  She

26   came with the pimping and --

27       INMATE MCCLORE:  Pandering case.

30

1      **PRESIDING COMMISSIONER BRYSON:**    -- pandering case.

2      **INMATE MCCLORE:**    Right.

3      **PRESIDING COMMISSIONER BRYSON:**    Well, when did she

4      go to the police?  The next day, the next week, a year

5      later, what happened?

6      **INMATE MCCLORE:**    She went to them, I guess, a week

7      later.

8      **PRESIDING COMMISSIONER BRYSON:**    And why would she

9      do -- why would she go to the police?  Why did she go to

10     the police, do you know?

11     **INMATE MCCLORE:**    Because we was breaking up,

12     basically.  I didn't want to have nothing do with her no

13     more, so I guess she went back to get back at me.  She

14     went and got the police, said I was pimping her, and

15     they come arrested me at my auntie's house.  And while I

16     was in the county jail going to court, they dropped the

17     pimping and pandering, but they charged me with the

18     assault.  That's what happened.  That's on the

19     paperwork.

20     **PRESIDING COMMISSIONER BRYSON:**    Now, I will tell you

21     that the law enforcement agencies do not charge people

22     with crimes unless they have some evidence.  So if in

23     fact you tapped her on the thigh with the telephone --

24     **INMATE MCCLORE:**    Right.

25     **PRESIDING COMMISSIONER BRYSON:**    -- and she had no

26     evidence of that, they wouldn't charge you with that,

27     sir.  It's, it stretches belief to believe that in fact

31

1    they would do that.  There has to be evidence to charge

2    people with a, certain crimes, so ....

3        INMATE MCCLORE:  You mean for the assault?  And I

4    admitted to the assault.  I told you yes, I hit her on

5    the leg with the telephone.

6        PRESIDING COMMISSIONER BRYSON:  You said you --

7    after.

8        INMATE MCCLORE:  Okay, when I hit on the leg with

9    the telephone -- one time.  And that's it.  And they

10   gave me assault with a deadly weapon.

11       ATTORNEY TARDIFF:  And did you plead on it?  Or did

12   you go to trial?

13       INMATE MCCLORE:  No, I pleaded on it.

14       PRESIDING COMMISSIONER BRYSON:  You know what

15   pleading and plea-ing means?  What a plea means?  Do you

16   know what that means?  What?

17       INMATE MCCLORE:  It mean that without trial, admit

18   to the crime.

19       PRESIDING COMMISSIONER BRYSON:  You admitted.

20       INMATE MCCLORE:  Right.

21       PRESIDING COMMISSIONER BRYSON:  Right.

22       ATTORNEY TARDIFF:  So why would you admit to

23   something as minor as a tap on the leg?  Because they

24   cut you a deal?

25       INMATE MCCLORE:  Right.  Well, no, they didn't cut

26   no deal, they --

27       ATTORNEY TARDIFF:  They just give a pimping and

32

1    pandering for --

2        INMATE MCCLORE:  Right.  They dropped the pimping

3    and pandering case, and, and my lawyer told me they

4    would drop the pimping and pandering case if you agree

5    to the assault and battery, and that's what I did.  But

6    let me say something to you.

7        PRESIDING COMMISSIONER BRYSON:  Go ahead.

8        INMATE MCCLORE:  I don't want to be, look like a

9    clown or being confusing to the Parole Board.  I am a

10   different person who I was back then.  And that's really

11   why I come in today, to say no matter what I did back

12   then, no matter how strange it sound from my mouth or on

13   the paperwork, I admit to everything.  But I want you to

14   note that -- the new person who I am today.  I have no

15   problem about my history.  And I want, I know some time

16   that the past got to stop influencing the present, and

17   I'm trying to do that today.  I don't understand any

18   different terminology on the paperwork or different

19   statements being said, all that.  I'm just -- I want to

20   get that behind me.

21       PRESIDING COMMISSIONER BRYSON:  Let me tell you why,

22   sir.

23       INMATE MCCLORE:  Okay.

24       PRESIDING COMMISSIONER BRYSON:  Okay.  Because you

25   have some serious criminal history --

26       INMATE MCCLORE:  I do.

27       PRESIDING COMMISSIONER BRYSON:  -- with crimes

33

1    against women.

2        **INMATE MCCLORE:**  I do, and I admit to that.

3        **PRESIDING COMMISSIONER BRYSON:**  And whether it's

4    against men or women, it doesn't matter --

5        **INMATE MCCLORE:**  Absolutely.

6        **PRESIDING COMMISSIONER BRYSON:**  -- but the fact is

7    it, it happened to be against women.  Now, also, in your

8    history here we have, you were born in Tennessee, the

9    fifth of six children, you graduated -- excuse me you

10   went through to the 11th grade, at the age of 18 came to

11   California and you married an Ethen Neely (phonetic)

12   that same year, and you had a child.

13       **INMATE MCCLORE:**  Absolutely.

14       **PRESIDING COMMISSIONER BRYSON:**  All right.  Then you

15   divorced in 1980.  Then you began a common law

16   relationship with Mona Saunwell (phonetic) for two

17   years.  You had a child with her, and a son.  So that

18   relationship didn't last.  Now, the concern here, sir,

19   to be very frank, is how you dealt with your whole

20   criminal history and including your noncriminal personal

21   history -- in a way that assures this Panel that you're

22   not going to go out again and commit, first of all, any

23   crime, but then a crime against women, because that's

24   what, because women -- it appears that in certain ways,

25   you prey upon women, you take advantage of women.  And

26   we have to look and see do you really understand what

27   you've done here.  Now let me ask you, you divorced

34

1    your, you, you were first married, and how, why, why did

2    you divorce?  What happened there?

3         INMATE MCCLORE:  Well, we just wasn't getting along

4    any more.  We just weren't getting along.

5         PRESIDING COMMISSIONER BRYSON:  You weren't -- okay.

6    You weren't getting along --

7         INMATE MCCLORE:  Right.

8         PRESIDING COMMISSIONER BRYSON:  -- so the --

9         INMATE MCCLORE:  (Inaudible.)

10        PRESIDING COMMISSIONER BRYSON:  Were you working?

11        INMATE MCCLORE:  Yes.

12        PRESIDING COMMISSIONER BRYSON:  Okay.  And so you

13   had a child together, which is a lot of responsibility.

14        INMATE MCCLORE:  It is.

15        PRESIDING COMMISSIONER BRYSON:  And how old were you

16   at that time?  It looks like you were about 21 or so at

17   that time?

18        INMATE MCCLORE:  Yes.

19        PRESIDING COMMISSIONER BRYSON:  And that lasted for

20   approximately four years and before you were divorced.

21   So, did you try to get custody of the child?

22        INMATE MCCLORE:  No.

23        PRESIDING COMMISSIONER BRYSON:  Were you, did you

24   contribute to the upbringing of --

25        INMATE MCCLORE:  Yes, I did.

26        PRESIDING COMMISSIONER BRYSON:  -- the child?  You

27   did.  Did you pay regular support for the child?

35

1    **INMATE MCCLORE:**  Right.  Right, yes, yes I did.

2    **PRESIDING COMMISSIONER BRYSON:**  So if we looked into

3    the records we would find out that you --

4    **INMATE MCCLORE:**  I don't know if it's in the

5    record --

6    **PRESIDING COMMISSIONER BRYSON:**  (Inaudible.)

7    **INMATE MCCLORE:**  -- but I did do for my child as

8    much as I did, I do, I could.  I gave them money and

9    love and support and things like that.  On my own.

10   But ....

11   **PRESIDING COMMISSIONER BRYSON:**  Then you got

12   another, you had a relationship from '82 to '84 in which

13   you had a child, a son.  What happened to that

14   relationship?

15   **INMATE MCCLORE:**  We fell apart.

16   **PRESIDING COMMISSIONER BRYSON:**  Why?

17   **INMATE MCCLORE:**  Because we just wasn't, weren't

18   getting along.

19   **PRESIDING COMMISSIONER BRYSON:**  And did you

20   contribute to the raising of that child?

21   **INMATE MCCLORE:**  No, he was about one years old,

22   then I caught this case.

23   **PRESIDING COMMISSIONER BRYSON:**  Okay.  Do you see

24   the pattern here?

25   **INMATE MCCLORE:**  Yes, and I was going to get to

26   that.  When, when Commissioner Fisher was here at the

27   last Hearing, she gave me some very good advice, and I

36

1    appreciate that.  I went back to my Central File,

2    exactly what she said, and I found what you saying, and

3    before I got around to it, and you, you said it

4    yourself, I did -- it, it was a pattern on women.  And I

5    had a little bit of faith in my own, and I started

6    living off of other people.  And it was a pattern, with

7    females, and I admit that.  And I saw that in my

8    Central File.  Exactly the file what you read, because

9    it said I was a predator.  And I, I'm not denying none

10   of it, the things I used to be.  I understand that.  I

11   had a very terrible criminal background, it's bad, the

12   crime I did, whatever I did.  I'm not here to change

13   anything.  But that's, when I went back and saw what I

14   read in the transcript, I was ashamed of myself and how

15   I used to live and what I did.  And a lot things you're

16   asking me right now, I just forget.  It's just been so

17   long time ago and I forgot and I don't have no excuse

18   for.  But I did go back to my Central File and read

19   exactly what you, what you saying about the pattern on

20   females --

21       PRESIDING COMMISSIONER BRYSON:  Well, sir, the

22   words --

23       INMATE MCCLORE:  -- and --

24       PRESIDING COMMISSIONER BRYSON:  -- "I take full

25   responsibility" flow out of the mouth very easily.  The

26   issue becomes we have to, have to see, and it's very

27   difficult to assess.  That's what makes it difficult, is

37

1    that obviously, in here there are no women, you don't

2    associate with women on the, in the majority -- there

3    are a few, but very few. And so, your understanding

4    becomes the big issue. Do you really understand what

5    was going on with you --

6        INMATE MCCLORE: Absolutely. And I agree with that.

7    There was a pattern of females.

8        PRESIDING COMMISSIONER BRYSON: Why?

9        INMATE MCCLORE: Mainly because there was more, in

10   my life at the time, females. You know, I had no

11   problem having a girlfriend, and I didn't kick it with a

12   lot individual men, and that what it was, and ....

13       PRESIDING COMMISSIONER BRYSON: What was your mother

14   and father's relationship?

15       INMATE MCCLORE: It was good.

16       PRESIDING COMMISSIONER BRYSON: Did your father

17   abuse your mother?

18       INMATE MCCLORE: No.

19       PRESIDING COMMISSIONER BRYSON: Did your father ever

20   (inaudible)?

21       INMATE MCCLORE: No.

22       PRESIDING COMMISSIONER BRYSON: Your, your children?

23       INMATE MCCLORE: No.

24       PRESIDING COMMISSIONER BRYSON: Let's see, you don't

25   have your parents any more; is that correct?

26       INMATE MCCLORE: Yes.

27       PRESIDING COMMISSIONER BRYSON: And how about your

38

1    siblings, your brothers and sisters?

2        INMATE MCCLORE:  Well, my older sister just passed

3    away about three years ago.  And I have, I have four

4    brothers still alive.

5        PRESIDING COMMISSIONER BRYSON:  How are they doing?

6        INMATE MCCLORE:  Doing good.

7        PRESIDING COMMISSIONER BRYSON:  What are they doing?

8        INMATE MCCLORE:  I have a brother working, he's a

9    architecture for Exxon, gas company in Lawford

10   (phonetic), Texas; and my other brother, he's a car

11   dealer in Memphis, Tennessee.

12       PRESIDING COMMISSIONER BRYSON:  All right.  At one

13   point you were hoping to get back to Tennessee.

14       INMATE MCCLORE:  Absolutely, yes.

15       PRESIDING COMMISSIONER BRYSON:  You still hoping to

16   do that at --

17       INMATE MCCLORE:  Yeah.

18       PRESIDING COMMISSIONER BRYSON:  -- at some point?

19       INMATE MCCLORE:  Yes.

20       PRESIDING COMMISSIONER BRYSON:  Okay.  It says that

21   your employment history consists of construction, spray

22   painter, assembly line worker, and working in the family

23   grocery store.  You also claim skills as a janitor,

24   stock clerk, and pipe fitter.  But is that accurate?

25       INMATE MCCLORE:  Yes.

26       PRESIDING COMMISSIONER BRYSON:  All those past

27   experiences?

39

1      **INMATE MCCLORE:**  Yes.

2      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Is there

3      anything else about your personal history that you want

4      this Board to know that would give more understanding of

5      what you're about?

6      **INMATE MCCLORE:**  No.  About my past history?

7      **PRESIDING COMMISSIONER BRYSON:**  Right.  Because

8      that's, that's what made you, the person that's sitting

9      in front of us today.

10     **INMATE MCCLORE:**  Right.

11     **PRESIDING COMMISSIONER BRYSON:**  And none of us can

12     really escape our past --

13     **INMATE MCCLORE:**  Absolutely.

14     **PRESIDING COMMISSIONER BRYSON:**  -- so -- and

15     forgetting about it means that we are doomed to re-live

16     it, frankly, based on our past.  So it's a good thing to

17     be able to look back and say, you know, what was going

18     on with me or you, at that time.  And that's why there's

19     concern because why would you be so angry?  You

20     apparently had a good mother and father who must have

21     taught you right from wrong.  Your father, you said,

22     treated your mother well --

23     **INMATE MCCLORE:**  Yeah.

24     **PRESIDING COMMISSIONER BRYSON:**  -- is that correct?

25     **INMATE MCCLORE:**  Yes.

26     **PRESIDING COMMISSIONER BRYSON:**  So it's hard to see

27     where this violence came from, and where this antipathy

40

1    to women, it's hard to see where that came from.  It's

2    hard, because I don't see it in your past, really.  So

3    have you thought about that?

4        **INMATE MCCLORE:**  Yes, I have.  And I, sometime I

5    wonder myself.  And that's, all the insight that I went

6    to, is when I went back and looked like, in Ms. Fisher

7    told me to do, and I went back to my Central File, and I

8    understood.  And I'm not here to say anything different

9    from what you saying, but so much that happened in my

10    life since I been in prison, I can't remember a lot of

11    things that you was asking me.  And when it come to

12    female, you right, I did -- it was, I had a pattern with

13    females.  I see that myself.  And I respect that.  I

14    didn't understand love -- I didn't care.  The word love,

15    I really didn't love; I just got in relationships and I

16    just did what I did.  I wish I would have understood

17    love and being respectful toward other people

18    (inaudible).  I just didn't.  So I'm here today to say

19    that I understand that.  And I'm a new person today, and

20    I like -- you know, I want to move forward and accept my

21    responsibility and go from there.  And the only way I

22    can to do that, I got to get rid of my bad personality

23    so the good will have room to grow.  And that's all I'm

24    trying to prove today.  I understand everything you

25    saying.  I'm not here to change anything but to let you

26    know I have changed to a better person.  And you

27    probably know my history, the pattern on the female, the

41

1    problem with a lot of things that I can't change.  And

2    I'm not disagreeing with you about none of it.  I did

3    those things.

4        PRESIDING COMMISSIONER BRYSON:  Sir, the prior

5    Panels have had a major issue with your insight into

6    the --

7        INMATE MCCLORE:  Absolutely.

8        PRESIDING COMMISSIONER BRYSON:  -- (inaudible).

9        INMATE MCCLORE:  Right.

10       PRESIDING COMMISSIONER BRYSON:  That's, that's what

11   (inaudible).  So we're not hounding on anything.  But I

12   think at this point, it would be good to talk about your

13   adjustment life since incarcerated for the second time.

14   And so if you'll turn your attention to Commissioner

15   Thompson, please.

16       DEPUTY COMMISSIONER THOMPSON:  Thank you.  Well,

17   we're looking at the period of time of September the

18   12th, 2005, through today, which is January the 3rd,

19   2007.  And with respect to the Board report that was

20   signed off on May the 26th of 2006, that's the most

21   recent one.  It's in here at Correctional Training

22   Facility your custody is Medium-A; you're the

23   mandatory 19 classification score, if I remember

24   correctly, and if that's not right, feel free to tell me

25   otherwise.  And as far as Vocational Training, they say

26   during the period covered that there has been no record

27   of Vocational Training.  Academics, same remark in the

42

1    work record.  You continue your full time assignment

2    working as a Photographer in the visiting room.  You

3    receive high marks for that.  Your supervisor thinks

4    you're very perceptive, you're efficient, you're

5    respected, you work well with the people that are there;

6    he's written you several laudatory chronos.  So, you do

7    that work very well, apparently.  As far as group

8    activities, you began Anger Management, apparently, in

9    the period of March of 2006, and you received a

10    certificate for completing all of the segments in Anger

11    Management, which is referred here a laudatory general

12    chrono saying that you did complete the whole program

13    and you are to be "commended for his participation in

14    this program."  So this program apparently began in

15    March of 2006, and ended on October the 5th, 2006.  And

16    there has been no other program that I can find that you

17    did after 2006, October.  And whoops ....  The -- no

18    psych treatment is noted during this period, or I think

19    any time since you've been in; I don't see that psych

20    treatment was ever extended to you.  And your prison

21    behavior has been exemplary since 1997.  You have had

22    six 115s, and the last one was March the 6th of 1997 --

23    I'm sorry, it says 2007, that's incorrect -- your last

24    CDC 115 was in March 6th, 1997, was for failure to

25    participate, and you have a 30-day loss of credit.

26    There's only one, which occurred February the 25th,

27    1994, when you were at CSP, Corcoran, and that was for

43

1     an assault and battery causing great bodily harm.  That

2     was assessed, found you guilty, and you lost 90 days of

3     credit on that one.  The other ones were, well, there

4     was home brew, there was destroying state property,

5     there was refusing to perform assigned duties, and there

6     was being out of bounds.  They are small matters; there

7     was the one issue of violence.  And nothing, as I say,

8     since 1997.  Is anything of that incorrect, or does it

9     need --

10         INMATE MCCLORE:  You said 1997, the last

11    disciplinary?

12         DEPUTY COMMISSIONER THOMPSON:  Is the last

13    disciplinary.

14         INMATE MCCLORE:  I never got a disciplinary in 1997.

15    It just, it, '97 just started (verbatim).

16         DEPUTY COMMISSIONER THOMPSON:  No.

17         ATTORNEY TARDIFF:  Are you talking about a 115 or

18    128?

19         DEPUTY COMMISSIONER THOMPSON:  Well, this is all

20    listed in --

21         INMATE MCCLORE:  Oh, yeah, 1997, at Avenal State

22    Prison.

23         DEPUTY COMMISSIONER THOMPSON:  Right.

24         INMATE MCCLORE:  That's right, okay.

25         DEPUTY COMMISSIONER THOMPSON:  Yeah, that was --

26         ATTORNEY TARDIFF:  Failure to participate.

27         DEPUTY COMMISSIONER THOMPSON:  They don't, they

44

1    don't show him as having any 128(a)s or counseling

2    chronos.  These are all listed as 115s, and none

3    since --

4        INMATE MCCLORE:  Right.

5        DEPUTY COMMISSIONER THOMPSON:  -- the one we just

6    mentioned.

7        INMATE MCCLORE:  I think two, two or three of those

8    was from the --

9        PRESIDING COMMISSIONER BRYSON:  Yeah.

10       INMATE MCCLORE:  -- first one.

11       PRESIDING COMMISSIONER BRYSON:  Yeah, the first two

12   (inaudible).

13       INMATE MCCLORE:  Right.

14       PRESIDING COMMISSIONER BRYSON:  So really, four

15   since your present (inaudible).

16       INMATE MCCLORE:  Okay.

17       PRESIDING COMMISSIONER BRYSON:  Yes, we have that.

18       DEPUTY COMMISSIONER THOMPSON:  Okay.  And with my

19   general running down what's been true, at least since

20   9- 5 -- 9 '05 to today, are you satisfied that as

21   explaining your behavior, progress, and involvement with

22   you?  All right.  Over the period of your entry into the

23   system and through October of 2006, you accumulated

24   five, ten, 12, 14 laudatory chronos for work performance

25   for participation in programs and general conduct and

26   behavior in the prison system.  And I do believe that

27   covers basically what's being going on with you at least

45

1   since September of '05 through today, and further back
2   in some areas such as the (inaudible). Any, anything on
3   that? Any changes, any clarifications?

4       **INMATE MCCLORE:** No.

5       **DEPUTY COMMISSIONER THOMPSON:** All right. Then I'll
6   turn to your psychiatric evaluation. And that was
7   prepared on October the 7th, 2003. Clinical assessment,
8   at that time on the diagnostic impression, Axis I, No
9   Contributory Clinical Disorder, and that's mental
10  disease; Axis II, Adult Antisocial Personality Behavior
11  by History Only; and on Axis III, physical basis for any
12  kind of your behavior, No Contributory Physical
13  Disorder; the Eternal Stressor on Axis IV is
14  incarceration. However, your Global Assessment of
15  Functioning, which is how you perceive the world, you
16  have a 90, which is a fantastic score; a hundred is the
17  best one can do. Now, you, it says, "Inmate McClore's
18  parole prognosis is excellent. There is virtually no
19  indication suggesting otherwise. He has participated in
20  virtually every activity or self-help group available at
21  this facility." I didn't find quite such a rich trace
22  in looking backward and forward, but the recent Anger
23  Management is certainly verified, and I think they
24  referred to your having gone to self-help. Now they say
25  there is nothing in this report, no further self-help
26  groups. You seem to have attained great strides in your
27  personal development. Laudatory chronos, beginning with

46

1    your entry into the system and then up to the year 2000,

2    and up to 2000, and then there seems to be a gap, at

3    least as far as I could find, that you didn't receive

4    any until October of last year, in which there was two,

5    one related to work performance, and one to completion

6    of the program, Anger Management.  Assessment of

7    Dangerousness says, "Inmate McClore has received no

8    CDC 115s or 128s in almost seven years.  His last

9    CDC 115 was relatively minor, involved in taking too

10   long in an education class."  And it, again, says, "You

11   are a good candidate for release and have been a good

12   citizen in prison.  "If referred to the community, the

13   inmate possesses no more threat of violence or

14   dangerousness than any other citizen in the community."

15   Normally that would have been a pretty ringing

16   endorsement.  The citizens of the community aren't quite

17   so reliable in comparison anymore.  Clinical

18   observation:

19        "Inmate McClore is competent and responsible

20        for his behavior.  He has demonstrated a clear

21        ability to abide by institutional standards,

22        and has done so through the majority of his

23        incarceration.  The inmate does not have a

24        mental health disorder, which would necessitate

25        treatment either during incarceration or

26        following it.  Inmate McClore does not have a

27        alcohol or drug problem that would necessitate

47

1        treatment either during his incarceration or

2        following it.  And at the same time he has

3        availed himself of all self-help and

4        psychological assistance that can be offered by

5        CDC, and there are no additional services that

6        could be provided to him.  He appears to be an

7        excellent candidate for parole."

8        And that was prepared by an S. Sexton, Ph.D.,

9   consulting psychologist at this facility, countersigned

10  by a B. Zika, Z-I-K-A, Ph.D., Correctional Training

11  Facility Senior Supervising Psychologist.  Did you read

12  that report?

13        INMATE MCCLORE:  Yes.

14        DEPUTY COMMISSIONER THOMPSON:  And now, any

15  questions, additions, or clarifications?

16        INMATE MCCLORE:  No.

17        DEPUTY COMMISSIONER THOMPSON:  I'll refer to you to

18  the Chair.

19        PRESIDING COMMISSIONER BRYSON:  All right.  Thank

20  you.  It's really interesting to me that on page 3 of

21  that report under Substance Abuse History, the clinician

22  says, "Thorough review reveals no history of substance

23  abuse."  Actually, two of your 115s were pruno; they

24  were within a very short time span.  What was that

25  about?

26        INMATE MCCLORE:  It's -- if you read the 115, you

27  can clearly see that, they moved me to a cell where the

48

1    inmate that was making pruno. So when they gave me the

2    115, it was a new procedures that came inside the

3    institution, whatever they find in a cell belong to both

4    you guys, if someone got moved in there. So when they

5    found the pruno, gave me the 115. The inmate came to my

6    hearing to testify that the pruno belongs to him; it

7    said in the 115. That's why, I, I know that I'm not

8    believable because I'm an inmate, but if people read the

9    paperwork, that document, the 115, it clearly states

10   that. But they still found me guilty anyway of the 115.

11       PRESIDING COMMISSIONER BRYSON: There are two 115s.

12       INMATE MCCLORE: Right. The one for state property,

13   I believe, and pruno. But he come to testify, and it's

14   supposed to be on the 115 in the deposition of the 115.

15       PRESIDING COMMISSIONER BRYSON: Destroyed state

16   property, home brewing in cell. The next one is home

17   brewing in cell.

18       INMATE MCCLORE: Right, absolutely.

19       PRESIDING COMMISSIONER BRYSON: And those were the

20   21st and the 26th.

21       INMATE MCCLORE: And the inmate -- right. The

22   inmate was supposed to -- he came to the hearing and

23   testified that the home brew belonged to him.

24       PRESIDING COMMISSIONER BRYSON: Both times?

25       INMATE MCCLORE: Right. Because I moved into the

26   cell and he was already had it in his cell I think about

27   two, three weeks, or something like that. And they came

49

1   and searched it and there it was.  He already had it in

2   his cell.

3       PRESIDING COMMISSIONER BRYSON:  Two or three weeks

4   after you moved in with him?

5       INMATE MCCLORE:  Yeah.  Something like that, yeah.

6       PRESIDING COMMISSIONER BRYSON:  So why were there

7   two, though.  That takes care of one or explains, could

8   explain one incident, but --

9       INMATE MCCLORE:  Exactly.

10      PRESIDING COMMISSIONER BRYSON:  -- how, what

11  happened on the next incident?

12      INMATE MCCLORE:  He, he was still making it.  But

13  they, like I was trying got out of the cell, but the

14  cell moving, it take time, to get the cell move.  So

15  when you put the paperwork in, to get the cell move,

16  it's not going to happen just like that.

17      PRESIDING COMMISSIONER BRYSON:  Did you, did you

18  know that he was making this?

19      INMATE MCCLORE:  Absolutely, yeah.  But I can't stop

20  him, because he much bigger than me, and I ain't going

21  to try to jump on nobody and tell what they can't do or

22  not; not being in prison.  So I asked him not to do it,

23  that's all I can do.  And he still want to do it.

24      PRESIDING COMMISSIONER BRYSON:  When you first came

25  in, did you know he was brewing it?

26      INMATE MCCLORE:  No.

27      PRESIDING COMMISSIONER BRYSON:  Which I don't

50

1    believe.  Because you can smell it (inaudible).  So when

2    you're brewing pruno, you can smell it.  So please don't

3    tell me you didn't know if there was pruno in the cell

4    when you walked in.

5        INMATE MCCLORE:  Excuse me.

6        PRESIDING COMMISSIONER BRYSON:  Yes.

7        INMATE MCCLORE:  I know I'm going to be denied at

8    this Hearing because I can clearly see there's nothing I

9    can say far as credit, guilty of what I say.  When I

10   first move in that man's cell, it wasn't no pruno in

11   there.  I didn't smell it, because it wasn't in there.

12       PRESIDING COMMISSIONER BRYSON:  So when did you

13   first become aware there was pruno in the cell?

14       INMATE MCCLORE:  After he started making it.  I

15   think one day I came in, come in from the work -- I used

16   to work for PIA, on the hill -- and when I came in from

17   work I started smelling it then.  I'd been in the cell

18   like, about a week, and I started working up on the

19   hill.  When I got out of work, came in, then I smelled

20   that he was making it.

21       PRESIDING COMMISSIONER BRYSON:  And you just didn't

22   say anything about it to anyone?

23       INMATE MCCLORE:  No.

24       PRESIDING COMMISSIONER BRYSON:  You didn't tell an

25   officer.

26       INMATE MCCLORE:  No, I didn't.  And I'm being honest

27   with you.

51

1    **PRESIDING COMMISSIONER BRYSON:**  What would you do
2    today?

3    **INMATE MCCLORE:**  Today, I know one thing for sure,
4    if I knew somebody was doing something wrong with the
5    cell and they making me moving in there, and I'm not
6    going in there.  I'm going to deny to go in there.  They
7    can write me up and take me to the hole, I'll refuse to
8    be involved in anything.  I got so much enthusiasm of
9    trying to get out of prison, now for sure, that I'm not
10   ever going to get in trouble again, here or on the
11   street.  And if I knew anything like that was going on,
12   I just refuse to go into the cell.  Just take me to the
13   hole, anywheres you want to take me.

14   **PRESIDING COMMISSIONER BRYSON:**  Let's talk about
15   your parole plans.  You do have a letter of support in
16   as much as you have a letter of what appears to be an
17   employment offer.  It's dated July 1st, 2006, from a
18   Mr. Michael L. Smith, of -- he's a CEO, it says, of
19   Miracle West Entertainment in San Bernardino.  That's a
20   job offer --

21   **INMATE MCCLORE:**  Yes.

22   **PRESIDING COMMISSIONER BRYSON:**  -- you're
23   considering?  How do you know Mr. Smith?

24   **INMATE MCCLORE:**  I met him in the visiting room, got
25   to know him.

26   **PRESIDING COMMISSIONER BRYSON:**  So he was here
27   visiting with a prisoner?

52

1    **INMATE MCCLORE:**  Right, his brother, yeah.

2    **PRESIDING COMMISSIONER BRYSON:**  I see.

3    **INMATE MCCLORE:**  Uh-huh.

4    **PRESIDING COMMISSIONER BRYSON:**  Okay.  What would be

5    your role in the Miracle West Entertainment?

6    **INMATE MCCLORE:**  Whatever he decides for me to do,

7    at the, at the place and time -- I don't have any

8    glasses on, I can't really read this, but ....

9    **PRESIDING COMMISSIONER BRYSON:**  I'm sorry, I didn't

10   know you wore glasses, sir.  It didn't indicate that on

11   the ADA form.

12   **INMATE MCCLORE:**  I got my glasses; I just don't have

13   them on right now.  I can put them on.

14   **PRESIDING COMMISSIONER BRYSON:**  Well, it's up to you

15   if you want to see the document.

16   **INMATE MCCLORE:**  Well, basically that's what he

17   saying, you know, what I be doing.

18   **PRESIDING COMMISSIONER BRYSON:**  Ah, let's review

19   that.  It says:

20       "I'm the CEO of Miracle West.  It's a quality

21       entertainment company that provides musical

22       services as well as film and clothing divisions

23       on a global level.  I have been personally

24       affiliated on a personal level for 20 plus

25       years now.  But life has not always been a walk

26       in the park for me.  I grew up with the same

27       thing in common with a lot of young black men,

53

1      and that's the plague of the

2      no-father-in-the-home syndrome.  I was on a

3      collision course until someone reached out and

4      helped and showed me the right way to live.  So

5      now at the age of 42 I'm in a position for

6      opportunity to reach out and make a difference

7      in someone's life.  Mr. W. Lynn McClore has a

8      golden opportunity to come and be able to be

9      productive in the community and society as an

10     employee at Miracle West Entertainment.

11     Mr. McClore would be associate producer, where

12     he would work hand and hand with myself and the

13     producers on all projects, which includes the

14     budgeting and marketing ventures.  I have full

15     confidence in Mr. McClore to work with me and

16     my colleagues at Miracle West Entertainment."

17     So, what is your experience that would lead you to

18     be valuable to this gentlemen at Miracle West?  What

19     would be -- what would be your job?  That's what I'm

20     looking for, what would you be doing?

21          **INMATE MCCLORE:**  Well, let me say this:  I was so --

22     I'm not from California.  So to look -- the chance I

23     have to talk to people and get to know people and try to

24     put a parole plan together is in the visiting room,

25     because I'm not from California.  So when he got to know

26     me and told me, well, I say (inaudible) with the Parole

27     Board.  And he offered me a job.  I was just so glad

54

1  just to get a job offer, I didn't really go into a lot

2  of details about it.  I was just, "oh, okay," and I

3  agree with him.  So he just send me a letter, and this

4  all he sent me.  So basically that's all I can say.

5      PRESIDING COMMISSIONER BRYSON:  So you know nothing

6  about this Miracle West --

7      INMATE MCCLORE:  I wouldn't care if he had me

8  cleaning toilets at that place, I would do that.

9      PRESIDING COMMISSIONER BRYSON:  My care, sir, if he

10  was doing an illegal business, that's why --

11      INMATE MCCLORE:  Oh, absolutely.  Oh, yeah, I would

12  care, but, I really don't think that it illegal

13  business, but whatever he would me doing there, I would

14  do it, because I just want to ....

15      PRESIDING COMMISSIONER BRYSON:  Okay.  How about the

16  residence plans, where would you live?

17      INMATE MCCLORE:  With my cousin.

18      PRESIDING COMMISSIONER BRYSON:  Where is that?

19      INMATE MCCLORE:  In San Fernando Valley in Glendale,

20  California.

21      PRESIDING COMMISSIONER BRYSON:  And how far away

22  would that be --

23      INMATE MCCLORE:  (Inaudible.)

24      PRESIDING COMMISSIONER BRYSON:  -- from the

25  San Bernardino company?

26      INMATE MCCLORE:  I think it's --

27      PRESIDING COMMISSIONER BRYSON:  I'm not familiar

55

1    with the greater (inaudible), so ....

2          **INMATE MCCLORE:**  Okay.

3          **ATTORNEY TARDIFF:**  Where did she live?

4          **INMATE MCCLORE:**  This is in Glendale.

5          **ATTORNEY TARDIFF:**  In Sherman Oaks?

6          **INMATE MCCLORE:**  Yeah.  Glendale, San Fernando

7    Valley.

8          **ATTORNEY TARDIFF:**  It's a long, long ways.

9          **INMATE MCCLORE:**  Yeah.

10          **ATTORNEY TARDIFF:**  Very long.

11          **PRESIDING COMMISSIONER BRYSON:**  So basically this

12    would (inaudible) work for both, that's ... and who

13    would that be with, now, I'm sorry, for your residence?

14          **INMATE MCCLORE:**  (Inaudible.)

15          **PRESIDING COMMISSIONER BRYSON:**  Do you have a copy

16    of that letter somewhere?

17          **ATTORNEY TARDIFF:**  Here's a letter from '04.

18          **PRESIDING COMMISSIONER BRYSON:**  From '04?  This is

19    2007.

20          **ATTORNEY TARDIFF:**  The mail's been held up here.

21    Apparently, there's a current letter, it's been mailed,

22    but it's not been given to the inmate, my client, yet.

23          **PRESIDING COMMISSIONER BRYSON:**  I see.  Okay.  So

24    basically, this is three years, well, basically two

25    years old.  So the issue here is people change their

26    mind, they move, this kind of thing.  So this is a

27    cousin you're stating, and you'd be able to move in with

56

1    your cousin --

2        **INMATE MCCLORE:**  Right.

3        **PRESIDING COMMISSIONER BRYSON:**  -- you're saying?

4    Well, it won't work with your, with your employment,

5    apparently not.  Those won't work at this point,

6    but ....

7        **ATTORNEY TARDIFF:**  And there's an '05 letter, here.

8    Again, another letter apparently he was sent --

9        **INMATE MCCLORE:**  Right.

10       **ATTORNEY TARDIFF:**  -- and --

11       **INMATE MCCLORE:**  This is a job in Los Angeles for

12   that Hearing.

13       **PRESIDING COMMISSIONER BRYSON:**  This is from the

14   president of what company?  (Inaudible) Design --

15       **INMATE MCCLORE:**  Yeah, yes.  Yeah.

16       **PRESIDING COMMISSIONER BRYSON:**  -- Products?  All

17   right.  And who is this person?

18       **INMATE MCCLORE:**  It's a friend of mine; I met him in

19   the visiting room as well.

20       **ATTORNEY TARDIFF:**  Let me explain the visiting -- he

21   works, he does the visiting room.  That's his job.

22       **PRESIDING COMMISSIONER BRYSON:**  Well, that's very

23   interesting.  He does, you do photography in the

24   visiting --

25       **INMATE MCCLORE:**  Yes.

26       **PRESIDING COMMISSIONER BRYSON:**  -- room?  What, what

27   is that about?

57

1          **ATTORNEY TARDIFF:**  They take pictures of the

2     inmates --

3          **INMATE MCCLORE:**  Inmates.

4          **ATTORNEY TARDIFF:**  -- inmates with their family.

5          **PRESIDING COMMISSIONER BRYSON:**  I see.

6          **ATTORNEY TARDIFF:**  And I've seen him down there when

7     I've come to interview.

8          **PRESIDING COMMISSIONER BRYSON:**  That's, that's

9     basically what you're doing for work now?

10          **INMATE MCCLORE:**  Right, yes.

11          **PRESIDING COMMISSIONER BRYSON:**  I see.  Do you have

12     a pay number on that?

13          **INMATE MCCLORE:**  Yes.

14          **DEPUTY COMMISSIONER THOMPSON:**  What do you make?

15          **INMATE MCCLORE:**  I think $20, $36, something like

16     that.

17          **PRESIDING COMMISSIONER BRYSON:**  A month, a week?

18          **INMATE MCCLORE:**  Yeah, a month.

19          **PRESIDING COMMISSIONER BRYSON:**  Uh-huh.  All right.

20     So you struck up relationships at --

21          **INMATE MCCLORE:**  Right.

22          **PRESIDING COMMISSIONER BRYSON:**  -- with these people

23     that way?

24          **INMATE MCCLORE:**  Right.

25          **PRESIDING COMMISSIONER BRYSON:**  I see.  This is a

26     January 20th, 2005, letter.  So it is, it is also dated.

27     Talking about giving you a second chance.  Send a

58

1   powerful message. "I've been in the business for 20

2   years." And this company does appear to be in business

3   in Inglewood, California. What would you do for this

4   company?

5       INMATE MCCLORE: Excuse me?

6       PRESIDING COMMISSIONER BRYSON: What would you do

7   for this company?

8       INMATE MCCLORE: I think (inaudible) a salesman

9   position.

10      PRESIDING COMMISSIONER BRYSON: Selling what?

11      INMATE MCCLORE: Ah, health and beauty supplies.

12      PRESIDING COMMISSIONER BRYSON: Okay. Talks about

13  $15 an hour job.

14      INMATE MCCLORE: Right.

15      PRESIDING COMMISSIONER BRYSON: All right. Counsel,

16  do you have anything further on the parole plans?

17      ATTORNEY TARDIFF: No.

18      PRESIDING COMMISSIONER BRYSON: We sent out 3042

19  notices; those notices go to agencies having a direct

20  interest in your case. We have a representative of the

21  Los Angeles County District Attorney's Office present

22  who will be given an opportunity to make a statement

23  regarding suitability prior to the conclusion of this

24  Hearing. First, Commissioner Thompson, do you have any

25  questions of this inmate at this time?

26      DEPUTY COMMISSIONER THOMPSON: Not at this time.

27      PRESIDING COMMISSIONER BRYSON: All right. Does the

59

1   District Attorney have questions of this inmate?

2        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   I do have one

3   question.   I thought I had two, and I don't see the

4   second one, but, I would like to, first of all refer to

5   the transcript as a foundation for the questions I'm

6   about to ask.

7        **ATTORNEY TARDIFF:**   Which transcript?

8        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   The one that we

9   were referring to previously that comes right after the

10   appellate decision.

11        **ATTORNEY TARDIFF:**   Okay.

12        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**   And I would refer

13   to page -- the bottom of page 166, where the question

14   was:   "Do you recall if it was the driver or the

15   passenger who asked you the question about being on your

16   period?"   And answer:   The victim says, "I can.   The

17   passenger."   And then I would refer the Panel to

18   page 174.   Let's see.   Actually, I think it ....   Okay.

19   Line 10, "May the record reflect the witness has

20   identified defendant McClore," and the Court says "so

21   identified."   And then by Ms. Rosenbach (phonetic), "Was

22   this individual the driver or the passenger?"   And the

23   answer was "passenger."   So this identifies the

24   passenger as the person who asked that question, and the

25   passenger as being the inmate.   So my question that I

26   would like to ask the Panel to ask him is why did he ask

27   the victim during this crime if she was on her period?

60

1    **INMATE MCCLORE:**  Because I saw a tampon in her

2    purse.  That's why.

3    **PRESIDING COMMISSIONER BRYSON:**  What difference

4    would it make?

5    **INMATE MCCLORE:**  Absolutely.  That's why I, I don't

6    understand she even asked me this.

7    **PRESIDING COMMISSIONER BRYSON:**  No, I'm asking why

8    you would ask her that question.  That's a very personal

9    question to ask a woman.

10    **INMATE MCCLORE:**  I agree with that.  Like, again, I

11    was immature at the time.  And that's what I did -- I'm

12    sorry, because I knew you hate my character --

13    **PRESIDING COMMISSIONER BRYSON:**  No, sir --

14    **INMATE MCCLORE:**  -- and, but it --

15    **PRESIDING COMMISSIONER BRYSON:**   -- sir, this is,

16    this is not about hating you; we don't hate you at all.

17    **INMATE MCCLORE:**  Well, it seems though --

18    **PRESIDING COMMISSIONER BRYSON:**  We're here, we're

19    here only to see that you understand what went on, and

20    what went on -- what do you think went on with, in this

21    woman's mind --

22    **INMATE MCCLORE:**  Well, you see --

23    **PRESIDING COMMISSIONER BRYSON:**  -- when you asked

24    her if she was having her period?

25    **INMATE MCCLORE:**  She probably thought that she was

26    going to be raped or -- I know this, but that's why I'm

27    trying to explain to you.  Now, that I know.  Back then

61

1   I was a different person, I'm a much better individual

2   now.  Yes, I know she was mentally trauma, and I

3   understand the impact that I did to her and her family.

4   And to my family for me being in prison.  I understand

5   all of this --

6       **PRESIDING COMMISSIONER BRYSON:**  Sir, why did you ask

7   her --

8       **INMATE MCCLORE:**  -- and I don't have no problems.

9       **PRESIDING COMMISSIONER BRYSON:**  -- why did you ask

10  her that question?

11      **INMATE MCCLORE:**  Because, what I seen inside her

12  purse.  If I remember, that's what the reason why I

13  believe I asked her that.  I don't know.  It's been a

14  long time.  I don't know why I asked her.  I'm just

15  being honest.  I don't, I don't -- to lie, I don't to

16  try to deceive you.  I just looked in the purse and I

17  asked her that.  It been so long, I don't know why.  I

18  did 20-something years.  I don't know why.

19      **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I, I would like

20  to ask one additional question to ask the Panel to ask.

21  He has recently completed an Anger Management course.

22  If he could give us a brief idea of what he learned

23  about that he thinks, you know, what's important to him.

24      **INMATE MCCLORE:**  All of it is important.  I really

25  enjoyed the class.  It's two, it's four different groups

26  of anger.  One is the past anger and the present.  The

27  next one is anger and aggression.  The next one is how

62

1    anger is caused.  And the next one, number four, is

2    managing anger.  And ideally for me, when it come to a

3    situation right now, I know how to react without letting

4    emotion getting involved; I know how to act in a calm

5    relaxed and make the right decision without being

6    aggressive or being angry in a violent manner.

7         **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  May I ask a

8    follow-up.  I'd like you to inquire does he feel, did he

9    recognize her -- am I wrong? -- that in his response to

10   the, my question and the Panel's question regarding what

11   the victim said, he appeared to be angry.  Am I wrong?

12        **PRESIDING COMMISSIONER BRYSON:**  Do you understand

13   that, sir?  Your voice became elevated, you became

14   agitated, your arms were gesticulating, you showed a lot

15   of agitation just a few moments ago in this Hearing

16   room.  And, so, do you understand that, that you're

17   portraying, your image that you're portraying today is

18   that you're, you're worked up, you're agitated, and ....

19        **INMATE MCCLORE:**  But I'm not angry.  I might be a

20   little frustrated, but I'm really not angry.  It's just

21   that when I came to this Hearing I was coming in this

22   Hearing and I thought I was going to pick up on a lot of

23   things that was said and done at the last Hearing.  And

24   my mind was set from, from the Hearing previously, this

25   Hearing was going to be based off of, off of that

26   Hearing.  That's how I thought these Hearings supposed

27   to go.  From the last decision it was going to be based

63

1    off of that.  And when I come -- and my mind-set, from

2    what Fisher told me, from what Commissioner McBean told

3    me, and I was -- my mind-set to show what, with the

4    advice that she gave me, I went and did that.  I went

5    and got more insight of the crime, came here willing to

6    talk about it, I'm willing to talk about Anger

7    Management and how it apply to my life back then and how

8    it apply to my life now.  But I see that this Hearing is

9    going just the opposite, so I wasn't prepared to talk

10   about what I was thinking when I saw the thing in the

11   purse or a lot of things that I just wasn't prepared

12   for.  I wasn't prepared to talk about a lot of things

13   because all these things were brought up in the previous

14   Hearing.  I came here ....

15       [Whereupon, pause while a prison horn is blowing.]

16       **INMATE MCCLORE**:  Okay.  I came up in here to follow,

17   to the Board Panel know that I followed all the advice

18   and instructions from the last previous Hearing that was

19   given to me in order for me to get out of prison.  And

20   that was Ms. Fisher told me in the decision, asking me

21   to do those things, come back, show more insight, talk

22   about anger -- go take some Anger Management, bring some

23   chronos in.  And I did all of that.  When I come here

24   today, it's a total different Hearing that didn't have

25   anything to do with the previous Hearing.  That's why I

26   feel as though, the way I feel.  But I'm not angry, I

27   just don't understand ....

64

1      **ATTORNEY TARDIFF:**  Well, perhaps some of this is my

2      fault.  I probably should have probably, I don't,

3      clearly, I, I guess I just assumed he understood that

4      this was just like a brand new Hearing and that each

5      Panel assesses on their own whether or not someone's

6      suitable, and they don't just take off from the last

7      Hearing.  It's a full Hearing from start to finish, and

8      it's subject to being, to being questioned about

9      anything that had, that the Panel feels would reflect on

10     whether or not someone is suitable.  Apparently,

11     Mr. McClore was under the understanding that this

12     Hearing was just going to determine whether or not he

13     had done what the prior Panel had asked him to do.

14     **PRESIDING COMMISSIONER BRYSON:**  And I appreciate

15     your taking responsibility, counsel.  However, that

16     stretches the belief, too, because this is your ninth

17     Subsequent Hearing.  So, frankly, sir, I'm sure you've

18     gone over -- in fact, looking at the transcript, you've

19     got a lot, covered a lot of issues repetitively.  It

20     can't be news to you that each Hearing is a de novo

21     Hearing.  That is fancy verbiage for each Hearing is

22     taking into account of its own.  We do look at prior

23     transcripts, of course, they're part of your Board

24     history, okay.  But that also gives you the chance to

25     present as you will.  And, frankly, you're presenting

26     with the same flippant attitude, actually, that

27     Commissioner Fisher talked about in the last Hearing.

65

1     If you want to go by the last Hearing and refer to it,

2     which you sort of opened the door -- in fact, here it

3     is.  You see, she says, "You seem kind of flippant."  It

4     says "flip" in the transcript, but I'm sure the word is

5     "flippant," and the transcriber just didn't know what

6     was said.  I'm talking about your offenses.  And she

7     said, "You know, it may just be because you talked about

8     them a lot."  It's hard to say, but it doesn't feel to

9     us that you have a lot of insight as to why you were

10    doing the things you were doing, or how your crimes

11    affected other people.  That's what's really troubling

12    to us.  And then she says, "What troubled both of us was

13    the fact that at the 1996, 1998, 1999, and 2002, and

14    2003 Hearings, at the end of the Hearings, all the

15    Commissioners made comments about your reactions."  And

16    she cautions you, "Don't do it again.  Because if you do

17    it again, the next person reading the transcript is

18    going to bring it up again."  So, au contraire,

19    monsieur, this, this is, should -- I'm sure it's very

20    clear to you.  I can't believe that you don't know that

21    we look at the entire Panel plea of your record and we

22    take everyone into account all over again.  You know

23    that.

24        **INMATE MCCLORE:**  This is what I'm saying again.  My

25    understanding is something like this:  I went by the

26    advice that she gave me.  I'm not angry at this Hearing.

27    I'm not throwing my hands up in no anger, I'm just

66

1    confused about what -- the instructions that she give me

2    and advice that I can't, that I got last time at the

3    last Hearing, and it's, it's nowhere today being talked

4    about this.  It's talked about everything else besides

5    what I came in here from the advice that I got.  So I'm

6    kind of like ....

7        **PRESIDING COMMISSIONER BRYSON**:  The advice you got,

8    sir, was to, the Panel --

9        **INMATE MCCLORE**:  To go more into the insight of the

10   crime --

11       **PRESIDING COMMISSIONER BRYSON**:  -- (inaudible) --

12       **INMATE MCCLORE**:  -- for my behavior --

13       **PRESIDING COMMISSIONER BRYSON**:  -- sir --

14       **INMATE MCCLORE**:  -- of why I committed the crime.

15       **PRESIDING COMMISSIONER BRYSON**:  All you, all you've

16   been saying, is I take more, full responsibility, I take

17   full responsibility.  That's not insight.  Okay.  You've

18   got issues with women in many different ways.  You got

19   criminal acts against women, where in fact, the most

20   heinous of them, you said, well, you know, actually you

21   were trying to console her.  And then you have, you have

22   breakups in relationships.  You have issues with the --

23   it, even today does not appear that you've dealt with

24   it.  That's the concern here.  Perhaps you need therapy

25   about it.  I don't know.  But that's, that's something

26   to consider.  You should be concerned about that, about

27   how you reacted in women's presence.  Because, sir, it's

67

1    not believable that, "well, it's just women that I was

2    around, I wasn't really around men, so, I really was

3    just interacting with women." You had a, you had a

4    crime partner. All right? You, you knew what was going

5    down when he's, gets in the car and makes demands on

6    her. You're watching the whole thing go down. And

7    right there, you were standing right there. So it's not

8    like you were an innocent participant here that didn't

9    really know what was happening. My gosh, you open a

10   woman's purse, you see tampons in there. Tampons, we

11   all know what tampons are for, I'm sure guys know what

12   tampons are for.

13        **INMATE MCCLORE:**  Absolutely.

14        **PRESIDING COMMISSIONER BRYSON:**  Right. So, why

15   would you turn to a woman and say, "Are you on your

16   period?" Well, what do you think, the woman's going to

17   think is going to happen to her if you're asking those

18   questions. You had to know that.

19        **INMATE MCCLORE:**  I said at that particular time, you

20   right, you did. And I told you, I'm a changed person.

21   And I'm not disputing what you saying. I agree with all

22   of that. Back then I was a, I, I'm ashamed of my

23   (inaudible) how I used to be. But I come to this

24   Hearing today, and I was trying, you know, show insight,

25   more in-, more insight into the crime of my behavior.

26   And I did have a pattern of -- it was on women. I went

27   and read the transcript, and I come to acknowledge that.

68

1    And acknowledged it more insight of the crime that I had

2    so little of faith in any own ability that I starred

3    living off the earnings off the people.  And a lot of

4    them was female.  You absolutely right; I acknowledge

5    that.  And it was wrong to do.  Everything I did was

6    wrong.  But I, I have changed.  I went to Anger

7    Management, and I wouldn't act the same way that I used

8    to do with my Anger Management no more, I know how to

9    control it.  I'm not mad, I'm just confused that, like I

10   say, not understanding what was said at the last

11   Hearing, and this Hearing is totally different, and it's

12   just -- talking about things that I just don't remember

13   no more.

14       **PRESIDING COMMISSIONER BRYSON:**  Okay.  And do you

15   have any more questions?

16       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  No, I don't,

17   thank you.

18       **PRESIDING COMMISSIONER BRYSON:**  All right.  Do you

19   have any questions, counselor?

20       **ATTORNEY TARDIFF:**  I just, I want -- I'm not clear

21   about this 115 in '94, the assault and battery causing

22   great bodily injury.  Now, was that what you were found

23   guilty of ultimately?

24       **INMATE MCCLORE:**  What?

25       **ATTORNEY TARDIFF:**  The assault and battery causing

26   great bodily injury.  Or what was the, or was, were you

27   just found guilty of battery?

69

1    **INMATE MCCLORE:**  Of battery.  The 115 was reduced

2    from A-1 offense to assault with great bodily injury

3    down to a --

4    **ATTORNEY TARDIFF:**  Battery only.

5    **INMATE MCCLORE:**  Yes.

6    **ATTORNEY TARDIFF:**  Okay.  So when it was put on the

7    record that you had a 115 for assault and battery

8    causing great bodily injury, that's not true.

9    **INMATE MCCLORE:**  Right.

10   **ATTORNEY TARDIFF:**  And was reduced to a battery,

11   because actually the great bodily injury was to

12   Mr. McClore when he was shot by a correctional officer.

13   **PRESIDING COMMISSIONER BRYSON:**  And that's when he

14   was fighting; is that correct?

15   **ATTORNEY TARDIFF:**  Right, with another inmate.  So

16   they reduced it to a battery.  So he doesn't have great

17   bodily injury.  Lesser offense, I guess, the way to put

18   it.  And how long have you had your job in Visiting?

19   **INMATE MCCLORE:**  I'd say six years.

20   **ATTORNEY TARDIFF:**  So, in terms of, I think an issue

21   might be that your ability, you know, apparently you

22   resorted to criminal activity as a means of making money

23   because you stated you weren't real responsible back

24   then, didn't keep a job.

25   **INMATE MCCLORE:**  I was in a lot of stress -- and for

26   the money, that's what I did it for.

27   **ATTORNEY TARDIFF:**  Okay.  So, today, though, if you

70

1    were under a lot of stress and you needed money, what

2    would you do?

3        INMATE MCCLORE:  I would go get me a job and go seek

4    some therapy for my stress and find me a job.  And since

5    I've been in prison, I have worked for six -- I have

6    worked 20 years since I've been in prison, and I truly

7    have the experience, now, how to feel to be independent.

8    And I will get out and get me a job and work and be

9    independent so I won't have to live off the earnings of

10   other people.

11       ATTORNEY TARDIFF:  So you've learned the value of

12   working --

13       INMATE MCCLORE:  Absolutely.

14       ATTORNEY TARDIFF:  -- and now know how to keep a

15   job --

16       INMATE MCCLORE:  Yes.

17       ATTORNEY TARDIFF:  -- and what to do when --

18       INMATE MCCLORE:  Yes.

19       ATTORNEY TARDIFF:  -- problems arise.

20       INMATE MCCLORE:  Yes.

21       ATTORNEY TARDIFF:  Okay.  But at the time of the

22   crime you didn't know these things, correct?

23       INMATE MCCLORE:  I didn't know these things, and I

24   was lazy, and I just didn't, I just didn't care at the

25   time.  But I, I'd like to say this, because I see what

26   this, where this Hearing is going.  I'm just stating

27   because how I feel.  At the time of this crime, the way

71

1    I really feel, if the world ever came together and built

2    a statute of a fool, they could have name it after me.

3    But as of today, they can tear it down, because I have

4    changed.  I'm more spiritually grounded, from my

5    education, my vocation, my vocation from my self-help

6    that I received in my incorration, incorration, I'm a

7    better person, because I --

8        **ATTORNEY TARDIFF:**  Incarceration.

9        **INMATE MCCLORE:**  Yeah, incarceration.

10       **ATTORNEY TARDIFF:**  Okay.  When you get a chance

11   (inaudible) at the closing.  I just want to establish

12   today you do have a longstanding history of working.

13       **INMATE MCCLORE:**  Right.

14       **ATTORNEY TARDIFF:**  Okay.  And you understand the

15   value of this.  I have nothing further on questions.

16       **PRESIDING COMMISSIONER BRYSON:**  All right, then I'd

17   like to invite the District Attorney to make a closing

18   statement.

19       **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I, I, I feel the

20   inmate's frustration just as a human being, but, I, and

21   I -- none of us really want to keep people in prison

22   when they shouldn't be here, but, but I also just, I

23   feel from the still anger in, it, it's kind of

24   frightening to feel that he still may have that

25   underneath.  And I know that he's completed Anger

26   Management; I think as, as Commissioner Bryson said,

27   that it might -- you know, maybe therapy might -- I

72

1    don't know if that's available here, but anyway,

2    something else to (inaudible) so that maybe he'll

3    understand.  He doesn't seem to understand what we're

4    reacting to at this point.  And for the reasons that I

5    will explain, I, it is the position of the District

6    Attorney that at this moment the inmate is still

7    unsuitable for parole.  A large part of that is because

8    of the life crime, which we know will never change, but

9    it must be considered, and especially considering that

10    life crime in connection with other crimes that he has

11    committed.  In this case he kidnapped and struck the

12    victim, stole her car.  And it was the inmate also

13    identified as the person who ripped the jewelry from her

14    body, from her neck, and took her rings.  They forced

15    her to go to two stores and buy clothes and shoes, as

16    has been explained, and then later dumped her off on the

17    side of the freeway or told her to get out the car

18    there.  And we know that the inmate did ask her if she

19    was having her period, which I'm sure must have made her

20    feel, as he understands, that perhaps she was going to

21    be raped at that time.  They also threatened to kill her

22    if she showed any fear and, or so forth, whatever that

23    meant, that they would then kill her.  She stated in the

24    transcript when she got into the car, he told her -- and

25    I'm not sure who she was referring to at that point, but

26    they were both together -- not to try to get away,

27    because quote, "I have a gun and I'll use it."  She said

73

1    she tried to get out and she was hit in the face, and

2    then she was pinned down.  Let's see.  And the inmate

3    has done what he was advised at the last Hearing, that

4    he needs to address his anger issues; he has completed

5    successfully, apparently, an Anger Management course.

6    It appears today, to me, in any event, that he has some

7    issues in that area.  And I'm not sure what's available

8    for him, but again, I think there's still an issue

9    there.  And as he has shown in prior Hearings,

10   repeatedly that he has shown anger and lack of

11   self-control in the past, which he -- I wouldn't

12   describe today as lack, lack of self-control, but his

13   frustration, and I think anger was apparent today.  He

14   had an escalating prior criminal history, was on parole

15   at the time of the life crime, he was not working and

16   was in violation of his parole at the time of the crime.

17   In fact, he was, at the time he was arrested -- because

18   he was not reporting to his parole officer, was not

19   living at the address he gave the parole agent, and was

20   not employed.  He's, he's described to us today of his

21   frustration at not being employed.  He also failed to

22   participate in drug counseling, as was ordered by his

23   parole agent.  He also, in his past history, as has been

24   mentioned, he had a history of victimizing women.  He

25   was charged with assault with a deadly weapon and

26   pimping.  He pled guilty to the assault with a deadly

27   weapon.  And, as has also been mentioned, was also

74

1   charged with residential burglary of his girlfriend's

2   aunt's home.  His parole was revoked for that offense.

3   When he was, for some reason, convicted of second

4   degree, even though it was a residential burglary.  The

5   probation officer --

6       [Whereupon, the tape was turned over.]

7   **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I was just

8   stating that the probation officer's report in the case

9.  that involved the original charge of pimping and the

10  245, the probation officer said, "It would appear that

11  he forced a female into prostitution, threatening her

12  with physical violence if she failed to share her

13  proceeds and bring him at least $300" -- I don't know

14  what period of time that $300 was -- "and then

15  assaulting her with a weapon, which was a telephone."

16  It really is hard to imagine that, that he would have

17  pled assault to a deadly weapon if he really just tapped

18  her with a telephone.  His failure while on parole

19  before is similar to his behavior at this time in the

20  sense that he was told -- well, no, let me strike that,

21  because he did in fact, he did in fact complete his

22  Anger Management.  As, as has been mentioned, the inmate

23  has during his, his incarceration on this offense, four

24  115s, two in his prior prison term; two for pruno, which

25  is interesting when I understand his explanation, but --

26  as to one -- but I'm not sure about both of them.  He

27  also, the parole plans, I think he has a problem with

75

1   the San Bernardino job and even the Inglewood and

2   Glendale.  That's, that's probably a distant, a distance

3   of about 40, probably 30, 35 miles.  But San Bernardino

4   would be from the Glendale area -- I've lived there most

5   of my life -- that would not be a physical location for

6   a residence versus being employed in terms of his parole

7   plans.  For all of the reasons that I've mentioned, it

8   is the position of the District Attorney that at this

9   moment the inmate is still not suitable for parole and

10  would present a danger to the community.

11      **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Counsel

12  I would like to give you the opportunity to make a

13  closing statement.

14      **ATTORNEY TARDIFF:**  Thank you.  His prison record, in

15  terms of the commitment offense, it's noted in the

16  probation officer's report, and it's page 4 of the

17  second part.  These pages are -- you can see there's

18  like two different reports here.

19      **PRESIDING COMMISSIONER BRYSON:**  (Inaudible.)

20      **ATTORNEY TARDIFF:**  I guess the first one involves

21  the pimping and pandering one and this ADW, and then the

22  second one is the, this kidnapping.  And on page 4, when

23  they interviewed the victim, it says, starting on

24  line 12, she states that the codefendant was the one who

25  was the most vicious towards her and the one making most

26  of the threats.  She does not anyway excuse the

27  defendant's behavior, but states he did not appear to be

76

1    the original instigator.  Also, going to the, that other

2    transcript behind the Appellate Court decision, I guess

3    that's the testimony taken at the trial?  Or the

4    preliminary hearing.

5        **DEPUTY DISTRICT ATTORNEY GLIDDEN:**  I'm not sure if

6    it's the trial or the preliminary hearing.

7        **ATTORNEY TARDIFF:**  Starting on page 211, it says,

8    line 16:  Question:  "And then he opened the passenger,

9    passenger door and got in."  "Correct."  "Did he say

10   anything to you as he got into the car, the passenger,

11   that is?" -- and that would be Mr. McClore -- "No."

12   "Did the driver do most of the talking while he was

13   doing all this driving," et cetera, et cetera, "or was

14   there one person who did more talking than the other?"

15   "It was definitely the driver that was" -- and then that

16   was interrupted.  "Did he seem like he was in charge?"

17   And then she answered, "Yes," the driver's, being the

18   driver was in charge.  It goes on to page 212.  "What

19   was the first thing you remember the passenger saying?"

20   "We weren't going to hurt you," on line 3 on page 212.

21   So ... and it does go on to say she was equally afraid

22   of both of them, but neither of them -- I just want to

23   put it on so it doesn't, you know -- but in either event

24   I think that clears up the fact that he in fact did not

25   threaten her with the gun or to kill her, and she in

26   fact saw him as not being the instigator, and that the

27   driver in fact seemed to be in charge.  I submit this as

77

1    a mitigating factor in the commitment offense, that he

2    played the lesser role.  And I think that might be part

3    of the problem at these Hearings is that this has been

4    made a big deal, and perhaps his focus has been on

5    clarifying all of this, perhaps misdirected direction or

6    something, if that's, that makes sense, instead of like,

7    he says that he clearly accepts responsibility for what

8    he did.  But at the same time he keeps saying what all

9    these things are that, you know, he was not the

10    instigator and he was not primary culprit, so to speak,

11    but he -- so I think that that's part of the problem in

12    this matter.  And also perhaps he's mistaken -- in the

13    Board report, his counselor also goes in, into this that

14    when Mr. McClore was seen by the BPT on 9/12/05, the

15    Board recommended that he remain disciplinary-free, get

16    self-help when available, and earn positive chronos.  He

17    has done this.  So I know he took that as meaning that

18    he's done what the Board asked.  And that perhaps that's

19    where his misperception gets in the way, because he

20    pointed this out to me in our interview.  So if he's not

21    given a date today, I think you should clearly should

22    tell him what may be -- I don't know, or I'll do you

23    it -- what's expected at these Hearings.  In terms of

24    his psych evals, they have been very good going back to

25    '94, actually.  The most current one, much of that has

26    already been read in the record; I'm not going to

27    regurgitate that again, but just to add -- and I brought

78

1  up the work thing, because that seems as if that would

2  be an issue in this matter, since he committed crimes to

3  support himself.  On page 2 of the most current psych

4  eval, it states that he, he has an excellent work ethic,

5  which is frequently commented by staff.  In terms of

6  the, his insight and judgment, it states, "His judgment

7  is sound and there is absolutely no evidence of a mood

8  or thought disorder."  In discussing his commitment

9  offense and his maturity over his years of

10  incarceration, he was "insightful, thoughtful, and

11  clearly remorseful.  There was no clinical indication of

12  adult antisocial behavior," but goes on to state, since

13  this was found in past reports, he will -- "left with no

14  other alternative other than to report that he has an

15  adult antisocial behavior by history.  But I want to

16  make it perfectly clear that I found no evidence of this

17  diagnosis during this present evaluation."  He received

18  a high GAF score of '90; his parole prognosis is

19  excellent; goes into some of his laudatory chronos.  In

20  terms of the Impact Workshop, the instructor stated,

21  quote, "Inmate McClore is to be commended for his

22  participation and willingness to gain insight and

23  empathy for the victim of crime," end quote.  "He takes

24  full responsibility for his behavior.  At no time did he

25  minimize his responsibility or the impact of his

26  behavior on the victim."  It concludes that "this inmate

27  has demonstrated his ability to reduce his potential

79

1    threat of violence in the institution, and if released

2    to the community," as has already been stated, "no more

3    threat of violence than the average citizen."  The next

4    eval he had before that was '99; that one also gave him

5    a high GAF score of '84.  "His prognosis for community

6    living, should he be paroled, is excellent.  He has

7    involved himself with many activities in the previous

8    years that would ensure knowledge that he did not

9    previously possess.  He has now taken time to put forth

10    the effort to learn.  When asked questions about his

11    version of the offense, he, the inmate states he

12    believes that not only is he responsible for his crime,

13    but he is completely responsible due to the fact that he

14    believes at this point he could have talked his crime

15    partner out of committing this crime."  It goes on to

16    state a couple more examples and concludes:  "These

17    three examples of insight and judgment show that this

18    inmate has matured greatly in the 14 years he has been

19    incarcerated, and then at this time he would be an

20    excellent candidate for parole."  And they noted no

21    significant risk factors or precursors to violence, and

22    I assume that would include substance abuse.  "In '98,

23    his violence potential was estimated to be somewhat

24    below average, and was only in relationship to the

25    inmate population."  And in '95, it notes that "his

26    insight and judgment appear to be improving over that of

27    his earlier years.  If released, he should be able to

80

1    maintain his gains.  If he is considered for parole, his
2    level of dangerousness should be less than for the
3    average inmate."  And so, there's basically at this
4    point -- over 12 years of positive evaluations.  If you
5    go to his prior incarceration history before, subsequent
6    to this Hearing, it shows a great deal of self-help; he
7    did a lot of self-help.  I'd just like to note for the
8    record, obviously he's going to have to work.  The
9    chronos are excellent in that regard.  In terms of his
10   disciplinaries, the last time, if you want the battery,
11   force or violence, it's been over 12 years ago -- I
12   don't think that that should any longer be used as a
13   factor of unsuitability -- and it's been ten years since
14   a nonviolent 115 is issued in '97.  He has completed
15   vocational Mill and Cabinet, obtained his GED; he's
16   upgraded himself that way.  In terms of parole plans, he
17   does have support out there, with the letters that were
18   read into the record.  And with that, I will submit.
19   Thank you.
20       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And now,
21   sir, we want to give you an opportunity to address this
22   Panel regarding your suitability for parole.
23       **INMATE MCCLORE:**  I just know I'm suitable for
24   parole.  I have changed.  And through my education and
25   vocation and the self-help that I've received since I've
26   been in prison, is a tool now that I can go back and
27   live a successful life without being any trouble.  And

1    know this:  I do have insight into the crime that I,

2    that I brought serious mental trauma to the victim, to

3    all of these crimes.  And I've betrayed the people that

4    cared for me and trusted in me.  And I want to, I wish I

5    could apologize to them and their families.  I am ready

6    to go home.  I have changed.  And I do anything to go

7    home.  I have high enthusiasm in getting out here and

8    doing the right thing.  And I will.  And if get denied

9    again, I just, I don't know what to do, I just try to do

10    better.  But I'm not really mad; I'm just not

11    understanding how the first Hearing went, to what they

12    say in the first Hearing and -- to me -- it just seem it

13    wasn't considered.  I know it was looked at, but looking

14    at something and considering is two different things to

15    me.  I'm not the smartest, but I ain't the dumbest

16    person in the world.  I know what I did was wrong and I

17    never do it again.  Never do it again.  Because I know

18    that it was wrong, and I admit myself, I would never

19    want to be a victim of a crime.  So I know that.  To all

20    these people, I'm sorry, and it never happen again.  And

21    the reason I haven't had a chance to prove myself around

22    women because I don't have no lady right now.  I'm not

23    around a bunch of women that I can prove myself.  That's

24    why I'm, I can't say a lot things what I do when I'm

25    around a female.  I don't need no therapy for that.  If

26    I was on the street around people -- women -- I know I

27    do better because I be changed.  I've got my Anger

82

1    Management together.  Obviously, I can control my anger.

2    I've been working in prison since I've been in prison.

3    I understand what it feels to be independent.  I don't

4    have to live off the earnings of other people.  I've got

5    pride now, I've got confidence, I've got the ability to

6    go do the right thing.  And I wish I could go home.

7        **PRESIDING COMMISSIONER BRYSON:**  Thank you for your

8    remarks.  The time now is 5:00 o'clock.  (Inaudible.)

9                     **R E C E S S**

10                    **---o0o---**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

83

**CALIFORNIA BOARD OF PAROLE HEARINGS**

D E C I S I O N

1

2

3    **DEPUTY COMMISSIONER THOMPSON:**  You appear to be on

4    the record.

5    **PRESIDING COMMISSIONER BRYSON:**  Thank you.  We are

6    reconvened in the matter of Wilbur McClore.  The time

7    now is 5:35.  Sir, the Panel reviewed all information

8    received from the public and relied on the following

9    circumstances in concluding that you are not suitable

10   for parole and that you would pose an unreasonable risk

11   of danger to society or a threat to public safety if

12   released from prison.  And I'll explain why.  This

13   offense was carried out in an especially cruel and

14   callous manner in that at approximately 1:15 in the

15   afternoon on November 26, 1985, while exiting her

16   vehicle at Wendy's drive-in restaurants, Sepulveda

17   Boulevard in Los Angeles, the victim, Krispi Boucher,

18   was physically forced back into her vehicle by

19   codefendant Murphy, who then struck her in the face,

20   demanding money.  The victim was particularly vulnerable

21   in that she was unarmed, unable to defend herself, and

22   she handed over her car keys, telling Murphy her purse

23   was in the trunk.  Threatening her life, stating he had

24   a gun, Murphy removed the purse from the trunk.  The

25   victim saw the inmate standing at the passenger door

26   watching her.  This offense was carried out in a

27   **WILBUR McCLORE    C-50493    DECISION PAGE 1    1/4/07**

84

1    dispassionate manner.  Both offenders entered the

2    vehicle, forcing the victim into the backseat, drove to

3    a shopping mall in San Fernando where they forced the

4    victim to purchase clothing and shoes for them, and then

5    back into the car and drove along the freeway.  After

6    stealing the victim's jewelry, the inmate and Murphy,

7    your crime partner, pushed the victim out of the vehicle

8    on the side of the road and drove away.  Sir, you have

9    failed society's previous attempts to correct your

10   criminality.  This is your second prison term.  You have

11   in your past violence, assaults, and prior criminality

12   showing an escalating pattern of criminal conduct.  In

13   fact, you were parole-violated.  As to your

14   institutional behavior, you have had commendable

15   behavior.  In terms of programming, you served as a

16   Porter, you're serving as a Photographer in visiting

17   with accommodations from your supervisor.  You did

18   achieve your GED in prison.  You have achieved two

19   vocational certifications, one in Mill and Cabinet, one

20   in Graphic Arts Design, and you have attended various

21   self-help and therapy groups, including Impact program,

22   you have concluded the Impact program, which included

23   Anger Management, the ROC program, and you have

24   laudatory chronos, which have been mentioned in the

25   record.  You also have read self-help books in the past;

26   that was in 2002.  As to self-help and therapy, you've

27   **WILBUR McCLORE   C-50493    DECISION PAGE 2   1/4/07**

85

1    participated in AA/NA from '96 to 2000, and to your

2    credit your criminal history does not show polysubstance

3    abuse.  Two of the 115s show a relationship to alcohol

4    but they have been explained into the record as well.

5    During your, the -- your current prison term, you have

6    four 115s, the most recent in 1997, for failure to

7    participate.  So, you have since then, showed positive

8    behavior in prison.  You have basically been

9    discipline-free since 1997, which, for the last ten

10   years -- and in truth since '94.  The psychological

11   report, dated October 7th, 2003, by Dr. S., period,

12   Sexton, S-E-X-T-O-N, basically supports your parole;

13   gives you very high Global Assessment Function of '90.

14   As to your parole plans:  This Panel feels that they're

15   not realistic in terms of relating your residence plans

16   to your potential work plans.  That is a weakness in

17   your plans.  You did present evidence of residential

18   plans, and although they were dated by two years, you

19   did appear to have a job offer, but you could not really

20   say what the job would be.  So they are, shall we say,

21   not substantial.  It is important to improve those.  As

22   to Penal Code 3042 responses, responses indicate

23   opposition to finding of parole suitability,

24   specifically by the District Attorney of Los Angeles

25   County.  In a separate decision, the Hearing Panel finds

26   it is not reasonable to expect that parole be granted at

27   **WILBUR McCLORE   C-50493     DECISION PAGE 3   1/4/07**

86

1    a Hearing during the following two years.  And the

2    reasons for this are as follows:  First of all the

3    offense was carried out cruelly and callously, in that

4    on November 26th of 1985, you apprehended, basically, an

5    innocent woman who was at her vehicle at Wendy's

6    drive-in restaurant in Los Angeles, forced her into her

7    car, and basically assisted in the, or were a full

8    participant in the kidnap and robbery of this victim.

9    She was particularly vulnerable, she was unarmed,

10   incapable of defending herself, she was slammed down on

11   the floorboard of the car, she was threatened.  She had

12   every reason to believe she was about to be raped and/or

13   killed.  She told your crime partner that her purse was

14   in the trunk; at one point she was ready to give away

15   everything, and, but you continued to keep her in the

16   car.  And Murphy removed the purse from the trunk, both

17   of you forced her into the backseat, then you forced her

18   to purchase clothing and shoes at a mall, and then you

19   drove along the freeway, and after stealing her jewelry,

20   you forced her out of the vehicle, and drove away.  This

21   offense was carried out, moreover, in a manner

22   demonstrating exceptionally callous disregard for human

23   suffering.  The victim was in fear for her life

24   constantly.  And you had a good opportunity to cease at

25   many points, but you continued.  The motive for this

26   crime was very trivial.  It was a robbery.  Your

27   **WILBUR McCLORE   C-50493      DECISION PAGE 4   1/4/07**

87

1   criminal history at this moment involved, or closely

2   contiguous to this crime, was another crime against a

3   woman, a Bonnie Bray, who you assaulted with a

4   telephone.  Now that was discussed as well on the

5   record.  Sir, we feel you're moving backwards here.

6   Because -- and apparently you need more time than just

7   one year to evolve understanding about this crime.  You

8   basically do not understand the nature and gravity of

9   this commitment offense.  And my colleague put it very

10  well:  She said there's grave difference between

11  acknowledging a crime, admitting you did it -- "I did

12  it, I take responsibility" -- and having insight and

13  understanding about that crime.  You are citing

14  mitigating circumstances all along the way.  You say you

15  lost your job, you were angry, but then on the other

16  hand, actually, we come to find out that you basically

17  quit the job.  You said, you told the woman, "we're not

18  going to hurt you."  But that makes so little sense,

19  because if you weren't going to hurt her, if this was

20  really empathy for her, then why did you continue with

21  it?  The implication here is "we're not going to hurt

22  you, we're just robbing and kidnapping you."  All right,

23  so -- and part way through this Hearing, and this is

24  what, this was the definitive factor for this Panel,

25  basically, you twice, you had an kind of an outbreak

26  where you said, "I can see how this Hearing is going,

27  **WILBUR McCLORE   C-50493    DECISION PAGE 5   1/4/07**

88

1    you hate me." Sir, this Panel doesn't hate you. A good

2    day is a day we can give a grant. We don't come here so

3    that we can do this and then send people back into the

4    institution. That's not fun for us; this isn't fun

5    sitting here doing this. A really good day is a day

6    that we can grant, everybody's happy. You're

7    clearly -- when you go out and be, be crime-free and

8    have a good affect on society, that's what we're really

9    looking for. We want to see these programs work. We

10   also want to mention that in fact the 115 where, there

11   was a reduction in penalty -- and I think it's just

12   important to put that on the record, and without reading

13   the entire 115, would you like to address that --

14        **INMATE MCCLORE:** Well --

15        **PRESIDING COMMISSIONER BRYSON:** -- Commissioner

16   Thompson?

17        **DEPUTY COMMISSIONER THOMPSON:** -- it was originally

18   charged as assault and battery with great bodily injury.

19   It had an investigator, and you pled not guilty, the

20   ultimate decision by the review Panel or the Hearing

21   officer was that there was guilt, based on the

22   investigating (inaudible) and based on the statements of

23   witnesses and others. They reduced the penalty for

24   that, for battery, for 90 days; they did not amend the

25   charge. It is still charged in the record as assault

26   and battery with great bodily injury. Apparently you

27   **WILBUR McCLORE   C-50493    DECISION PAGE 6   1/4/07**

89

1    and another inmate had been engaged in a verbal that

2    became physical confrontation, which created the

3    situation were everyone was ordered down and a shot was

4    fired.   In fact two shots were fired and you were

5    injured thereby.   But it was not reduced to a simple

6    battery.   The material remains in the file to this date

7    on that 115.   It is the original charge; the penalty is

8    found that of battery, but the charge was not amended.

9    Just is clarify that.

10        **PRESIDING COMMISSIONER BRYSON:**   Sir, you have done a

11   lot of work, and you do -- you actually pointed it out

12   yourself that you have not been challenged in terms of,

13   of women in this prison because there are so few, that's

14   true.   There are a few women officers and some

15   counselors, but the majority of the population is male.

16   And there aren't a lot of good programs,

17   unfortunately -- we were just opining about that --

18   there aren't a lot of good programs for men who have

19   issues with women that actually help you.   But we're,

20   we're certainly saying that you probably need therapy,

21   as available, on that issue, because you're, you still,

22   you demonstrated what we call a chip on your shoulder or

23   hair-trigger, but you have some latent anger that has

24   manifested itself.   You're confronted here by two

25   women -- guess what? -- and the D.A.'s a woman and your

26   counselor's a woman, so, I don't know how this worked

27   **WILBUR McCLORE   C-50493    DECISION PAGE 7   1/4/07**

90

1   out.  It could have worked out worse for you, but

2   basically, and our judgment, and I hope you understand

3   this, has nothing to do with that.  What we're really

4   just concerned about is that you do work through some of

5   these issues, because, again, saying, yeah, I did, I

6   know, I say, I took, take full responsibility is not the

7   same as just actually really -- your understanding, what

8   was going on with you so that, so that truly you don't,

9   you can, so that you can have relationships with women

10  and not get upset and have that something terrible

11  happen again.  That's basically where we're going with

12  this.  So, we would certainly not be opposed if, if you

13  could be able to get some therapy.  But we do

14  acknowledge it's very hard to get in here.  We are

15  asking for a new psychological evaluation, and we have

16  specified that you should get some help and treatment in

17  this area, which basically is the best we can do.  You

18  could also read, and again, you did that one year.

19      **INMATE MCCLORE:**  Yes.

20      **PRESIDING COMMISSIONER BRYSON:**  And that was worth

21  while, and you could read, attempt to get some books on

22  these issues and maybe ask the counselor for some help

23  in getting some titles, get some books on this -- and

24  see where we're coming from on this -- and then get

25  (inaudible) come in for therapy, just frankly discuss

26  it, and discuss really what your issues could have been

27  **WILBUR McCLORE   C-50493    DECISION PAGE 8  1/4/07**

91

1    at that time (inaudible) the time to do.  It's not much

2    time to do it, really.  It's two full years of your

3    life, but we feel you have a fair amount of work to do.

4    So do you have anything further?

5         DEPUTY COMMISSIONER THOMPSON:  No.  I wish him well,

6    and good luck.

7         PRESIDING COMMISSIONER BRYSON:  Good luck, sir.  And

8    that concludes this Hearing.  The time is now 5:47.

9                        ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED TWO YEARS

24    THIS DECISION WILL BE FINAL ON:_____ MAY 0 4 2007_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    WILBUR McCLORE   C-50493   DECISION PAGE 9   1/4/07

92

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Don Larson, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 91, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of WILBUR McCLORE, CDC No. C-50493, on JANUARY 4, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 23, 2007, at Sacramento County, California.

_DE Larson_____
Don Larson
Transcriber
**VINE, MCKINNON & HALL**

EXHIBIT "C"

47

## CALIFORNIA BOARD OF PRISON TERMS

### D E C I S I O N

**DEPUTY COMMISSIONER HARMON:**  We're on record.

**PRESIDING COMMISSIONER MOORE:**  All right. Thank you.  Let the record show that all interested parties have returned to the room. Wilbur McClore, CDC number C as in Charlie 50493.  This Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole at this time, and Mr. McClore would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time.  Paramount reasoning would be the timing and the gravity of the committing offense.  The offense was carried out in a cruel and vicious manner. Mr. McClore, this would be another one-year denial, sir.  This was the kidnapping of Kristy Anne Broacher, wherein the prisoner and his crime partner did kidnap the victim.  She had come into a Wendy's restaurant.  The prisoner's crime partner seemed to be the main instigator of this particular event.  Shoved

**WILBUR MCCLORE   C-50493 DECISION PAGE 1    10/23/03**

48

1    her back -- the victim back into the car.

2    They ended up taking her to a mall, making her

3    buy clothing.  She was (indiscernible) times

4    when the (indiscernible).  She was then taken

5    and dropped off afterwards, as other items

6    were stolen from her; as well as her vehicle.

7    This was -- This (indiscernible) took on a

8    period of -- an extended period of time of a

9    couple of hours.  She was threatened and

10   terrorized and by the prisoner's crime

11   partner.  These conclusions are drawn from the

12   Statement of Facts, wherein the prisoner and

13   his crime partner kidnapped and robbed the

14   victim in this particular incident, Kristy

15   Broacher.  Psychosocial report -- The prisoner

16   has an escalating pattern of criminal conduct,

17   a history of unstable tumultuous relationships

18   with others; dropping out of school, not

19   completing school.  He failed to -- previous

20   grants of probation and parole and cannot be

21   counted upon to avoid such criminality.  He's

22   failed to profit from society's previous

23   attempts to correct his criminality.  Such

24   attempts included adult probation, a parole,

25   county jail time, prior prison term.  The

26   prisoner has (indiscernible) history or prior

27   **WILBUR MCCLORE   C-50493 DECISION PAGE 2   10/23/03**

49

1   criminality, which includes petty theft,
2   burglary, assault with a deadly weapon, which
3   was the prisoner's second commitment offense,
4   which was a -- And that was also a parole
5   violation.  Institutional behavior -- The
6   prisoner has not participated sufficiently --
7   participated in beneficial self-help therapy
8   programming at this time.  During the course
9   of his incarceration, he has only gotten four
10  115's on this term.  Psychosocial report was
11  adequate.  Parole plans was some questions in
12  terms of verification on the residential plan,
13  although there was an offer made, there's no
14  verification, no address, and so forth.  Also
15  there's some question (indiscernible) although
16  the offer was made.  There are some acceptable
17  offers in terms of employment as well.  3042
18  notices -- The Hearing Panel notes responses
19  to 3042 notices indicate opposition to a
20  finding of parole suitability.  Specifically,
21  the District Attorney's Office of Los Angeles
22  County in opposition to a finding of
23  suitability, present today.  The prisoner's
24  counselor, F.I. -- CCI F.I. Deguzman wrote the
25  prisoner would pose a low degree, which is
26  positive.  Remarks -- The Panel makes the
27  **WILBUR MCCLORE   C-50493 DECISION PAGE 3   10/23/03**

50

1  following findings:  The prisoner still needs

2  to continue to maintain the gains that he's

3  made over an extended period of time.  He

4  should be commended.  He's done some positive

5  things.  He's on a positive track.  He needs

6  to continue in the direction.  He's in the

7  Impact Program, Anger Management.  Had several

8  vocations or (indiscernible) mill and cabinet.

9  Accomplished a GED.  However, these positive

10  aspects of his behavior don't outweigh the

11  factors of unsuitability at this time.  And as

12  I said, it's another one-year denial,

13  Mr. McClore.  Continue to remain disciplinary

14  free, per your recommendation, and to continue

15  to participate in self-help therapy

16  programming to better understand the causative

17  factors in terms of whatever may be available

18  to you.  As well, the other issue is to -- the

19  concern, as I mentioned, for both of us in

20  regards to your parole plans; your residence,

21  your parole plans.  You need to clean that up,

22  clarify that for us.

23          INMATE MCCLORE:  I could have did it.  I

24  have it.  I just didn't bring it with me

25  because I didn't know this was going to be

26  brought up.  But if that's all you want, I

27  **WILBUR MCCLORE   C-50493 DECISION PAGE 4   10/23/03**

51

1    could have got the address.  I have no

2    problem.  I could have mailed it to you.  You

3    could call her, get the address.  If I could

4    have brought it, if I knew this was going to

5    be a big issue; the address.  But I think that

6    it's not because I get denied on the same

7    thing every time I come in here.  Every time.

8    I don't know what else to do.  No more to do.

9    I don't know.  Maybe if I kill myself, I get

10   to parole in a box.  If that's what you want,

11   I'll do it.  Because I don't know what you

12   want.  I don't understand no more.  I don't

13   understand.  What do you want me to do?  What

14   more?  I'm just asking.

15       ATTORNEY FOX:  Read the transcript.  Okay.

16       INMATE MCCLORE:  I read the transcripts

17   every year.  They say the same thing over and

18   over again.  That's all I'm saying.  I just

19   don't know what to do.

20       DEPUTY COMMISSIONER HARMON:  Mr. McClore,

21   I can tell you myself that you're on the right

22   track.

23       INMATE MCCLORE:  I heard that before from

24   you.

25       DEPUTY COMMISSIONER HARMON:  Well you need

26   -- You may hear it again.  You're on the right

27   WILBUR MCCLORE   C-50493 DECISION PAGE 5    10/23/03

52

1    track.   The crime you committed was a

2    horrible, horrible crime.

3         **INMATE MCCLORE:**   I agree.   I agree.

4         **DEPUTY COMMISSIONER HARMON:**   Your history

5    is horrible.   We have a responsibility to

6    public safety as our first priority.   And we

7    want to make sure that everything is in order

8    before we give you that date.   We don't see

9    that you're ready at this time.   You're not

10   the only person that's being denied.   But I

11   can tell you that not everybody throws a

12   little fit in the hearing room, like you just

13   did.

14        **INMATE MCCLORE:**   Because I don't know

15   what --

16        **DEPUTY COMMISSIONER HARMON:**   So that's not

17   real impressive.   It only supports my feeling

18   that you're not ready for parole.   So speaking

19   for myself, you're on the right track.   One of

20   the further things you need to do is you need

21   to get control of your emotions so that it

22   doesn't create a situation like that -- like

23   it just occurred.   Okay.   But I think you're

24   on the right track.   But you've still got work

25   to do.   It's a horrible crime.   It's that

26   simple.   It's real simple.   Okay.   But you are

27   **WILBUR MCCLORE   C-50493 DECISION PAGE 6   10/23/03**

53

1  a good candidate and you're getting better.

2  And you might have to put up with more

3  refusals.  And you're going to have to deal

4  with it.

5      INMATE MCCLORE:  Oh, I'm going to deal

6  with it.  I just -- I just don't understand

7  why the same thing (indiscernible).  Oh, I'm

8  going to deal with it.  I understand I have to

9  go through it.  But I don't know anything else

10  to do.  That's what I'm saying.  I understand

11  exactly what you're saying.

12      DEPUTY COMMISSIONER HARMON:  Okay.

13      INMATE MCCLORE:  Can I say this?

14      DEPUTY COMMISSIONER HARMON:  Check with

15  the Commissioner here.  I don't know if he was

16  done.

17      PRESIDING COMMISSIONER MOORE:  Oh, I

18  wasn't.  But I'm done now.  Are you finished?

19      DEPUTY COMMISSIONER HARMON:  I'm done.

20      PRESIDING COMMISSIONER MOORE:  This

21  concludes the hearing.  The time is 1500

22  hours.  Have a good day, sir.

23      INMATE MCCLORE:  Yes, Sir.

24                  --o0o--

25  PAROLE DENIED ONE YEAR

26  FINAL DATE OF DECISION_____JAN 21 2004____

27  WILBUR MCCLORE  C-50493 DECISION PAGE 7  10/23/03

39

1       CALIFORNIA BAORD OF PRISON TERMS

2              D E C I S I O N

3       PRESIDING COMMISSIONER FISHER: All right. I

4   note for the record that everyone that was previously

5   in the room and identified themselves have returned to

6   the room. Mr. McClore, I'm going to cut to the chase

7   here. This is another one-year denial and I'm going to

8   be real specific with you as to why. The Panel

9   reviewed all the information received from the public

10  and relied on the following circumstances in

11  concluding the Mr. McClore is not yet suitable for

12  parole and would pose an unreasonable risk of danger

13  to society or a threat to public safety if released

14  from prison. This case was the kidnapping of Miss

15  Krista Boucher who was forced into her car and forced

16  to turn over money and to, in fact, actually shop for

17  her two kidnappers. Mr. McClore, we went back through

18  the transcripts of your prior hearings and there are

19  two major things that really came out at us. The first

20  one is the fact that you just seem kind of flipped

21  about talking about your offenses, you know, and it

22  may just be because you've talked about them a lot,

23  it's hard to say. But it doesn't feel to us that you

24  have a lot of insight as to why you were doing the

25  things you were doing or into how your crimes affected

26  other people. The other thing that really troubled

27  **WILBUR MCCLORE    C-50493    DECISION PAGE 1    9-12-05**

40

1   both of us was the fact that in the '96, '98, '99, '02

2   and 2003 hearings, at the end of the hearings, all of

3   the Commissioners made comments about your reaction.

4   And that concerns us. Don't do it again, because if

5   you do it again, because if you do it here, I

6   guarantee you the next person reading the transcript

7   of this hearing is going to bring it up again. It

8   gives us pause. It gives us pause that in '96 you

9   walked out. In '98, the Commissioner referred to

10  having temper tantrums; in '99 you argued with the

11  Commissioner; in  2002 you argued with the

12  Commissioner; in 2003, Commissioner Harmon referred to

13  you throwing a fit. Now, you're chuckling, but here's

14  the thing, we don't see that kind of behavior and give

15  you a 115, but I have to tell you that, to any Panel,

16  is going to be a red flag. I'm going to suggest this

17  to you, I want you to, over the course of next year,

18  and we are working very hard to clear up the back log,

19  we haven't even come up with a way to do it, so

20  hopefully you'll be back here in year, I want you to

21  go through the transcripts of not just your commitment

22  offense, but the transcripts that we have in here, the

23  information about the assault with deadly weapon, I

24  want you to go through those, I want you to really go

25  through your Central File and come back in prepared to

26  talk about, other than, you fell in with bad company,

27  **WILBUR MCCLORE    C-50493    DECISION PAGE 2    9-12-05**

41

1    or you went through a bad patch and talk about what

2    kind of insight you developed as to why you were

3    behaving the way you were behaving and what's

4    different about you now. And if you can't get into an

5    Anger Management Program in the institution, do

6    something on your own, okay. Because you coming in

7    here at the end of your hearings and throwing a temper

8    tantrum as was referred to by multiple Commissioners,

9    is not going to do you any good. It just makes you

10   look bad and for the most part, you've conducted

11   yourself really well in this hearing and you seem to

12   be conducting yourself well in the institution, but if

13   certain things set you off, we have to be worried

14   about that. So, I'm giving you the best advice I can

15   here. I -- you're doing a good program, you haven't

16   done as much work since your last hearing as you were

17   doing before, and I know that there's been a shortage

18   of programs. I really want to encourage you to do some

19   work on your own so that you can come back here loaded

20   with the self-help and just come back looking really

21   good instead of (Indiscernible). All of the

22   Commissioners agreed with the prior decisions, they

23   all do. So, when you do stuff like that, it raises

24   people's (Indiscernible). This was a crime where

25   nobody was dead, nobody got hurt, it was a bad crime

26   and you had prior prison terms, but you ought to be

27   **WILBUR MCCLORE    C-50493    DECISION PAGE 3    9-12-05**

42

1    able to get out of prison. You just need to do those

2    things and first of all, I hope that you're back here

3    on exactly the same date next year as you are today

4    and that you'll come back having considered seriously

5    what I just told you. And this completes the decision.

6    Do you have any comments?

7         DEPUTY COMMISSIONER MCBEAN: Yea. I couldn't

8    agree more and I think Commissioner Fisher really said

9    it well, and I hope that you heard her words. The only

10   thing that I wrote down, she was trying to question

11   you about your level of insight and why you committed

12   the crime, you said you didn't use drugs, I noticed

13   some reference in the past of experimentation with

14   marijuana, that is in the prior transcripts, we do

15   .count that, but what you said was, "I was just

16   stressing". That is all I heard from you in terms of

17   insight as to why you did this crime. You know,

18   hanging out with the wrong people and you were just

19   stressing, you weren't under the influence, you

20   weren't using drugs, and you stress in these hearings,

21   as has been pointed out. You had to be shot in '94 to

22   get you to stop fighting. So, all that kind of adds up

23   to, you need to be able to better understand what got

24   you there and be able to better discuss it here and to

25   be able to handle the decisions made about you when

26   you don't like them, which is what I think we're

27   WILBUR MCCLORE    C-50493    DECISION PAGE 4    9-12-05

43

1   seeing consistently over the years, at the Board. We

2   know you want to get out of prison, we understand

3   that, but you need to be able to handle the things

4   that don't go your way in life without stressing and

5   hurting somebody or hurting yourself in the process,

6   which is what you do when you come here and you don't

7   handle it well. So, she gave you excellent advice, I

8   couldn't agree more, you've done zero self-help since

9   your last hearing and that's not a good thing either.

10  You need to be doing something to get into anything

11  and everything that you can because, don't tread water

12  and think, okay, I've done enough and that's all I'm

13  going to do, that's not a good thing either. You need

14  to get out there and find something, get involved in

15  it and try to gain everything you can to gain as much

16  insight as you can. Because no one's ever done

17  growing, and that includes us. Okay. Well, good luck

18  to you sir.

19          **PRESIDING COMMISSIONER FISHER:** One more thing,

20  I just want to plant a seed here Mr. McClore and that

21  is that, when the Panel finds you suitable, you're

22  going to have to pass mustard at the Governor's desk

23  and he's going to be reading these decisions too. They

24  will pick apart everything, so you just want to be the

25  best package you can be, and because of these comments

26  that have been made in the past, you really want to do

27  **WILBUR MCCLORE    C-50493    DECISION PAGE 5    9-12-05**

44

1   whatever you can over the next 12 months to counter
2   act that. Because all you are when you hit his desk is
3   a file. He doesn't have an opportunity to sit across
4   the table and talk to you like the Commissioners do,
5   so -- and certainly that has nothing to do with
6   whether a Panel finds you suitable, but I think it's a
7   shame when a Panel does find an inmate suitable who
8   really has done a good job, if there's something that
9   they haven't been able to address on paper and the
10  Governor sends it back. So I just want you to be
11  thinking about that and doing what you need to do for
12  yourself and to dot all the I's and cross all the t's.
13  And I think your close. All right. Good luck sir.
14
15
16
17
18
19
20
21
22
23  PAROLE DENIED FOR 1 YEAR.
24  THIS DECISION WILL BE FINAL ON: ~~JAN 1 0 2006~~
25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,
26  THE DECISION IS MODIFIED
27  WILBUR MCCLORE    C-50493    DECISION PAGE 6    9-12-05

45

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, TIFFANY BILLINGSLY, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 44, and which

recording was duly recorded at VALLEY CORRECTIONAL

TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter

of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF

WILBUR McCLORE, CDC NO. C-50493, ON SEPTEMBER 12,

2005, and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated SEPTEMBER 19, 2005, at Sacramento,

California.

*Tiffany Billingsly*

TIFFANY BILLINGSLY
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

65

1       **CALIFORNIA BOARD OF PRISON TERMS**

2                   **D E C I S I O N**

3           **DEPUTY COMMISSIONER LUSHBOUGH:**  We're on

4       record.

5           **PRESIDING COMMISSIONER BORDONARO:**  We're

6       back on the record in the case of Mr. McClore.  All

7       those that were previously in the room have

8       returned.  The Panel has received -- Excuse me,

9       reviewed all of the information received from the

10      public and relied on the following circumstances in

11      concluding that the prisoner is not yet suitable

12      for parole and would pose an unreasonable risk of

13      danger to society or a threat to public safety if

14      released from prison.  The commitment offense was

15      carried out in a cruel manner.  It was carried out

16      in a manner which demonstrates a callous disregard

17      for human suffering.  These conclusions were drawn

18      from the Statement of Facts wherein the prisoner

19      and his crime partner did kidnap for robbery a

20      Kristi Boucher.  Apparently she had come into a

21      Wendy's restaurant.  The crime partner seemed to be

22      the main instigator of this event.  Shoved her back

23      in the car, they ended up taking her to a mall,

24      making her buy clothing, shoes and other clothes

25      for them.  And then she was taken and dropped off

26      after other items were stolen from her, including

27      **WILBUR MCCLORE   C-50493   DECISION PAGE 1   07/18/02**

66

1   her car.  This was over a period of, according to

2   the appellate decision, a couple of hours they had

3   her kidnapped.  The crime partner apparently did

4   threaten her, terrorized her, and she was

5   traumatized from the event.  His previous record,

6   he did fail previous grants of probation and

7   parole.  He had failed to profit from society's

8   previous attempts to correct his criminality.

9   Those attempts did include a prior prison term,

10  probation and some county jail time.  He had an

11  unstable social history and prior criminality,

12  which includes not completing school, he had a

13  petty theft, a burglary, and then there's his ADW,

14  which is the second commitment offense.  There was

15  a probation revocation.  Shows an escalating

16  pattern of criminal conduct.  He went from petty

17  theft to a burglary to an ADW, to this kidnapping.

18  He was also unemployed at the time of the offense,

19  and had been for some period of time.  Excuse me.

20  Institutionally, he's not yet sufficiently

21  participated in beneficial self-help and therapy

22  programming.  He's had six 115s since he's been

23  incarcerated, the last one of those in 1997 for

24  failure to participate.  He's had no 128s this

25  term.  Psychological report is generally favorable,

26  it's by a M. Carswell.  States that he is no more

27  **WILBUR MCCLORE   C-50493   DECISION PAGE 2    07/18/02**

67

1   dangerous than -- "No more threat of violence or

2   dangerous than any other citizen in the community."

3   I find that -- It's actually signed by Steven

4   Terrini for Martha Carswell.  I find that strange,

5   given the fact that she also gives him, Axis II --

6   Diagnostic Impression Of An Adult Antisocial

7   Behavior Improved, which means every other citizen

8   in the community must have that diagnosis, or

9   something's just not right.  It's a little

10  contradictory.  We'll ask for a new psych report to

11  be done just to clear up that.  It may be a minor

12  issue, however it does cast some shadow on this

13  psychological report.  And we'll ask for another

14  psych report to be performed.  His parole plans, he

15  has letters of support on file from Los Angeles

16  County, friends that could give him a place to live

17  and a place to work.  He wants to eventually go

18  back to Tennessee where his family lives, most of

19  his family.  The Hearing Panel notes that 3042

20  notices were sent out.  There was a response by the

21  District Attorney of Los Angeles County who sent a

22  representative here today who did oppose parole.

23  We'll note that the Correctional Counselor believes

24  that this inmate would pose a low degree of threat.

25  The Panel makes the following findings.  That the

26  prisoner does need continued self-help programming

27  **WILBUR MCCLORE   C-50493   DECISION PAGE 3   07/18/02**

68

1   in order to face, discuss, understand and cope with

2   stress in a non-destructive manner.  And until

3   progress is made, he continues to be unpredictable

4   and a threat to others.  He should be commended for

5   not having any 115s since 1994, for his average to

6   above average work reports, he has a laudatory

7   chrono concerning his conduct in his Wing.  He's

8   been participating in Impact, self-study program

9   also, in Anger Management.  He completed two

10  vocations in the past, Graphic Arts and Mill and

11  Cabinet, and he's also completed a GED.  However,

12  these positive aspects of his behavior do not yet

13  outweigh the factors of unsuitability.  This is a

14  one-year denial.  We recommend that the prisoner

15  remain disciplinary free, that if it's available to

16  him, he continue to participate in self-help and

17  therapy programming as it's available to him.  Also

18  to cooperate with clinicians in the completion of a

19  new clinical evaluation prior to his next Board

20  appearance.  That concludes the reading of the

21  decision.

22          INMATE MCCLORE:  Can I say something?

23          PRESIDING COMMISSIONER BORDONARO:  Hold on a

24  second.  Commissioner Lushbough, any comments?

25          DEPUTY COMMISSIONER LUSHBOUGH:  No, I have

26  no comments.  Thank you.

27  WILBUR MCCLORE  C-50493  DECISION PAGE 4  07/18/02

69

1          **PRESIDING COMMISSIONER BORDONARO:**   Do you

2    have a comment, Mr. McClore?

3          **INMATE MCCLORE:**   Yes.   I'd like to ask a

4    question, because I didn't know, I just got to find

5    this out.   If I'm constantly going to be denied for

6    my history, and I'm going to constantly be denied

7    for the nature of the case, what good is it, me

8    still coming in here, even if I go back and do the

9    new psych report?   I don't understand.

10         **PRESIDING COMMISSIONER BORDONARO:**   Well, it

11   does you a lot of good, Mr. McClore.   Because if

12   you don't come in, it's going to be that much more

13   difficult to get yourself a parole date.

14         **INMATE MCCLORE:**   That's the same --

15         **PRESIDING COMMISSIONER BORDONARO:**   Hold on.

16         **INMATE MCCLORE:**   Okay.

17         **PRESIDING COMMISSIONER BORDONARO:**   Now you

18   asked me a question, --

19         **INMATE MCCLORE:**   Yeah.

20         **PRESIDING COMMISSIONER BORDONARO:**   -- let me

21   finish it.   All right.   You obviously are somewhat

22   frustrated, and I understand that.   We talked about

23   it for quite a while.   You've been in prison for a

24   long time, no one was physically hurt, injured,

25   there wasn't permanent physical damage to

26   Ms. Boucher, that's a good thing.   You've got a lot

27   **WILBUR MCCLORE   C-50493   DECISION PAGE 5   07/18/02**

70

1    of things that are going in your favor, so don't

2    take this as a negative.

3        INMATE MCCLORE:  I have to because I got

4    denied parole.  And I'd like to say this too.

5    There's no more self-help programs here, I done

6    took every last one of them.  The psych even said

7    that with the last one I took.  Why should any more

8    self-help that I got to take, or could take or find

9    anywhere in this institution, when they constantly

10   saying, there's no more.

11       PRESIDING COMMISSIONER BORDONARO:  Well, you

12   know what, the past --

13       INMATE MCCLORE:  I don't know what to do.

14       PRESIDING COMMISSIONER BORDONARO:  First of

15   all, the past doesn't bind the future.  What's

16   available today isn't necessarily what's going to

17   be available tomorrow.  There is a long list of

18   self-help groups that are here, new things come up.

19   There's other things that come available.  If you

20   want, there's a list of them that we reviewed

21   today, and I reviewed your list, there are some

22   self-help programs here a Soledad that you haven't

23   taken.  You need to investigate those.  Whoever is

24   telling you that, I don't think is telling you 100

25   percent of the truth.  What you need not to do is

26   to become discouraged and frustrated and give up,

27   **WILBUR MCCLORE  C-50493  DECISION PAGE 6   07/18/02**

71

1    because I think you're extremely close.  You've got

2    one Commissioner to vote for you last time, you

3    know.  We didn't see it that way today, but it

4    doesn't mean that the next time you come, it's not

5    going to be different.  I wouldn't, if I were you,

6    give up, become frustrated and do something that's

7    going to set you further back.  Because we both

8    believe that you're extremely close to a parole

9    date.  Any comments?

10         **DEPUTY COMMISSIONER LUSHBOUGH:**  No.  I agree

11   with you.  I concur 100 percent.

12         **PRESIDING COMMISSIONER BORDONARO:**  All

13   right.  I'm going to conclude the hearing at 4:05.

14   Good luck.

15

16                         --o0o--

17

18

19

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **EFFECTIVE DATE OF THIS DECISION** _____AUG 0 9 2002_____

27   **WILBUR MCCLORE   C-50493   DECISION PAGE 7    07/18/02**

72

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, DEBRA S. BRADFUTE, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 71, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of WILBUR MCCLORE, CDC No. C-50493, on JULY 18, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 05, 2002, at Sacramento County, California.

_Debra S. Bradfute_
Debra S. Bradfute
Transcriber
**CAPITOL ELECTRONIC REPORTING**

55

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3        **PRESIDING COMMISSIONER LAWIN:**  We're back on

4    record and all parties have returned to the room

5    in the hearing for Mr. McClore.  The Panel

6    reviewed all information received from the public

7    and relied on the following circumstances in

8    concluding that the prisoner is not yet suitable

9    for parole and would pose an unreasonable risk of

10   danger to society or a threat to public safety if

11   released from prison.  This is a majority decision

12   and a one-year denial.  The commitment offense was

13   the kidnap of Christie Boucher.  She was taken

14   from a restaurant and in her car -- in her own

15   car.  She was driven to a location where she was

16   forced to purchase clothing, shoes for the inmate

17   and his crime partner.  Objects of hers were taken

18   while she was in the car and the inmate and his

19   crime partner were in the car with her.  They then

20   dropped her off on a freeway.  This offense was

21   carried out in a cruel manner.  The victim was of

22   course terrorized in that she was kidnapped from

23   an area where she probably thought she was quite

24   secure, which was a Wendy's Restaurant.  And this

25   offense was carried out in a manner which

26   demonstrates a disregard for human suffering in

27   **WILBUR MC CLORE   C-50493   DECISION PAGE 1   6/07/01**

56

1   that she was held to give up her belongings and to

2   use her credit card to pay for items for the

3   inmate and his crime partner.  The prisoner had an

4   escalating pattern of criminal conduct.  He had

5   failed to profit from society's previous attempts

6   to correct his criminality.  Such attempts

7   included adult probation, parole, county jail, and

8   a prior prison term.  He had previous criminality

9   of -- consisting of arrests for petty theft and

10  theft by credit card, went on to burglary for

11  which he received a two-year state prison term.

12  He then had an arrest initially for pimping, which

13  was dismissed, then assault with a deadly weapon,

14  great bodily injury with force, and he -- his

15  parole was revoked at some point, he was put back

16  into CDC, and ultimately the commission of the

17  instant offense.  And the prisoner has not

18  sufficiently participated in beneficial self-help

19  programs.  In terms of parole plans, he does not

20  acceptable employment plans.  However, this Panel

21  is fully aware of the fact that he has, since

22  coming into CDC, suffered a disability which will

23  hinder his ability to gain employment in certain

24  areas, and he has certainly been looking to see

25  what's out there in terms of resources to assist

26  him in finding employment that he will be able to

27  **WILBUR MC CLORE   C-50493   DECISION PAGE 2   6/07/01**

57

1    participate in.  And the Hearing Panel notes that

2    the District Attorney's office of Los Angeles

3    County responded to P.C. 3042 notices and opposed

4    parole.  The Panel finds that the prisoner needs

5    continued therapy in order to face, discuss,

6    understand, and cope with stress in a

7    nondestructive manner, and until further progress

8    is made, continues to be unpredictable and a

9    threat to others.  Nevertheless, he has much to be

10   commended for.  The fact that he did acquire his

11   GED in 1990.  He has certification in graphic arts

12   and mill and cabinet.  He has participated for at

13   least four years in a 12 step program,

14   participated in the children's holiday festival,

15   donated his time, and previously had participated

16   in the Science of Mind course, Bible

17   correspondence courses, individual therapy, the

18   Muslim-sponsored courses, served as a literacy

19   tutor, and participated in the ROCK program.  He

20   also has had good work reports, has a couple of

21   laudatory chronos for his work, and currently is

22   serving as a photographer in the visiting room.

23   The one area that is unfortunate is the fact that

24   in 1997 he did receive a 115 for failure to

25   participate and that is one of six total 115s

26   throughout his incarceration.  These positive

27   **WILBUR MC CLORE   C-50493   DECISION PAGE 3   6/07/01**

58

1   aspects of his behavior do not yet outweigh the

2   factors of unsuitability.  During the course of

3   the next year, the Panel recommends that you

4   remain disciplinary-free.  Don't even add a 128.

5   I mean, you don't have any 128s now, but you

6   really did yourself a disservice by getting in

7   that situation in '97 to acquire a 115 and I hope

8   that when you come back here next year there will

9   be nothing new added to the list.  And if

10  available, participate in whatever self-help

11  becomes available to you.  Commissioner Welch,

12  would you like to make comments?

13         COMMISSIONER WELCH:  Yes.  I dissented for a

14  parole date because I think that you're reaching a

15  point where you seem significantly remorseful for

16  what happened, and I think that you have a lot of

17  family support out there, people that's willing to

18  support you once you get out.  I feel that what

19  you have to do now is not get discouraged, but you

20  have to persevere and continue to firm up the

21  areas that you're weak in.  And one more vote and

22  you get a parole date.  So, you have to convince

23  one more Commissioner.  So, I encourage you to go

24  back and continue to do a good program.  And as

25  Commissioner Lawin said, the disciplinary progress

26  can be very devastating to you should you receive

27  **WILBUR MC CLORE   C-50493   DECISION PAGE 4   6/07/01**

59

1    even a 128.  Thank you.

2        **PRESIDING COMMISSIONER LAWIN:**  Commissioner

3    Harmon?

4        **DEPUTY COMMISSIONER HARMON:**  Yeah, a couple

5    of things, Mr. McClore.  First of all, I share

6    some of the same concerns that were mentioned by

7    the District Attorney.  And if you could, I would

8    like to see you get involved more in the area of

9    Anger Management.  I share some of those same

10   concerns.  And I was going to ask you also, did

11   you write this brief?

12       **INMATE MC CLORE:**  Well, some of it, not all

13   of it

14       **DEPUTY COMMISSIONER HARMON:**  Okay.  Okay.

15   But anyway, I want to commend you for that because

16   it's well done.  I didn't asked you if you'd

17   proofread it because in here it says you've been

18   disciplinary-free since 1957 and I don't think --

19       **INMATE MC CLORE:**  '57?

20       **DEPUTY COMMISSIONER HARMON:**  Yeah, I don't

21   even think you're that old.  And, of course, at

22   the beginning here, the life crime, you weren't

23   convicted in April of '97, you know, you were

24   convicted in February of '87, so -- by a jury

25   trial.  And I -- You know, little things like

26   that.  But the fact that you took the time to put

27   **WILBUR MC CLORE  C-50493  DECISION PAGE 5  6/07/01**

60

1   that document together or whatever is good because

2   it really helps point out a lot of your

3   accomplishments.  Other than that, I would like to

4   see you get more involved in the area of self-help

5   in specifically Anger Management.  I really think

6   you're close to a date.  And if you can't find it

7   within the institution, I would encourage you to

8   get involved maybe with the library or any other

9   way of self-study.  Anyway, that's what I had to

10  say, and I encourage you to do it.  That's all I

11  have.

12       PRESIDING COMMISSIONER LAWIN:  And if you do

13  the self-study, bring next year your references,

14  what you did.  That will conclude this hearing at

15  11:30.

16       ATTORNEY CHAMPLIN:  Can I get the briefs

17  back or does the Board --

18       PRESIDING COMMISSIONER LAWIN:  Oh, I

19  submitted --

20       ATTORNEY CHAMPLIN:  Okay.

21       PRESIDING COMMISSIONER LAWIN:  I --

22       ATTORNEY CHAMPLIN:  Made it a part of the

23  packet?

24                    --o0o--

25  PAROLE DENIED ONE YEAR

26  EFFECTIVE DATE OF THIS DECISION_____JUL 0 2 2001_____

27  WILBUR MC CLORE  C-50493  DECISION PAGE 6  6/07/01

61

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 60, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of WILBUR MC CLORE, CDC No. C-50493, on JUNE 7, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated June 20, 2001, at Sacramento County, California.

_____
Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT "D"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JULY 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 7, 2003

This is the eighth psychological evaluation for the Board of Prison Terms on inmate Wilbur McClore, CDC# C-50493. This report is the product of a personal interview, lasting approximately one hour, conducted on 10/07/03, as well as a review of his Central file and unit health record. This single contact, psychodiagnostic interview was for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I.   IDENTIFYING INFORMATION:

Inmate McClore is a 47-year-old, single, African-American male. He professes a strong Christian background and belief system. He presented as well groomed, and his only obvious unusual physical characteristic was the fact that he was walking with a cane, and a slight limp. Inmate McClore indicated that, as he is from Memphis, Tennessee, he has the nickname of "Memphis" here at CTF.

### II.   DEVELOPMENTAL HISTORY:

Inmate McClore is the fifth of six children. He has four brothers, and one sister. The inmate indicated that his development was totally normal, and unremarkable. He denied any history of cruelty to animals, or a history of arson. He denied any significant childhood medical problems, reporting only normative childhood illnesses. He denied a history of physical or sexual abuse, as either a victim or a perpetrator.

### III.   EDUCATIONAL HISTORY:

Inmate McClore attended public school through the 11th grade, and earned his GED while at Folsom State Prison in 1990. Inmate McClore indicates that he has not been enrolled in the education program for a number of years, as his performance is far above the minimum required. His current TABE score was not available to this clinician, but his presentation indicates that his education level is above average for this population.

### IV.   FAMILY HISTORY:

Inmate McClore's parents are both deceased. He indicates that the majority of his siblings continue to reside in and around Memphis, Tennessee. He indicates that,

MCCLORE        C-50493        CTF-CENTRAL        ~10/07/03        gmj

MCCLORE, WILBUR
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

as his family are living outside of the State of California, he has not been able to enjoy family visits. He indicated, however, that his family remains close, and keep in touch through letter writing and telephone contact. Inmate McClore stated that no other member of his family has a criminal history. He characterized his family as a strict Baptist family.

V.     PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate McClore is a heterosexual male, and denies any high-risk sexual behavior. He indicated that his first experience of sexual intercourse was at the age of approximately 17 or 18 years. He reported no non-normative sexual behavior.

VI.    MARITAL HISTORY:

Inmate McClore has never been married, but he has two adult sons—Sky is 25 years of age, and D'metriss is 19 years of age. He indicated that, at present, he is not a grandparent. He stated that his relationship with his children is good, and he stays in touch with both of them by telephone.

VII.   MILITARY HISTORY:

This inmate denied any history of military service.

VIII.  EMPLOYMENT/INCOME HISTORY:

The record indicates that inmate McClore held numerous jobs prior to incarceration. He reported having worked as a warehouseman, and worked painting airplanes.

Since his incarceration, he indicated that he has completed a three-year course of print design through the print shop, and has received a certificate of completion. He also completed a two-year program in the mill and cabinet shop, for which he received a certificate of completion.

Currently, inmate McClore is employed as a porter, with the responsibilities of the visiting area's official photographer. His duties include photographing inmates and their families. The sergeant in charge of visiting wrote a laudatory chrono on 06/30/03, in which he stated, "Mr. McClore has been a very positive influence in the visiting room." He went on to state, "Mr. McClore is always respectful of other inmates and their families, and is very efficient in helping them with their needs in the visiting room. Mr. McClore's helpfulness is appreciated." Inmate McClore's Central file contains many laudatory chronos extolling his cooperative nature, his competency, and his excellent work ethics. He appears to be frequently commended by staff.

MCCLORE          C-50493          CTF-CENTRAL          10/07/03          gmj

MCCLORE, WILBUR
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

IX.    SUBSTANCE ABUSE HISTORY:

Inmate McClore denies any history of drug abuse. A thorough review of his Central file reveals no history of substance abuse. He indicated that he did consume alcohol in social situations, but never felt that he had an alcohol problem.

Inmate McClore indicated that he attended Alcoholics Anonymous and Narcotics Anonymous, primarily for social reasons, and to heighten his awareness of the issues related to alcoholism and drug addiction. There is no indication that any alcohol treatment has ever been required.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate McClore has no prior history of psychiatric illness, or of a psychiatric disorder. He is not being treated for psychiatric or stress-related issues currently.

Inmate McClore reports being hospitalized in 1994, after having been accidentally shot by custody staff. As a result of that injury, he has a significant limp, and walks with a cane. His medical file indicates multiple treatments, and the use of multiple medications in an attempt to assist him in dealing with both the pain and other related difficulties with this disability.

Inmate McClore indicates that, other than for treatment related to his leg injury, he is completely healthy, and denies any other medical issues.

XI.    PLANS IF GRANTED RELEASE:

Inmate McClore indicates that he has three job offers---one in the Los Angeles area, one in the San Jose area, and one in Tennessee. He indicated that, if the Board of Prison Terms sees fit to release him to Los Angeles, California, he has been offered a salesman's position with a beauty supply shop and salon owned by a personal friend. He indicated that the friend has also offered to provide him permanent residence. He indicated that the correctional counselor I has contacted the salon owner, and has confirmed her offer of employment. In the CC-I's report, entitled Life Prisoner Evaluation Report, Subsequent Parole Consideration Hearing, July 2003 Calendar, the CC-I verifies his future plans, and employment opportunities. If the parole board sees fit to release him to Santa Clara County, he indicated that he has been offered a janitorial services job, also with a personal friend who owns the service. Inmate McClore's long-term goal is to return to Tennessee, and work with his brother as a landscaper. He is aware that this option is less likely than the others, but indicates when he completes his parole period in whatever jurisdiction deemed appropriate by the board, his plan is to return to Tennessee, and to reunite with his siblings. His parole plans appear very reasonable to this clinician, and there is every expectation that he would complete his parole without incident.

MCCLORE        C-50493        CTF-CENTRAL        10/07/03        gmj

MCCLORE, WILBUR
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


# CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate McClore is 47-year-old, African-American male of medium build who appeared his stated age. He was alert, cooperative, and calm. His attire was extremely well maintained, as was his grooming. His speech, affect, and flow of thought were all within normal range. His intellectual functioning appeared well within the average range, if not slightly above. Due to the leg injury previously mentioned, he walks with a slight limp, and with a cane. In discussing his commitment offense, and his maturity over his years of incarceration, he was insightful, thoughtful, and clearly remorseful. His judgment is sound, and there is absolutely no evidence of a mood or thought disorder.

The record indicates that he has been given the Axis II diagnosis of adult antisocial behavior, improved. His presentation throughout the one hour, psychodiagnostic interview, and his reported behavior throughout his incarceration, provides no clinical indication of adult antisocial behavior. Since it has been reported by previous clinicians as being present, but improved, I am left with no other alternative, other than to report that he has adult antisocial behavior, by history. But I want to make it perfectly clear that I found no evidence of this diagnosis during this present evaluation.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     No Contributory Clinical Disorder.
AXIS II:    Adult Antisocial Behavior, by history only.
AXIS III:   No Contributory Physical Disorder.
AXIS IV:    Incarceration.
AXIS V:     Current GAF = 90.

Inmate McClore's parole prognosis is excellent. There is virtually no indicator suggesting otherwise. He has participated in virtually every activity of self-help offered in the institution over the years of his incarceration. He has made excellent use of his incarceration time, and has gained varied and valuable knowledge that he did not previously possess. In fact, to this clinician's knowledge, there are no additional self-help groups or services provided by the psychology department of the institution that has anything more to offer to this inmate. He has already used them wisely, and has made great strides in his personal development.

In a laudatory chrono dated 04/29/02, facility captain Guerra indicated that he had attended a 13-week, Impact Workshop. The chrono was lengthy, and ended with this statement, "Inmate McClore, is to be commended for his participation and willingness to gain insight and empathy for the victim of crime." To better

MCCLORE        C-50493        CTF-CENTRAL        10/07/03        gmj

MCCLORE, WILBUR
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

understand the significance of this chrono, the board would be encouraged to read it in its entirety.

In this same vein, on 11/21/01, correctional officer Bann wrote an informational laudatory chrono that was fairly lengthy. In excerpts from that chrono, he stated, "As a correctional officer of over 18 years' experience, it is my professional opinion that Mr. McClore demonstrates an extremely high degree of maturity, responsibility, and understanding in dealing with the stresses, tensions, and problems of this prison environment." He went on to state, "His personal interactions, and contact with both staff and inmates alike has always been void of any disrespectful or behavioral problems; always demonstrating an outward air of likeability for all those he comes in contact with, or has the slightest interaction with. It is my opinion that, once reintroduced back into society through parole, he will continue to demonstrate those qualities of maturity, responsibility, and empathy necessary to fulfill his role as a law-abiding and productive citizen." There is nothing in my contact with the inmate, or a review of his medical and Central file, that would disagree with officer Bann's assessment.

XIII.   REVIEW OF LIFE CRIME:

When queried about the commitment offense, inmate McClore is matter-of-fact, direct, and takes full responsibility for his behavior. He stated several times how remorseful he was for what he had done, and as in previous board reports, he was apologetic for the money that he has caused the State of California to waste on both his criminal trial and incarceration. At no time did he minimize his responsibility, or the impact of his behavior on the victim. He indicated that, had he been victimized in the same way, he would have been traumatized, and he realizes the trauma that he has caused the victim. He went on to state that neither he nor his crime partner had any desire to hurt the victim in any way, but he now realizes that the mere fact of the robbery and the kidnapping was sufficient to traumatize the victim, and for that he is extremely remorseful and apologetic.

XIV.   ASSESSMENT OF DANGEROUSNESS:

A.      Inmate McClore has received no CDC-115s or CDC-128s in almost seven years. His last CDC-115 was relatively minor, and involved talking too loud in an education class. As previously documented by Captain Guerra and Officer Bann, this inmate has demonstrated his ability to reduce his potential threat of violence in the institution. Given all of the above information, it is this clinician's opinion that this inmate poses a considerably lower degree of threat than the average Level II inmate.

B.      If released to the community, this inmate poses no more threat of violence or dangerousness than any other citizen in the community.

MCCLORE        C-50493        CTF-CENTRAL        10/07/03        gmj

MCCLORE, WILBUR
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

C.    In searching this inmate's Central file, and his previous report, there are no significant risk factors or precursors to violence that were located by this writer.

D.    Inmate McClore has availed himself of all of the self-help programs provided by CDC at this institution. At the present time, there are no additional self-help or psychological services that can be rendered to this inmate to increase his self-awareness; he has already reached maximum benefit.

XV.    <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

A.    Inmate McClore is competent and responsible for his behavior. He has demonstrated a clear ability to abide by institutional standards, and has done so through the majority of his incarceration.

B.    This inmate does not have a mental health disorder which would necessitate treatment, either during his incarceration period or following parole.

C.    Inmate McClore does not have an alcohol or drug problem that would necessitate treatment, either during his incarceration period or following parole.

D.    As this inmate has availed himself of all of the self-help and psychological assistance that can be offered by CDC, there are no additional services that can be provided to him. He appears to be an excellent candidate for parole.

S. SEXTON, Ph.D.
Consulting Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

for B. Zika

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

SS/gmj

D: 10/07/03
T: 10/09/03

MCCLORE          C-50493          CTF-CENTRAL          10/07/03          gmj

NAME AND NUMBER:  McClore (C-50493)                    CTF

## INFORMATIONAL CHRONO 128b

The Board of Prison Terms Psychological Evaluation Report completed for Inmate
McClore, by Dr. Sexton, in October, 2003 is still accurate and considered up-to-date.  We
do not see the need for any further updates to this report, as there has been no significant
change in Inmate McClore's mental health condition.  We have referred this to the BPH
Desk at the C&PR office for further clarification and assignment, as needed.

**B. Zika, Ph.D.**
**Senior Psychologist**

Date: 02/01/07

Orig:   C-file
Copy:  Inmate
          MH File                          B. Zika, Ph.D.
          Medical File                      Senior Psychologist
          Correctional Counselor            CTF - Soledad

BOARD OF PAROLE HEARINGS
LIFE PRISONER HEARING DECISION FACE SHEET                              STATE OF CALIFORNIA

☐ PAROLE GRANTED – (YES)
☐ CDC: Do not release prisoner before
   Governor's Review

☑ PAROLE DENIED – (NO)        *2yrs*

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON: _____

| Records Use Only |
|---|
| Parole Release Date |
| YR    MO    DAY |
| Attach Prison Calculation Sheet |

## PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommends:
☑ No more 115's or 128A's
☐ Work to reduce custody level
☑ Get self-help*

☐ Stay discipline free
☑ Learn a trade*
☑ Get therapy* *as available*

☑ Earn positive chronos
☐ Get a GED*

☑ Recommend transfer to _____
☑ Other *New psych eval per BPT 1000(a) pg 11.*
   *These programs are recommended if they are offered at your prison and you are eligible / able to participate.*

Penal Code 3042 Notices        ☒ Sent    Date:  11/21/06

Commitment Offense(s)

| PC 209 (B) CS/ 667.5 (B) | KIDNAP/ ROBB W/ PPT-NU (1) |
|---|---|
| Code(s) | Crime(s) |
| A811397 | 14 |
| Case(s) | Count(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 04/06/87 | | 04/04/93 |

☐ Initial Hearing        ☒ Subsequent (Hearing No,)  9      Date of Last Hearing
                                                             09/12/05

CDC Representative    D. S. LEVORSE, C&PR

Attorney for Prisoner    MARY ANN TARDIFF              Address

D.A. Representative    *[illegible] Gloria*            County    LOS ANGELES

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL.  It will not become final until it is reviewed.

Chair _____                    Date  1/ /

Panel Member  *JB [illegible]*                     Date  1/4/2007

Panel Member _____              Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| MC CLORE, WILBUR | C-50493 | CTF-SOLEDAD | JAN 2007 | 01/5/07 |

BPT 1001 (Rev. 08/03)

*By~~~~~~~*

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
SETTING A LIFE PRISONER TERM - PAROLE DENIED

11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

☑ 3. the panel's belief that the prisoner's current mental health is an
important issue. In the new full evaluation, the panel requests that the
clinician specifically address the following:

☑ a. the prisoner's violence potential in the free community;

☑ b. the significance of alcohol/drugs as it relates to the commitment
offense and an estimate of the prisoner's ability to refrain from
use/abuse of same when released;

☑ c. the prisoner's psycho-sexual problems;

☑ d. the extent to which the prisoner has explored the commitment
offense and come to terms with the underlying causes;

☑ e. the need for further therapy programs while incarcerated.

☑ f. other _I/m historically, incl C/o, has
issues w/women plus evidenced anger
during hearing, leading panel to conclude_

☐ 4. the panel's belief that the prisoner has deteriorated psychologically and
there appears to be a need for treatment. The panel bases this conclusion
upon

_he needs therapy to gain insight (as
different from rationality) into
criminality_

☐ B. (Other requests to CDC staff):

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JUNE 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 13, 1999

This is the fifth psychological evaluation for the Board of
Prison Terms on inmate Wilber Mc Clore. This report is the
product of a personal interview, conducted on 05/13/99, as
well as a review of his Central file and unit health record.
This single contact interview was for the express purpose of
preparing this report for the Board of Prison Terms.

I.    **IDENTIFYING INFORMATION:**

Inmate Mc Clore is a 42-year-old, single, black,
Christian male. He had no obvious unusual physical
characteristics. Since he is from Memphis, Tennessee,
he is often called "Memphis" here at CTF.

II.   **DEVELOPMENTAL HISTORY:**

Inmate Mc Clore was the fifth of six children. He
reported no prenatal or perinatal concerns or birth
defects. There were no abnormalities of developmental
milestones. He walked, talked and developed at an
unremarkable rate. He denied any history of cruelty to
animals or a history of arson. He stated that he had
no significant childhood medical history other than the
regular childhood diseases. He denied a history of
physical or sexual abuse as either a victim or a
perpetrator.

III.  **EDUCATIONAL HISTORY:**

Inmate Mc Clore finished the 11th grade in public
school and received his GED from Folsom in 1990. His
current T.A.B.E. score was unavailable. However, he
has performed acceptably in education to this point.

IV.   **FAMILY HISTORY:**

Inmate Mc Clore's mother is deceased. His father is
currently 74 years old and in fair health. His family
continues to reside in Tennessee, with one brother in
Texas, and since all of his family is out of state,

MC CLORE       C-50493       CTF-CENTRAL       05/25/99       gj

MC CLORE, WILBER
CDC NUMBER:  C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

does not get many visits except from a niece.  He does remain close to his family and they write and use the phone to stay in touch.

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

This inmate is heterosexual and denied any high-risk sexual behavior and denied any sexual behavior while incarcerated.

VI.   MARITAL HISTORY:

Inmate Mc Clore has never been married, but has a 21-year-old son from a previous, five year relationship. This son resides in Texas.  He also has a 14-year-old son from a previous, three year relationship.  This son resides in Palmdale.  He states that his relationship with his children is good and he stays in touch with both of them by phone.

VII.  MILITARY HISTORY:

This inmate denied any history of military service.

VIII  EMPLOYMENT AND INCOME HISTORY:

This inmate held numerous jobs before incarceration. He painted airplanes and worked as a warehouseman for a computer company in Northridge, California.  Since incarceration, he has completed a vocation in mill and cabinet.  He currently works as a clerk in the print shop, where he is also completing a vocation.  The chronos in his Central file are all excellent for hard work, cooperation and competency in his chosen dedications.

IX.   SUBSTANCE ABUSE HISTORY:

This inmate has always attended Alcoholics Anonymous and Narcotics Anonymous, but only for social reasons. A thorough review of his Central file reveals no history of any substance abuse or drug abuse problem whatsoever.  Currently, he is continuing to attend because the Board of Prison Terms requested he continue to do so, so he is following their direction.  However, he states he was not under the influence of anything at

MC CLORE, WILBER
CDC NUMBER:  C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

the time of his commitment offense and has no history of any substance abuse.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

This inmate has no prior medical or psychiatric diagnosis or serious illnesses.  His only prior hospitalization or serious accident would be in 1994; while an inmate at Corcoran State Prison, he was involved in an altercation with another inmate and was shot by custody staff.  Due to that injury, he still walks with a cane as a disability and takes medication for pain management.

XI.   PLANS IF GRANTED RELEASE:

This inmate states that should he be released, he will parole to Los Angeles County, which is his county of commitment.  He will seek employment in some type of a clerk or bookkeeping position.  He has a letter in his Central file from a friend who has offered him a place to live.  When queried concerning his ability to maintain a positive parole period, the inmate stated that by participating and following rules and regulations, he is fairly sure that he could complete parole without incident.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

A. This inmate is a 42-year-old, black male of medium build who appeared his stated age.  He was alert, cooperative and calm.  He was appropriately dressed and groomed.  His speech, affect and flow of thought were all within normal range.  His intellectual functioning was estimated to be within the average range.  Due to his leg injury, this man walks with a cane.  He demonstrated insight into his commitment offense.  His judgment appeared to be sound.  There was no evidence of a mood or thought disorder.

B. CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    No Contributory Clinical Disorder.
AXIS II:   Adult Antisocial Behavior, improved.
AXIS III:  No Contributory Physical Disorder.
AXIS V:    GAF = 84.

MC CLORE, WILBER
CDC NUMBER: C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

This inmate's prognosis for community living, should he be paroled, is excellent. He has involved himself with many activities in the previous years that would ensure knowledge he did not previously possess. He has now taken the time and put forth the effort to learn. For example, for the last two years, Officer Band has written him wonderful chronos about how much maturity he has gained while incarcerated. He also completed a Life Skills group with Dr. Bakeman in the past. He also not only started one-to-one counseling with Dr. Bakeman, he has now completed that. A chrono dated 12/08/98, stating that that requirement by the Board of Prison Terms has been completed, is in his Central file. This inmate believes that by following the rules he can complete parole, and then he would like to return to Tennessee, where he can be with his family.

His family owns businesses in the Memphis area, and he can work and become closer to his family again. The prognosis for a successful parole period is excellent.

XIII. REVIEW OF LIFE CRIME:

When asked questions about his version of the offense, this inmate stated he believes that not only is he responsible for this crime, but he is completely responsible due to the fact that he believes at this point he could have talked his crime partner out of committing this crime. He is also very remorseful about how it affected the victim. He is also very apologetic to the State of California for the amount of money it took to convict him of his crime. These three examples of insight and judgment show that this inmate has matured greatly in the 14 years he has been incarcerated, and that at this time he would be an excellent candidate for parole.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  Within a controlled setting, due to his record of no CDC-115 violations since his last Board of Prison Terms report, as well as his good record with CDC, this inmate poses a considerably lesser degree of threat of violence than the average Level II inmate.

MC CLORE, WILBER
CDC NUMBER:  C-50493
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


    B.   If released to the community, this inmate poses no
        more threat of violence or dangerousness than any
        other citizen in the community.

    C.   In searching this inmate's Central file and his
        previous reports, there are no significant risk
        factors or precursors to violence that were
        locatable by this writer.

XV.   <u>CLINICIAN OBSERVATIONS, COMMENTS AND RECOMMENDATIONS</u>:

    A.   This inmate is competent and responsible for his
        behavior.  He has the capacity to abide by
        institutional standards and has generally done so
        during his entire incarceration.

    B.   This inmate has no mental health disorder which
        would necessitate treatment either before or after
        parole.

    C.   This inmate does not appear to have and alcohol or
        drug problem that would necessitate treatment
        either before or after his incarceration.


*S.J. Terrini phD; for:*

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad




STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

MC/gj

d:  05/13/99
t:  05/26/99


MC CLORE     C-50493     CTF-CENTRAL     05/25/99     gj

# EXHIBIT "E"



# Cage Your Rage Program

This is to certify that

## MC CLORE, W. LYNN, C-50493

has successfully completed a
twelve-session course of Anger Management
in an "Inmate's Guide to Anger Control"

Presented this __5th__ day of October, 2006.

Chaplain Judge C. Lindsey
Correctional Training Facility - Central

STATE OF CALIFORNIA

**NAME and NUMBER**

Mc CLORE, W

C50493

B-217L

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

While assigned as a visiting room photographer under my supervision for the past year, Mr. McClore has been a very positive influence in the visiting room. Mr. McClore has shown a willingness to take on additional duties when asked of him and complete them in an expedient manner. Mr. McClore is always respectful of other inmates and ... is helping them with their needs in the visiting room. Recently he has been very ... size needed crayons, books, games and other

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION

ARNOLD SCHWARZENEGGER, GOVERNOR

## DIVISION OF ADULT PAROLE OPERATIONS

1515 S Street, Room, Room 212N Sacramento, CA 95814
P.O. Box 942883
Sacramento, CA 94283-0001



November 10, 2006

Wilbur L. McClore, C50493
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Dear Mr. McClore:

This is in response to your recent letter requesting information concerning programs that are available to you upon your release. To assist parolees with their rehabilitation, the Division of Adult Parole Operations (DAPO) has developed and implemented numerous community-based programs. These include employment assistance services, computerized learning centers, residential facilities that provide multiple services to homeless parolees, and substance abuse treatment programs.

Currently, DAPO administers three employment programs, which are located throughout the State. One of these provides employment assistance services through State Employment Development Department job specialists, who are located within selected parole offices. Another program, the Offender Employment Continuum (OEC) helps parolees become self-sustaining by providing them with referrals to educational programs, vocational training, and prospective employers. Additionally, the OEC works closely with the Prison Industry Authority (PIA) to assist parolees who have participated in PIA programs to find long-term gainful employment. The Parole Employment Program provides employment services such as workshops and job placement assistance to parolees through community providers.

In addition to the employment programs, there are the Computerized Literacy Learning Centers (CLLC) where a parolee can advance from early education through 12th grade and/or obtain a General Education Development Certificate. CLLCs are located within selected parole units throughout the State.

DAPO also provides multiple services to homeless parolees through its Residential Multi-Service Centers (RMSC) and Parolee Service Centers (PSC). RMSCs are located in Alameda, Fresno, Kern, Los Angeles, San Diego, San Francisco, San Joaquin, and Yolo counties. PSCs are located in Alameda, Fresno, Kern, Los Angeles, Monterey, Shasta, San Diego, San Francisco, and Tulare counties. These community-based programs provide lodging, meals, individual and group counseling, parenting skills training, money management, life skills training, substance abuse counseling, and medical referrals. Other services include job search, job retention training, and assistance in obtaining employment. In addition, PSC contractors provide participants with a batterer's program. During transition planning, RMSC contractor staff provides program participants with assistance in locating permanent housing in the community and aftercare services.

Wilbur L. McClore, C50493
Page 2

For parolees who have a history of substance abuse, the DAPO operates several substance abuse treatment programs. These are located throughout the State and include the Substance Abuse Treatment and Recovery Program and the Parolee Services Network.

Programs and services are free of charge to all parolees. However, to access them, parolees must coordinate their enrollment through their assigned parole agent. After you have been assigned a parole agent, I encourage you to contact him or her for assistance in locating specific resources that may be available to you in your community.

I am enclosing a copy of the Parolee Information Handbook. The handbook identifies, to a limited degree, local service agencies and qualifying factors. It also outlines typical benefits such as clothing, housing, financial assistance, and bonding for employment, which some parolees may or may not be eligible for.

When completing your pre-parole plans, Release Program Study (CDC 611), with your assigned correctional counselor, you should discuss any parole issues you may have. To further assist you, I also recommend that you request, through your correctional counselor, participation in the institution's Pre-release Program.

I hope you find this information helpful.

Sincerely,

G. S. ALDER
Program Development Unit
Division of Adult Parole Operations

Enclosure

STATE OF CALIFORNIA

Arnold Schwarzenegger, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF APPRENTICESHIP STANDARDS
320 West Fourth Street, Room 830
Los Angeles, CA 90013
Tel: (213) 576-7750
Fax: (213) 576-7758

www.dir.ca.gov

October 26, 2006

Mr. W. Lynn McClore C50493 B217
PO Box 689
Soledad, CA 93960

Dear Mr. McClore

This letter is being sent to you in response to your request for Apprenticeship information.
Enclosed you will find a list of Apprenticeship programs which are assigned to the
Division of Apprenticeship Standards, in Los Angeles.

Please use these lists to locate the program of your choice. Then contact the Joint
Apprenticeship Training Committee by telephone to determine:

1. The requirements for entry.
2. The length of the training.
3. The days and time that the committee accepts application.
4. The documents that the committee wants you to bring with you
   when applying.

The apprenticeship programs can run from 2 years to 5 years depending on the craft.
All apprenticeship programs consist of on-the-job training and supplemental/related
instructions. You will be paid a wage during the period you receive the on-the-job training.

Hopefully, this information will be helpful to you in finding an apprenticeship program that fits
your individual career interest.

Sincerely,

*Stephanie Foster*

Stephanie Foster
Senior Apprenticeship Consultant

Enclosures:

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF APPRENTICESHIP STANDARDS
320 West Fourth Street, Room 830
Los Angeles, CA 90013
Tel: (213) 576-7750
Fax: (213) 576-7758

Arnold Schwarzenegger, *Governor*
www.dir.ca.gov



Los Angeles District Office
Committee List
Revised October 12, 2006

## BARBER

**LOS ANGELES COUNTY BARBERS
AND COSMETOLOGIST JAC**
630 Shatto Place
Los Angeles, CA 90005
Phone: **213/487-7070 x7028**

## BRICKLAYER

**BRICKLAYERS & ALLIED CRAFTS JAC**
12921 Ramona Blvd. Suite G
Irwindale, CA 91706
Phone: **626/856-5750**

## BRICK TENDER

**SOUTHERN CALIFORNIA LABORER JAC**
22815 Frampton Ave.
Torrance, CA 90501-5034
Phone: **310/257-8004**

## CABINET MAKER

**LOS ANGELES COUNTY CABINET
AND STORE FIXTURE JAC**
10015 Rose Hills Road, Suite 100
Whittier, CA 90601
Phone: **562/699-0419**

## CARPENTER

**SOUTHERN CALIFORNIA
CARPENTRY JA&TC**
533 S. Fremont Avenue, Suite 401
Los Angeles, CA 90071-1706
Phone: **213/739-9343**

## CARPENTER

**GOLD COAST CARPENTERS**
412 Dawson Drive
Camarillo, CA 93012
Phone: **805/482-1905**

## CARPET INSTALLER

**SOUTHERN CALIFORNIA RESILIENT
FLOOR & DECORATIVE COVERING
CRAFTS JATC**
14906 Spring Avenue
Santa Fe Springs, CA 90670
Phone: **562/623-9244**

## CEMENT MASON

**SOUTHERN CALIFORNIA
CEMENT MASONS JAC**
1333 South Mayflower Ave., Ste. 350
Monrovia, CA 91016
Phone: **626/256-7674**

## CONSTRUCTION CRAFT LABORERS

**LABORERS SOUTHERN CALIFORNIA JAC**

1385 West Sierra Madre
Azusa, CA 91702
Phone: **626/610-1700**

## COSMETOLOGIST

COSMETICA
COSMETOLOGY AND BARBERING UAC
9050 Telegraph Road. Ste.201
Downey, CA  90240
Phone: **562/862-1090**

## COSMETOLOGIST

COSMETOLOGY UAC
1891 N. Gaffey, Suite P
San Pedro, CA 90731
Phone: **310/547-3711**

## DRYWALL FINISHER

LOS ANGELES DRYWALL FINISHER JAC
2077 Yates Avenue
City of Commerce, CA 90040

Phone: **323/727-2811**

## ELECTRICIAN

MOTION PICTURE ELECTRICIAN JAC
15503 Ventura Boulevard
Encino, CA  91436
Phone: **818/995-0900 and 818/769-0007**

## ELECTRICIAN

VENTURA COUNTY ELECTRICAL JATC
201 Bernoulli Circle-Unit "A"
Oxnard, CA 93030
Phone: **805/604-1155**

## ELECTRICIAN

IBEW  LOCAL UNION NO. 40
LOS ANGELES COUNTY
CHAPTER NECA JAC
5643 Vineland Avenue
North Hollywood, CA  91601
Phone: **818/762-4239**

## ELECTRICIAN

LOS ANGELES COUNTY ELECTRICAL
JA&TC
6023 S. Garfield Avenue
City of Commerce, CA  90040
Phone: **323-221-5881**

## ELECTRICIAN

LOS ANGELES/VENTURA CHAPTER
OF ASSOCIATED BUILDERS & CONTRACTORS
INC. EUAC
15854 Strathern St.
Van Nuys, CA  91406
Phone: **818/908-6450**

## ELECTRICIAN

SANTA BARBARA COUNTY ELECTRICAL
JATC
530 East Main Street
Santa Maria, CA 93454
Phone: **805/348-1200**

## ELECTRICIAN

SAN LUIS OBISPO ELECTRICAL
WORKERS JAC
6363 Edna Road
San Luis Obispo, CA  93401

## ELEVATOR CONSTRUCTORS
SOUTHERN CALIFORNIA ELEVATOR
CONSTRUCTORS
100 South Mentor Avenue
Pasadena, CA  91106
Phone: **626/449-1869**

(FIRE/LIFE/SAFETY)PROTECTIVE SIGNAL
INSTALLER

WESTERN BURGLER AND FIRE ALARM
ASSOCIATION ( WBFAA) UAC
3401 Pacific Avenue, Suite 1C
Marina Del Rey, CA  90292-7808
Phone: **800/809-0280**

FLOOR WORKERS

LOS ANGELES COUNTY FLOOR WORKERS
JATC
10015 Rose Hills Road
Whittier, CA 90601
Phone:  **562/695-0571**

HEAT & FROST INSULATORS
& ASBESTOS WORKERS

SOUTHERN CALIFORNIA HEAT & FROST
INSULATORS & ASBESTOS WORKERS
670 E. Foothill Blvd., #3
Azusa, CA  91702
Phone:  **626/334-6884**

INTERCOMMUNICATION
& SOUND ELECTRICIAN

LOS ANGELES COUNTY
INTERCOMMUNICATION & SOUND JAC
6023 S. Garfield Ave.
City of Commerce, CA  90040
Phone: **323/221-5881**

LANDSCAPE & IRRIGATION
FITTER

LANDSCAPE & IRRIGATION FITTER OF
SOUTHERN CALIFORNIA JATC
142 W. Pomona Avenue
Phone: **626/301-0531**

PAINTER

SOUTHERN CALIFORNIA PAINTERS
& DECORATORS JA&TC
2077 Yates Ave
City of Commerce CA  90040
Phone: **323/727-2811**

MACHINIST

SOUTHERN CALIFORNIA
TOOL & DIE, MOLD MACHINIST
& METAL WORKING
13230 E. Firestone, Suite A
Santa Fe Springs, CA  90670-7083
Phone: **562/404-4295 x10**

MILLWRIGHT

CALIFORNIA MILLWRIGHT
& MACHINERY
ERECTORS JATC
10015 Rose Hills Road
Whittier, CA 90601
Phone:  **562/695-0571**

OPERATING & MAINTENANCE
ENGINEER

OPERATING & MAINTENANCE
ENGINEERING APPRENTICESHIP
& TRAINING TRUST FOR
SOUTHERN CALIFORNIA
2501 W. Third Street
Los Angeles, CA 90057
Phone: **213/385-2889 x112**

OCCUPATIONS:
CONSTRUCTION INSPECTOR
DREDGE OPERATOR
EQUIPMENT OPERATOR
HEAVY DUTY MECHANIC
PLANT EQUIPMENT OPERATOR
AND ROCK, SAND AND GRAVEL

SOUTHERN CALIFORNIA
OPERATING ENGINEERS JAC
2190 S. Pellisier Place
Whittier CA  90601-1501
Phone: **562/696-0611**

## PILE DRIVER

**SOUTHERN CALIFORNIA PILE DRIVERS JATC**
728 N Lagoon Ave
Wilmington CA  90744-5499
Phone: **310/830-5300**

## PLASTERER

**SOUTHERN CALIFORNIA PLASTERING INSTITUTE AT&JAC**
1610 W. Holt Avenue
Pomona, CA  91768
Phone: **909/865-1773**

## PIPEFITTER

**SAN LUIS OBISPO COUNTY PLUMBING JAC**
3710 Broad St.
San Luis Obispo, CA 93401
Phone: **(805) 543-2416**

## PLUMBER

**GLENDALE, BURBANK, SAN FERNANDO VALLEY & ANTELOPE VALLEY PLUMBERS AND STEAMFITTERS JA&TC**

1305 N. Niagara Street
Burbank, CA  91505-1941
Phone: **818/848-1386**

## PLUMBER

**POMONA VALLEY PLUMBERS & STEAMFITTERS JAC**
4959 Palo Verde, Suite 200C
Montclair, CA 91763
Phone: **909/625-2493**

## PLUMBER

**LONG BEACH PLUMBERS JATC**
1246 Locust Avenue
Long Beach, CA 90313
Phone: **562/436-1082**

## PLUMBER

**VENTURA COUNTY PLUMBING & PIPEFITTING JAC**
1955 N. Ventura Avenue
Ventura, CA 93001
Phone: **805/643-6345**

## PLUMBER/PIPEFITTER

**SANTA BARBARA COUNTY PIPE TRADES JAC**
93 Thomas Road
Buellton, CA 93427
Phone: **805/688-1470 x7714**

## REFRIGERATION & AIR CONDITIONING FITTER

**LOS ANGELES & ORANGE COUNTIES AIR CONDITIONING & REFRIGERATION JJATC**
2220 S. Hill
Los Angeles, CA 90007-1441
Phone: **213/747-0291**

## ROOFER/WATERPROOFER

**SOUTHERN CALIFORNIA ROOFERS WATERPROOFERS JAC**
9901 Paramount Blvd., Suite 211
Downey, CA 90240
Phone: **562/927-2544**

## SHEET METAL WORKER

**SOUTHERN CALIFORNIA SHEET METAL JA&TC**
633 North Baldwin Park Blvd.
City of Industry, CA  91746
Phone: **626/968-3340**

**SHEET METAL WORKER**
**TRI-COUNTIES SHEET METAL& AIR**
**CONDITIONING JAC**

2500 Channel Drive
Ventura, CA 90303
Phone: **805/648-2220**


**SPRINKLER FITTER**

**SPRINKLER FITTERS UA LOCAL709 JAC**
12140 Rivera Road, Suite #B
Whittier, CA 90606-2602
Phone: **562/907-7622**

**STEAMFITTER & INDUSTRIAL**
**PIPEFITTER**

**LOS ANGELES AND VICINITY**
**STEAMFITTERS & INDUSTRIAL**
**PIPEFITTERS JATC**
18355 S. Figueroa Street
Gardena, CA 90248-4217
Phone: **310/323-4475**

**TILE FINISHER**
 **& MARBLE FINISHER**

**TILE SETTER**

**TILE & MARBLE FINISHERS JAEC**
**TILE LAYING INDUSTRY JAC**
**SAN DIEGO TILE INDUSTRY JAC**
9730 E. Garvey Avenue
S. El Monte, CA 91733
Phone: **626/329-0850**

**TRANSPORTATION SYSTEM**
**ELECTRICIAN**

**SOUTHERN CALIFORNIA**
**TRANSPORTATION**
**SYSTEMS ELECTRICAL JAC**

6023 S. Garfield Avenue
City of Commerce, CA 90040
Phone: **323/221-5881**

<u>LINE MECHANIC</u>

<u>CITY OF BURBANK ELECTRICIAN JAC</u>

164 W Magnolia Blvd.
Burbank CA 91502
Phone: 818/238-5050

<u>ELECTRIC LINE MECHANIC</u>
<u>STATION ELECTRICIAN OPERATOR</u>
<u>WATER SYSTEMS ANALYST</u>

CITY OF GLENDALE JAC
613 E Broadway, Room 100
Glendale, CA 91206
Phone: 818/548-2110

<u>POWER PLANT MECHANIC</u> Phone: 818/548-2089
<u>POWER PLANT OPERATOR</u>          818/548-2148

CITY OF GLENDALE WATER & POWER
634 Bekins Way
Glendale CA 91201-3013

<u>CABLE SPLICER 626/744-6986</u>
<u>LINEMAN 626/744-3705</u>

CITY OF PASADENA JAC
100 N Garfield Ave
PO Box 7115
Pasadena CA 91109

<u>ELECTRONIC MECHANIC</u>
<u>ELECTRONIC TECHNICIAN</u>
<u>ELECTRONIC REPAIRER</u>
<u>FIREBRICK REPAIRER</u>
<u>TRUCK MECHANIC</u>

OWENS ILLINOIS
2901 FRUITLAND AVE.
Los Angeles, CA    90058
Phone: (323) 582-1594

<u>TOOL & DIE MAKER</u>
<u>MAINTENANCE MECHANIC</u>
<u>MAINTENANCE ELECTRICIAN</u>

THE HON COMPANY
2323 E. FIRESTONE BLVD
South Gate, CA 90280
Phone: 213/586-3278

Wilbur McClure, C-50493
Correctional Training Facility
P.O. Box 689 / B-Wing, 217-Low
Soledad, CA. 93960-0689

March 2, 2008

STATE OF CALIFORNIA COURT OF APPEALS
SECOND APPELLATE DISTRICT
300 S.Spring St., Fl.2, N.Tower
Los Angeles, CA.
90013-1213

Re: PETITION FOR WRIT OF HABEAS CORPUS.

Dear Clerk of the Court,

    Enclosed please find a true copy of petitioner's PETITION FOR WRIT OF HABEAS CORPUS to be filed in your court. Due to the fact that I'm indigent I was unable to afford the additional copies normally required by the court for the filing of this petition. Petitioner requests the court note as well that the United States Supreme Court requires only one copy of PETITIONS filed in their court by inmates confined in an institution who are not represented by counsel. The high court recognizes the difficulties inmates have in producing copies. (See United States Supreme Court New Rules - Model 1995, 116 S.Ct. 22).

    As it is I managed to copy enough copies of this PETITION FOR WRIT OF HABEAS CORPUS to serve the APPELLATE COURT and the ATTORNEY GENERAL, all with great difficulty, most of which was the availability of copy service, the breakdown of the aforementioned equipment and the fact that I'm currently housed at Correctional Training Facility that suffers numerous lockdowns and various other excuses why the library is closed. It's a major process and I consider myself fortunate to be able to get copied what I have under the trying and almost impossible circumstances.

    Due to the requirements I file my PETITION in a timely manner, I have no choice by to file this PETITION without the number of copies requested by court rules. If this is a problem, please file my PETITION FOR WRIT OF HABEAS CORPUS and let me know if I need to provide more copies and I will do my best to obtain them.

    Enclosed as well please find the cover/caption sheet of my copy of this PETITION FOR WRIT OF HABEAS CORPUS to be stamped "FILED" and returned to me in the S.A.S.E. I've provided.

    Thank you for your attention to these matters. Your help is greatly appreciated.

Sincerely,

_____

Wilbur McClure,
Petitioner in Pro Per

PROOF OF SERVICE
(C.C.P. §§1013(A), 2015.5)

STATE OF CALIFORNIA )
                    )
COUNTY OF MONTEREY )

    I, Wilbur McClure, am a resident of the state of California, County of Monterey. I am over 18 years of age and I am a party to the within action. My residence address is P.O. Box 689, Soledad, California, 93960-0689.

    On March 2, 2008, I served the foregoing PETITION FOR WRIT OF HABEAS CORPUS on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United State Mail at Soledad, California, addressed as follows:

STATE OF CALIFORNIA        STATE ATTORNEY GENERAL
COURT OF APPEALS          P.O. Box 944255
SECOND APPELLATE DISTRICT   Sacramento, CA.
300 S.Spring St., Fl.2, N.Tower 94244
Los Angeles, CA. 90013-1213

    There is regular delivery service by the U.S. Postal Service between the place of mailing and the places so addressed.

    I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Executed this 2nd day of March, 2008, at Soledad, California, 93960-0689.

_____
Wilbur McClure, C-50493
P.O. Box 689
B-Wing, 217-Low
Soledad, CA. 93960-0689

Cage Your Rage Program

This is to certify that

*MCCLORE, W. LYNN, C-50493*

has successfully completed a twelve-session course of Anger Management in an "Inmate's Guide to Anger Control"

Presented this 5th day of October, 2006.

Chaplain Judge C. Lindsey
Correctional Training Facility - Central

# Cage Your Rage Program

This is to certify that

**MC CLORE, W. LYNN, C-50493**

has successfully completed a
twelve-session course of Anger Management
in an "Inmate's Guide to Anger Control".

Presented this 5th day of October, 2006.

Chaplain Judge C. Lindsey
Correctional Training Facility - Central

# Cage Your Rage Program

This is to certify that

## MCCLORE, W. LYNN, C-50493

has successfully completed a

twelve-session course of Anger Management

in an "Inmate's Guide to Anger Control"

Presented this 5th day of October, 2006.

Chaplain Judge C. Lindsey

Correctional Training Facility - Central

NAME and NUMBER    Mc CLORE, W    C50493    B-217L

While assigned as a visiting room photographer under my supervision for the past year, Mr. McClore has been a very positive influence in the visiting room. Mr. McClore has shown a willingness to take on additional duties when asked of him and complete them in an expedient manner. Mr. McClore is always respectful of other inmates and their families and is very efficient in helping them with their needs in the visiting room. Recently he has been very helpful in starting a new visiting recycle program that aids in purchasing needed crayons, books, games and other child oriented activities. Mr. McClores helpfulness is appreciated.

ORIG    C-File
cc    Unit File
    CC-I
    Inmate
    Writer

**J. ADAM**
**VISITING SERGEANT**
**CTF-CENTRAL**

DATE    6/30/2003                                    CTF-C        LAUDITORY CHRONO

NAME and NUMBER        MCCLORE, W.    C50493    BW-217L        CDC-128-B (Rev. 4/74)

Inmate MCCLORE, W., C50493, BW-217L, has successfully completed the thirteen-week IMPACT workshop. The IMPACT Program is a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims. Throughout the thirteen weeks, the inmate participants were actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Elderly Abuse, Gang Violence, Sexual Assault, Theft and Property Crimes, Murder, and Victims' Rights. IMPACT is a voluntary self-help group and received support by presentations given by guest speakers from outside agencies such as the Monterey Rape Crisis Center, the Social Services Department, the Santa Cruz Barrios Unidos Center, and the Salinas Women's Crisis Center. In addition, survivors of various crimes, i.e., Domestic Violence, Gang Violence, and the family members of Murder victims appeared as guest speakers and made presentations on the crimes that affected their lives. Inmate MCCLORE, W. is to be commended for his participation and willingness to gain insight and empathy for the victims of crime.

Original: Central File
    CC: IMPACT File
        Writer
        Inmate

**I. Guerra, Facility Captain**
IMPACT Program Coordinator
Correctional Training Facility

DATE: 04-29-02            **LAUDATORY**                **GENERAL CHRONO**

NAME    McCLORE        NUMBER    C50493        CELL    BW-217L        CDC-128B

Inmate McCLORE C50493 has been assigned to B-Wing housing unit at CTF-Central since October 22, 1997. During this period of time, I have observed his behavior and interaction in a stressful living environment; his attitude and temperament in dealing with staff and inmates, and his hygienic habits. As a Correctional Officer of seventeen years, it is my professional opinion that inmate **McCLORE** demonstrates a high degree of maturity and responsibility in dealing with the stresses, tensions and problems of this prison environment. His personal contact with staff and inmates alike has always been void of any disrespectful or behavioral problems; always demonstrating an outward air of affability toward all those he interacts with. It is my opinion that once reintroduced back into society through parole he will continue to demonstrate those qualities of maturity and responsibility necessary to fulfill his role as a productive citizen.

Original:    C-File
    cc:    Education Dept.
        CC I
        Supervisors File
        Inmate

**S.M. BANN**
**Correctional Officer**
**Senior B-Wing Officer**

DATE: April 19, 2001            **INFORMATIONAL CHRONO**            **GENERAL CHRONO**

NAME and NUMBER    Mc CLORE, W    C50493    B-217L

While assigned as a visiting room photographer under my supervision for the past year, Mr. McClore has been a very positive influence in the visiting room. Mr. McClore has shown a willingness to take on additional duties when asked of him and complete them in an expedient manner. Mr. McClore is always respectful of other inmates and their families and is very efficient in helping them with their needs in the visiting room. Recently he has been very helpful in starting a new visiting recycle program that aids in purchasing needed crayons, books, games and other child oriented activities. Mr. McClores helpfulness is appreciated.

ORIG    :    C-File
cc           Unit File
             CC-I
             Inmate
             Writer

J. ADAM
VISITING SERGEANT
CTF-CENTRAL

DATE    6/30/2003                                    CTF-C        LAUDITORY CHRONO

---

NAME and NUMBER        MCCLORE, W.    C50493    BW-217L        CDC-128-B (Rev. 4/74)

Inmate **MCCLORE, W.**, C50493, BW-217L, has successfully completed the thirteen-week IMPACT workshop. The IMPACT Program is a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims. Throughout the thirteen weeks, the inmate participants were actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Elderly Abuse, Gang Violence, Sexual Assault, Theft and Property Crimes, Murder, and Victims' Rights. IMPACT is a voluntary self-help group and received support by presentations given by guest speakers from outside agencies such as the Monterey Rape Crisis Center, the Social Services Department, the Santa Cruz Barrios Unidos Center, and the Salinas Women's Crisis Center. In addition, survivors of various crimes, i.e., Domestic Violence, Gang Violence, and the family members of Murder victims appeared as guest speakers and made presentations on the crimes that affected their lives. Inmate **MCCLORE, W.** is to be commended for his participation and willingness to gain insight and empathy for the victims of crime.

Original: Central File
    CC: IMPACT File
         Writer
         Inmate

I. Guerra, Facility Captain
IMPACT Program Coordinator
Correctional Training Facility

DATE: 04-29-02            LAUDATORY                    GENERAL CHRONO

---

NAME    McCLORE        NUMBER    C50493        CELL    BW-217L        CDC-128B

Inmate **McCLORE** C50493 has been assigned to B-Wing housing unit at CTF-Central since October 22, 1997. During this period of time, I have observed his behavior and interaction in a stressful living environment; his attitude and temperament in dealing with staff and inmates, and his hygienic habits. As a Correctional Officer of seventeen years, it is my professional opinion that inmate **McCLORE** demonstrates a high degree of maturity and responsibility in dealing with the stresses, tensions and problems of this prison environment. His personal contact with staff and inmates alike has always been void of any disrespectful or behavioral problems; always demonstrating an outward air of affability toward all those he interacts with. It is my opinion that once reintroduced back into society through parole he will continue to demonstrate those qualities of maturity and responsibility necessary to fulfill his role as a productive citizen.

Original:        C-File
    cc:          Education Dept.
                 CC I
                 Supervisors File
                 Inmate

S.M. BANN
Correctional Officer
Senior B-Wing Officer

DATE: April 19, 2001        INFORMATIONAL CHRONO                GENERAL CHRONO

NAME and NUMBER    Mc CLORE, W        C50493        B-217L

While assigned as a visiting room photographer under my supervision for the past year, Mr. McClore has been a very positive influence in the visiting room. Mr. McClore has shown a willingness to take on additional duties when asked of him and complete them in an expedient manner. Mr. McClore is always respectful of other inmates and their families and is very efficient in helping them with their needs in the visiting room. Recently he has been very helpful in starting a new visiting recycle program that aids in purchasing needed crayons, books, games and other child oriented activities. Mr. McClores helpfulness is appreciated.

ORIG        C-File
cc          Unit File
            CC-I
            Inmate
            Writer

**J. ADAM**
**VISITING SERGEANT**
**CTF-CENTRAL**

DATE    6/30/2003                                    CTF-C        LAUDITORY CHRONO

---

NAME and NUMBER        **MCCLORE, W.    C50493    BW-217L**        CDC-128-B (Rev. 4/74)

Inmate **MCCLORE, W.**, C50493, BW-217L, has successfully completed the thirteen-week IMPACT workshop.  The IMPACT Program is a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims.  Throughout the thirteen weeks, the inmate participants were actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Elderly Abuse, Gang Violence, Sexual Assault, Theft and Property Crimes, Murder, and Victims' Rights.  IMPACT is a voluntary self-help group and received support by presentations given by guest speakers from outside agencies such as the Monterey Rape Crisis Center, the Social Services Department, the Santa Cruz Barrios Unidos Center, and the Salinas Women's Crisis Center.  In addition, survivors of various crimes, i.e., Domestic Violence, Gang Violence, and the family members of Murder victims appeared as guest speakers and made presentations on the crimes that affected their lives. Inmate **MCCLORE, W.** is to be commended for his participation and willingness to gain insight and empathy for the victims of crime.

Original: Central File
    CC: IMPACT File
        Writer
        Inmate

**I. Guerra, Facility Captain**
IMPACT Program Coordinator
Correctional Training Facility

DATE: 04-29-02                    **LAUDATORY**                    **GENERAL CHRONO**

---

NAME    McCLORE        NUMBER    C50493        CELL    BW-217L        CDC-128B

Inmate **McCLORE** C50493 has been assigned to B-Wing housing unit at CTF-Central since October 22, 1997.  During this period of time, I have observed his behavior and interaction in a stressful living environment; his attitude and temperament in dealing with staff and inmates, and his hygienic habits.  As a Correctional Officer of seventeen years, it is my professional opinion that inmate **McCLORE** demonstrates a high degree of maturity and responsibility in dealing with the stresses, tensions and problems of this prison environment.  His personal contact with staff and inmates alike has always been void of any disrespectful or behavioral problems; always demonstrating an outward air of affability toward all those he interacts with.  It is my opinion that once reintroduced back into society through parole he will continue to demonstrate those qualities of maturity and responsibility necessary to fulfill his role as a productive citizen.

Original:    C-File
    cc:      Education Dept.
             CC I
             Supervisors File
             Inmate

**S.M. BANN**
**Correctional Officer**
**Senior B-Wing Officer**

DATE: April 19, 2001        **INFORMATIONAL CHRONO**                **GENERAL CHRONO**

The purpose of this chrono is to elaborate on inmate Mcclore's, December, 2006 work supervisors report (101). I have been assigned Mcclore's work supervisor in the CTF Central Visiting Room since August, 2006. Mcclore's work supervisor report does not reflect the fact Mcclore's work reaches much further than his duty statement. The visiting room can be a stressful environment for both inmates and visitors. Mcclore, goes beyond his job requirements by assisting visitors with such tasks as greeting, seating, relaying messages to custody staff, answering questions about protocol, and assisting with general clean up, thus relieving some of the stress the visitors experience. I receive many complements from visitors about Mcclore's politeness, compassion, and professionalism. A personal observation I would like to relay is that Mcclore takes exceptional pride in his job as photographer. This can be a very stressful position for an inmate. Mcclore, deals directly with the public, taking photographs of visitors and inmates. These photographs are the only items allowed out of the visiting room. This makes these photographs valuable possessions that are taken extremely seriously. I have never received a complaint about his work, and this is an environment where custody staff receive daily complaints about things as trivial as table heights. I mention this because I feel it speaks volumes about Mcclore's ability to handle stressful environments. Mcclore, is always eager to take on extra responsibilities and is a "Team Player" when it comes to accomplishing the mission of the Visiting Room.

J. BORGES, C/O
CTF-CEN Visiting Room

DATE: 12/26/06     128(b) Laudatory Chrono     GENERAL CHRONO

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128 B'(5-05)

NAME and NUMBER     MC CLORE, W.     C50493     BW-217L

~~Inmate MC CLORE, C50493, has actively participated in the "Cage Your Rage" Anger Management program. This~~ twelve (12) session program addressed four (4) stages: "Anger, Past and Present", "Anger and Aggression", "What Causes Anger?", and "How to Mange Anger". This inmate has been equipped with the knowledge and tools to understand that, (a) Anger is an emotion, (b) Anger is controllable, and (c) to this powerful emotion, there is a choice whether or not to give in to it. Mr. MC CLORE should be commended for his participation in this program.

ORIG     :     CENTRAL FILE
cc     :     Protestant Chapel
         :     Inmate

Reverend Judge C. Lindsay
Protestant Chaplain
CTF-Soledad

DATE     10/5/2006     LAUDATORY     GENERAL CHRONO

The purpose of this chrono is to elaborate on inmate Mcclore's, December, 2006 work supervisors report (101). I have been assigned Mcclore's work supervisor in the CTF Central Visiting Room since August, 2006. Mcclore's work supervisor report does not reflect the fact Mcclore's work reaches much further than his duty statement. The visiting room can be a stressful environment for both inmates and visitors. Mcclore, goes beyond his job requirements by assisting visitors with such tasks as greeting, seating, relaying messages to custody staff, answering questions about protocol, and assisting with general clean up, thus relieving some of the stress the visitors experience. I receive many complements from visitors about Mcclore's politeness, compassion, and professionalism. A personal observation I would like to relay is that Mcclore takes exceptional pride in his job as photographer. This can be a very stressful position for an inmate. Mcclore, deals directly with the public, taking photographs of visitors and inmates. These photographs are the only items allowed out of the visiting room. This makes these photographs valuable possessions that are taken extremely seriously. I have never received a complaint about his work, and this is an environment where custody staff receive daily complaints about things as trivial as table heights. I mention this because I feel it speaks volumes about Mcclore's ability to handle stressful environments. Mcclore, is always eager to take on extra responsibilities and is a "Team Player" when it comes to accomplishing the mission of the Visiting Room.

J. BORGES, C/O
CTF-CEN Visiting Room

DATE: 12/26/06    128(b) Laudatory Chrono    GENERAL CHRONO

---

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
                                                                                CDC-128 B²(5-05)

NAME and NUMBER    MC CLORE, W.                C50493        BW-217L

Inmate MC CLORE, C50493, has actively participated in the "Cage Your Rage" Anger Management program. This twelve (12) session program addressed four (4) stages: "Anger, Past and Present", "Anger and Aggression", "What Causes Anger?", and "How to Mange Anger". This inmate has been equipped with the knowledge and tools to understand that, (a) Anger is an emotion, (b) Anger is controllable, and (c) to this powerful emotion, there is a choice whether or not to give in to it. Mr. MC CLORE should be commended for his participation in this program.

Reverend Judge C. Lindsay
Protestant Chaplain
CTF-Soledad

ORIG    :    CENTRAL FILE
cc      :    Protestant Chapel
        :    Inmate

DATE    10/5/2006                        *LAUDATORY*                        GENERAL CHRONO

The purpose of this chrono is to elaborate on inmate Mcclore's, December, 2006 work supervisors report (101). I have been
assigned Mcclore's work supervisor in the CTF Central Visiting Room since August, 2006. Mcclore's work supervisor report does not reflect the fact Mcclore's work reaches much further than his duty statement. The visiting room can be a stressful environment for both inmates and visitors. Mcclore, goes beyond his job requirements by assisting visitors with such tasks as greeting, seating, relaying messages to custody staff, answering questions about protocol, and assisting with general clean up, thus relieving some of the stress the visitors experience. I receive many complements from visitors about Mcclore's politeness, compassion, and professionalism. A personal observation I would like to relay is that Mcclore takes exceptional pride in his job as photographer. This can be a very stressful position for an inmate. Mcclore, deals directly with the public, taking photographs of visitors and inmates. These photographs are the only items allowed out of the visiting room. This makes these photographs valuable possessions that are taken extremely seriously. I have never received a complaint about his work, and this is an environment where custody staff receive daily complaints about things as trivial as table heights. I mention this because I feel it speaks volumes about Mcclore's ability to handle stressful environments. Mcclore, is always eager to take on extra responsibilities and is a "Team Player" when it comes to accomplishing the mission of the Visiting Room.


J. BORGES, C/O
CTF-CEN Visiting Room

DATE: 12/26/06     128(b) Laudatory Chrono     GENERAL CHRONO

---

STATE OF CALIFORNIA                                       DEPARTMENT OF CORRECTIONS AND REHABILITATION
                                                                                            CDC-128 B⁵(5-05)

NAME and NUMBER     MC CLORE, W.                    C50493          BW-217L

Inmate MC CLORE, C50493, has actively participated in the "Cage Your Rage" Anger Management program. This twelve (12) session program addressed four (4) stages: "Anger, Past and Present", "Anger and Aggression", "What Causes Anger?", and "How to Mange Anger". This inmate has been equipped with the knowledge and tools to understand that, (a) Anger is an emotion, (b) Anger is controllable, and (c) to this powerful emotion, there is a choice whether or not to give in to it. Mr. MC CLORE should be commended for his participation in this program.


Reverend Judge C. Lindsay
Protestant Chaplain
CTF-Soledad

ORIG    :  CENTRAL FILE
cc       :  Protestant Chapel
          :  Inmate

DATE   10/5/2006              LAUDATORY              GENERAL CHRONO

*LEGAL MAIL*

Legal Mail.

Floyd Vclasco D-59493
Correctional Training Facility
P.O. Box 689 (W-214)
Soledad, CA. 93960-0689

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave.
P.O. Box 36060
San Francisco, CA.
94102

INSPECTED BY

AUG 1 9 2008

U.S. MARSHALS SERVICE

$ 05.200

